## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

SHARON AUSTIN, ROBIN GOODMAN, MATTHEW
MARR, ANDREA QUEELEY, JEAN RAHIER, and
KATIE RAINWATER,

*Plaintiffs*,

v.

Case No.

BRIAN LAMB, ASHLEY BELL BARNETT, JOHN
BRINKMAN, TIMOTHY M. CERIO, MANNY DIAZ, JR.,
AUBREY EDGE, PATRICIA FROST, CARSON GOOD,
EDWARD HADDOCK, KEN JONES, ALAN LEVINE,
CHARLES H. LYDECKER, CRAIG MATEER, JOSE
OLIVA, AMANDA J. PHALIN, and ERIC SILAGY, in
their official capacities as members of the Florida Board of
Governors of the State University System; MORTEZA
HOSSEINI, DAVID L. BRANDON, JOHN BRINKMAN,
RICHARD P. COLE, CHRISTOPHER T. CORR, JAMES
W. HEAVENER, SARAH LYNNE, DANIEL T. O'KEEFE,
RAHUL PATEL, MARSHA D. POWERS, FRED S.
RIDLEY, PATRICK O. ZALUPSKI, and ANITA G.
ZUCKER, in their official capacities as members of the
University of Florida Board of Trustees; PETER COLLINS,
BOB SASSER, JOHN THIEL, VIVAN DE LAS
CUEVAS-DIAZ, JORGE GONZALEZ, JUSTIN ROTH,
KATHRYN BALLARD, BRIDGETT BIRMINGHAM,
JACKSON BOISVERT, JIM HENDERSON, DEBORAH
SARGEANT, DREW WEATHERFORD, and MAXIMO
ALVAREZ, in their official capacities as members of the
Florida State University Board of Trustees; and ROGELIO
TOVAR, CARLOS A. DUART, NOËL C. BARENGO,
FRANCESCA CASANOVA, DEAN C. COLSON, ALAN
GONZALEZ, GEORGE HEISEL, JESUS LEBEÑA,
ALEXANDER M. PERAZA, YAFFA POPACK, CHANEL
T. ROWE, MARC D. SARNOFF, and ALBERTO R.

TAÑO, in their official capacities as members of the Florida International University Board of Trustees.

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Plaintiffs are professors at public universities in the State of Florida whose curricula and expressive activity have been fundamentally restrained and chilled in violation of the First Amendment to the United States Constitution. Plaintiffs' harms stem from the latest legislative effort in a series of attempts by the State of Florida to levy an attack on disfavored speech, including anything which the State perceives to fall within the ambit of diversity, equity, and inclusion.

2.     In recent years, the Florida Legislature has enacted laws seeking to suppress disfavored speech.  One of these laws, 2022's House Bill 7, also known as the Stop W.O.K.E. Act, prohibited public university faculty from instructing on certain topics related to "race, color, national origin, or sex."[1]  The United States Court of Appeals for the Eleventh Circuit, in affirming an injunction of the Stop

---

[1] The Stop W.O.K.E. Act deemed the instruction of certain topics related to "race, color, national origin, or sex" in public schools and state universities to "constitute discrimination on the basis of race, color, national origin, or sex," unless such "instruction is given in an objective manner without endorsement of the concepts." Fla. Stat. § 1000.05 (4)(a)–(b) (2022).

W.O.K.E. Act's private-employer provision, concluded that the law unconstitutionally "penalize[d] certain viewpoints—the greatest First Amendment sin."[2]

3.    Continuing its effort to police the marketplace of ideas, the Florida Legislature again passed vague, viewpoint-discriminatory legislation that broadly restricts academic freedom and imposes the State's favored viewpoints on public higher education, punishing educators and students for expressing differing and disfavored viewpoints.[3]

4.    This legislation, passed in 2023 and collectively referred to here as Senate Bill 266 ("S.B. 266"), bans the funding of expression that "[a]dvocate[s] for diversity, equity, and inclusion, or promote[s] . . . political or social activism," Fla. Stat. § 1004.06(2), and restricts the viewpoints that can be taught in general education courses, Fla. Stat. § 1007.25(3).  Instead of defining the relevant terms, the Florida Legislature delegated that authority to the Board of Governors of the

---

[2] The Eleventh Circuit considered sections of the law that banned mandatory workplace trainings that promoted certain beliefs related to race, color, sex, or national origin.  *See Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277, 1281 (11th Cir. 2024) ("Banning speech on a wide variety of political topics is bad; banning speech on a wide variety of political viewpoints is worse.").

[3] *See* Fla. Stat. § 1004.06(2); *see also* Press Release, Gov. Ron DeSantis, *Governor Ron DeSantis Signs Legislation to Strengthen Florida's Position as National Leader in Higher Education*, FLGOV.COM (May 15, 2023), https://perma.cc/34K2-WXUM ("SB 266 takes several steps to prevent woke ideologies from continuing to coopt our state universities and state colleges.  The bill prohibits higher education institutions from spending public dollars on initiatives that promote dangerous political and social activism, such as DEI initiatives.").

State University System of Florida ("Board of Governors" or "BOG"), which in

2024 promulgated regulations implementing S.B. 266. *See* Florida BOG

Regulation 9.016 ("Regulation 9.016"); Florida BOG Regulation 8.005

("Regulation 8.005") (collectively, "the Regulations").

5.      Regulation 9.016 implements S.B. 266's ban on funding for programs

or campus activities that advocate for "diversity, equity, or inclusion," or that

engage in "political or social activism."  The regulation's definitions are

ambiguous, inconsistent, and far too broad to provide any real guidance other than

indicating the Legislature's and the BOG's intent to disfavor certain speech.

Regulation 8.005 enumerates the categories and courses that qualify for statewide

general education designation.  All students, regardless of their major, are required

to take a specified number of courses with the general education designation to

graduate.  In January 2024, the BOG amended Regulation 8.005 to remove

"Principles of Sociology" from the list of Social Sciences courses that would

satisfy the general education requirement at Florida public universities because of

viewpoints discussed in the course.

6.      Through the Regulations implementing S.B. 266, the BOG has

stripped hundreds of university courses of their general education status, including

courses that historically have been designated as general education.  Florida's

public universities also have denied scholarship and research funding to faculty

and students that had been approved in the past.

7.      Plaintiffs bring this lawsuit to challenge S.B. 266 and these regulations, which together have disrupted their careers and restricted the activities and education of faculty and students throughout the State University System.

8.      The University of Florida ("UF"), for example, denied a professor's request for funding to present her research at a conference that she had attended the year before without issue.  UF has also been unwilling to fund some doctoral students' attendance at conferences or to host guest speakers—requests that the university had previously approved—when the activities appear tied to disfavored speech.

9.      Like S.B. 266's funding ban, the bill's general education restrictions also seek to suppress viewpoints the State disfavors.  For example, under Section 1007.25(3), general education courses "may not distort significant historical events or include a curriculum that teaches identity politics," nor can they be "based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities."  Section 1007.25(3) does not, however, define "distort" or "identity politics."  Instead, professors are left to guess whether and how their courses could run afoul of Florida law.

10.     In an attempt to comply with these vague provisions, public universities have begun to implement S.B. 266's restrictions in classes that previously qualified as general education courses.  Florida State University ("FSU") denied general education status to fourteen out of seventeen English courses that applied for general education status, despite those courses having previously held such status.  Florida International University ("FIU") likewise removed several sociology and anthropology courses from the general education catalog.

11.     Removing these courses puts entire departments' financial viability at risk; imposes administrative and psychological burdens on professors, which detract from their other academic responsibilities; and robs students of the opportunity to take these courses while also progressing toward their degrees in other fields of study.  Students are less likely to take a course that does not count toward their major or general education requirements because they are concerned with (1) the cost of taking such a course, given that their tuition is based on how many credit hours they are enrolled in; and (2) whether taking that course would force them to extend their time at university in order to meet all of their graduation requirements.  This is particularly true for students in science, technology, engineering, or mathematics ("STEM") degree programs, whose schedules are often less flexible because they are required to take specific classes

each semester.  Although courses that are no longer listed as general education courses may still be taught as electives in some cases, professors have been forced to alter their course titles and course descriptions in an attempt to conform with the recent legislation, a task that they have taken on without clarity on how to comply with the law.

12.    The impacts of these regulations are not limited to the classroom. Funding restrictions under Section 1004.06 have stripped certain student organizations of their ability to provide meaningful services to their members. UF, for example, closed the Center for Inclusion and Multicultural Engagement ("CIME"), which provided invaluable resources to students and student organizations through their Office of Hispanic Latinx Student Engagement, Office of Black Student Engagement, Office of Asian Pacific Islander Desi Student Engagement, and Office of LGBTQ+ Student Engagement.[4]  CIME was closed despite the continued and largely state-funded operation of similar offices for

---

[4] CIME was abruptly shut down in August 2024, when a university spokesperson announced that the office would be undergoing changes to comply with S.B. 266.  While CIME appears to have been rebranded as the "Office of Community and Belonging," students have been left in the dark as to what this rebrand means and are concerned about whether previously available programs and resources will be maintained.  *See* Grace McClung, *State elimination of DEI initiatives shuts down UF's Center for Inclusion and Multicultural Engagement*, THE INDEPENDENT FLORIDA ALLIGATOR (Aug. 5, 2024), https://perma.cc/DNJ9-NQC3; *see also Staff*, UF STUDENT ENGAGEMENT, https://perma.cc/66NT-RGKU (last visited Jan. 14, 2025).

disabled, veteran, and first-generation students.[5]

13.     Further, the chilling effects of Section 1004.06 are felt by student organizations, despite the Legislature's carveout for student fees.  Because student organizations rely on university funding, they are limiting their events and programming for fear of violating Florida law.  For example, at UF, at least one student news organization avoided covering another student organization's event discussing the impacts of S.B. 266, for fear of losing funding.  Not only does the threat of losing funding restrict the freedom of student journalists to cover events taking place at their institutions, but it also robs student organizations, particularly those supporting students of color or other marginalized groups, of the opportunity to spread their message to students across campus.

14.     As described here, Plaintiffs' First Amendment rights under the United States Constitution have been violated by S.B. 266 and the Board of Governors' implementing Regulations.

15.     The United States Supreme Court has highlighted the vital role of educators' academic freedom in our democracy, emphasizing that "[t]o impose any strait jacket upon the intellectual leaders in our colleges and universities

---

[5] *See Disability Resource Center*, UNIV. OF FLA., https://perma.cc/6K9B-X6AP (last visited Jan. 14, 2025); *Office of Student Veteran Services*, UNIV. OF FLA., https://perma.cc/22Y6-REJ7 (last visited Jan. 14, 2025); and *Office of First-Generation Student Success*, UNIV. OF FLA., https://perma.cc/WV8Q-A86Z (last visited Jan. 14, 2025).

would imperil the future of our Nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). These protections also extend to students: "[S]tudents must always remain free to inquire, to study and to evaluate, and to gain maturity and understanding; otherwise our civilization will stagnate and die." *Id.* As the Supreme Court explained, "The quality and creative power of student intellectual life . . . remains a vital measure of a school's influence and attainment. . . . [T]o cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 836 (1995).

16.    S.B. 266 and Regulation 9.016 violate Floridians' academic freedom as it relates to their First Amendment rights. *See Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967) (Academic "freedom is . . . a special concern of the First Amendment").

17.    In an attempt to close the marketplace of ideas at Florida's public universities to viewpoints that are not endorsed by the State of Florida, S.B. 266 and the Regulations impose viewpoint-based restrictions on speech in violation of the First Amendment. This state-sponsored viewpoint discrimination, accompanied by S.B. 266's and Regulation 9.016's overbroad and vague language, inhibits academic freedom. Together, S.B. 266 and the Regulations

have left instructors and students fearful for the future of not only education, but also free thought and democracy in Florida.

18.    Part of this fear stems from the fact that S.B. 266 and Regulation 9.016 are vague and overbroad in violation of the First Amendment. Although Regulation 9.016, for example, purports to define key terms in S.B. 266, like "political or social activism," the definitions are expansive, prohibiting, for example, "any activity organized with a purpose of ***effecting or preventing change*** to a government policy, action, or function, or any activity intended to ***achieve a desired result*** related to social issues," (emphasis added). Because the definitions are so broad, the faculty and students who are subject to, and the administrators who must enforce, the law are not on notice as to what activity is prohibited (or what is permitted). As a result, professors are self-censoring out of fear of running afoul of S.B. 266, and students are concerned about speaking openly on campus out of fear that certain conversations could violate the law.

19.    By enforcing S.B. 266 and the Regulations in a way that limits students, faculty members, and staff from accessing or observing different perspectives that they may disagree with or find uncomfortable, Defendants have also violated section 1004.097(3)(f) of Florida's Campus Free Expression Act. The Florida Legislature amended the Campus Free Expression Act in 2021 to include an anti-shield provision in order "to protect the expression of diverse

viewpoints at Florida College System [] institutions and state universities."[6]

Section 1004.097 creates a cause of action against a public institution of higher education when that institution "shield[s] students, faculty, or staff from expressive activities."[7]  An individual is shielded from expressive activities when their "access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive," is limited.[8]  Protected under this law is an individual's "lawful oral and written communication of ideas, including . . . faculty research, lectures, writing, and commentary, whether published or unpublished."[9]  By allowing discussions of only those viewpoints that the State agrees with, Defendants are shielding faculty members, students, and staff in violation of section 1004.097(3)(f).

20.    This Court should declare the aforementioned provisions of S.B. 266 and the BOG's implementing regulations unconstitutional and enjoin them.

## PARTIES

### A. **Plaintiffs**

21.    Plaintiff Sharon Austin is a researcher, educator, and tenured

---

[6] Fla. S. Educ. & Emp. Comm., *CS/CS/HB 233 — Postsecondary Education* (2021), https://perma.cc/S736-T7YR (last visited Jan. 14, 2025).

[7] Fla. H.B. 233 § 1004.097 (3)(a) (2021).

[8] Fla. H.B. 233 § 1004.097 (2)(f) (2021).

[9] Fla. H.B. 233 § 1004.097 (3)(a) (2021).

Professor of Political Science and the former Director of the African American

Studies Program at UF.  One of the ways that Plaintiff Austin meets her

professional requirements is by presenting her research at conferences.[10]  On

April 8, 2024, UF, a publicly funded institution and a member of the State

University System of Florida, denied Plaintiff Austin's funding request to attend

an international conference hosted by Diversity Abroad (the "Diversity Abroad

Conference") where she was invited to present her work—a request UF had

granted the year before—because her viewpoint is disfavored by the State

pursuant to S.B. 266.  Additionally, UF's Provost's Office flagged two of Plaintiff

Austin's courses ("Politics of Race" and "Black Horror and Social Justice") for

non-compliance with S.B. 266, despite these courses previously satisfying UF's

general education requirements.  At the Provost's Office's instruction, Plaintiff

Austin made changes to the course descriptions and altered a module on

microaggressions to address the Assistant Provost's concern that the courses

violated S.B. 266's "text about identity politics and systemic racism."  Despite

these course revisions, Plaintiff Austin was notified on December 6, 2024, that

neither of her courses were approved by the BOG for general education

---

[10] UF's "criteria for granting tenure, promotion, or permanent status" depends on a faculty member's" performance of the duties and responsibilities expected of a member of the university community."  UF recognizes three broad categories of academic engagement: (1) teaching; (2) research; and (3) service.  *Promoting & Tenure Guidelines for 2024–2025*, UNIV. OF FLA., https://perma.cc/L6H5-KAGD (last visited Jan. 14, 2025).

designation.

22.    Plaintiff Robin Goodman is a tenured English Professor and researcher at FSU.  Since 2015, Plaintiff Goodman taught, as relevant here, "Third World Cinema," a general education course about the relationship between political intervention and cinematographic techniques.  As part of the course, students watch and discuss a range of films, including Academy of Motion Picture Arts and Sciences-recognized films like "The Battle of Algiers."  In August 2024, Plaintiff Goodman learned that FSU's general education courses, including her own, were being reviewed by FSU and would be submitted to the BOG to determine whether they would continue to receive general education status.  Unlike the rigorous review process that FSU faculty is required to undergo when adding or removing a course—a process that can take anywhere from six to eight months—by the beginning of the Fall 2024 semester, the Board of Governors had reached its decision.  In the beginning of that semester, FSU informed Plaintiff Goodman that her course had been removed from the general education list.  FSU also determined that "Third World Cinema" would no longer qualify to meet students' Ethics requirement, as it previously had.  FSU requires that students complete at least one Ethics course, after which the students should be able to "[e]valuate various ethical positions" and "[d]escribe the ways in which historical,

social, or cultural contexts shape ethical perspectives."[11]  Because "Third World

Cinema" discusses political intervention in a way that is disfavored by the State,

FSU removed the course from the list of classes that meet FSU's Ethics core

requirement, as well as FSU's Humanities and Culture general education

requirement.

23.     Plaintiff Matthew Marr is a researcher and tenured Associate

Professor of Sociology in the Department of Global and Sociocultural Studies and

the Asian Studies Program at FIU.  Plaintiff Marr teaches both undergraduate and

graduate courses at FIU, including "Introduction to Sociology."  "Introduction to

Sociology" is a foundational sociological course, providing students the basics of

the scientific study of human action and interaction.  In the course, students

examine how individual and group action and experiences are shaped by the social

context in which they occur and, in turn, how that social context is itself shaped

by individual and group action and experiences.  As is the case in all sociology

courses, "Introduction to Sociology" exposes students to various concepts,

including that everything is socially constructed and, thus, nothing in society is

inherent but is instead constantly evolving.  In January 2024, the BOG amended

Regulation 8.005, removing all introductory sociology courses across the state

---

[11] Undergraduate Degree Requirements, FLA. STATE. UNIV., https://perma.cc/KFA9-SLQL (last visited Dec. 3, 2024).

from the list of courses that satisfy the general education requirement for a social sciences course, despite the fact that, as the original social science, Sociology is the foundation for all other social sciences.  As a result of the BOG's amendment of Regulation 8.005, Plaintiff Marr can no longer teach "Introduction to Sociology" as a state-level general education course.

24.    Plaintiff Jean Rahier is a researcher and tenured Professor of Anthropology and African and African Diaspora Studies at FIU.  He served as the Director of the African and African Diaspora Studies Program from 2008 to 2016. In Summer 2024, Plaintiff Rahier learned that two of his courses ("Black Popular Cultures: Global Dimensions" and "Myth, Ritual, and Mysticism"), had been removed by FIU's provost from the general education curriculum at the recommendation of the BOG.  Plaintiff Rahier understood that his courses were removed from the general education curriculum after the BOG ran keyword searches and concluded, based on their titles, the courses violated S.B. 266.  As to "Myth, Ritual, and Mysticism," this course historically has been so popular at FIU that the school offered multiple sections of the course, taught by several professors, every semester to accommodate student demand.  After the Chair of Plaintiff Rahier's department learned that the course was to be removed from the general education curriculum because of concerns it violated S.B. 266, he contacted the professors for "Myth, Ritual, and Mysticism," including Plaintiff

15

Rahier.  The Chair informed the professors that, based on a spreadsheet that the

Chair had received from the provost, there was the possibility of keeping the

course as part of the general education curriculum if certain changes were made.

At the Chair's suggestion, Plaintiff Rahier and the other professors agreed to

remove the word "myth" from the course title, as well as remove the word

"supernatural" from the course description.  Despite making these changes,

however, Plaintiff Rahier was informed in September 2024 that his courses still

would not be reinstated.  Both "Black Popular Cultures: Global Dimensions" and

"Myth, Ritual, and Mysticism" were popular courses among students at FIU and,

due to their high numbers of enrollment, provided important funding to the

African and African Diaspora Studies Program and the Global and Sociocultural

Studies Department, respectively.  Because of their removal from the general

education curriculum, students are less likely to enroll in Plaintiff Rahier's courses

and, thus, the African and African Diaspora Studies Program and the Global and

Sociocultural Studies Department are in jeopardy of losing key funding.

25.    Plaintiff Andrea Jean Queeley is an Associate Professor of

Anthropology and African and African Diaspora Studies at FIU.  Following the

enactment of S.B. 266, two of Plaintiff Queeley's undergraduate courses ("The

Anthropology of Race and Ethnicity" and "Black Popular Cultures: Global

Dimensions") were stripped of their general education designation, despite the

fact that both courses had been offered for general education credit for over a decade.  Plaintiff Queeley understood that her courses were removed by the BOG after it ran a keyword search that somehow indicated her courses did not comply with S.B. 266.

26.    Plaintiff Katie Rainwater is a Visiting Assistant Teaching Professor in the Department of Global and Sociocultural Studies at FIU, where she regularly teaches "Introduction to Sociology" and "Sociology of Gender."  As explained above, "Introduction to Sociology" was removed from the state-level general education courses in January 2024.  In Summer 2024, Defendant FIU's Board of Trustees members approved the removal of "Sociology of Gender" from FIU's general education curriculum.  As contingent faculty, Plaintiff Rainwater's continued employment at FIU is dependent on whether she is able to teach her courses, which are only offered when a sufficient number of students have enrolled.  Because S.B. 266 is likely to impact the funding available to departments, such as Global and Sociocultural Studies, and those departments will experience lower enrollment overall, Plaintiff Rainwater's employment is at risk, as are the classes she teaches.

**B. <u>Defendants</u>**

27.    Defendants Brian Lamb, Ashley Bell Barnett, John Brinkman, Timothy M. Cerio, Manny Diaz, Jr., Aubrey Edge, Patricia Frost, Carson Good,

Edward Haddock, Ken Jones, Alan Levine, Charles H. Lydecker, Craig Mateer,

Jose Oliva, Amanda J. Phalin, and Eric Silagy are sued in their official capacities

as members of the BOG.  The Board of Governors is the governing body of the

State University System, responsible for operating, regulating, and managing the

public university system in Florida.[12]  Fourteen of the seventeen[13] members of the

Board of Governors were appointed by Governor DeSantis and confirmed by the

Florida State Senate.[14]

28.    Defendants Morteza Hosseini, David L. Brandon, John Brinkman,

Richard P. Cole, Christopher T. Corr, James W. Heavener, Sarah Lynne, Daniel T.

O'Keefe, Rahul Patel, Marsha D. Powers, Fred S. Ridley, Patrick O. Zalupski, and

Anita G. Zucker are sued in their official capacities as members of the UF Board

of Trustees.

29.    Defendants Peter Collins, Bob Sasser, John Thiel, Vivian de las

Cuevas-Diaz, Jorge Gonzalez, Justin Roth, Kathryn Ballard, Bridgett

Birmingham, Jackson Boisvert, Jim Henderson, Deborah Sargeant, Drew

Weatherford, and Maximo Alvarez are sued in their official capacities as members

---

[12] *Higher Education*, FLA. DEP'T OF EDUC., https://perma.cc/QQP6-CEUD (last visited Jan. 14, 2025).

[13] As of the date of this filing, only sixteen individuals were listed as members of the Board of Governors.  *Members*, STATE UNIV. SYS. OF FLA., https://perma.cc/ZR35-TUUN (last accessed Jan. 16, 2025).

[14] Fla. Const., art. IX, s. 7.

of the FSU Board of Trustees.

30.    Defendants Rogelio Tovar, Carlos A. Duart, Noël C. Barengo, Francesca Casanova, Dean C. Colson, Alan Gonzalez, George Heisel, Jesus Lebeña, Alexander M. Peraza, Yaffa Popack, Chanel T. Rowe, Marc D. Sarnoff, and Alberto R. Taño are sued in their official capacities as members of the FIU Board of Trustees.

## JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983.

32.    Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b) and 1391(e).

33.    Defendants are sued in their official capacities.  Each defendant resides and/or works within the State of Florida.

## FACTUAL ALLEGATIONS

### I.  Florida Statute Section 1004.06

#### A. *Statutory Text & Requirements*

34.    Understanding how Florida's universities are governed helps expose how S.B. 266 and the BOG's regulations have negatively impacted Florida public universities' faculty and students.  Florida's twelve public universities are part of

19

Florida's State University System, which is governed by the BOG. The BOG exists to operate, regulate, and control the management of the university system.

35.    While the BOG oversees the State University System, each university within the system has its own thirteen-member Board of Trustees ("BOT"), which serves as the governing body of its respective institution. Each university's BOT consists of eleven appointed members as well as the Chair of the Faculty Senate and the President of the Student Body. Of the eleven appointed members, six are appointed by Florida's Governor and five are appointed by the BOG.[15] The BOT oversees operations at its designated university, including establishing and implementing policies and regulations consistent with the BOG's regulations or guidelines and maintaining high-quality education consistent with its respective university's mission.

**B. *Statutory Text & Requirements***

36.    S.B. 266 mandates:

> (2) A Florida College System institution, state university, Florida College System institution direct-support organization, or state university direct-support organization may not expend any state or federal funds to promote, support, or maintain any programs or campus activities that:

---

[15] *See* Fla. Bd. of Govs. Reg. 1.001(2)(a); *Board of Trustees*, UNIV. OF FLA., https://perma.cc/QFC6-K9YY (last visited Jan. 14, 2025); *Board of Trustees*, FLA. STATE UNIV., https://perma.cc/G2KF-T9SB (last visited Jan. 14, 2025); *Board of Trustees*, FLA. INT'L UNIV., https://perma.cc/WZ66-TKZU (last visited Jan. 14, 2025); *About the Board*, FLA. AGRIC. & MECH. UNIV., https://perma.cc/KXB5-A5FA (last visited Jan. 14, 2025).

(a)    Violate s. 1000.05;[16] or

(b)    Advocate for diversity, equity, and inclusion, or promote or engage in political or social activism, as defined by rules of the State Board of Education and regulations of the Board of Governors.

Fla. Stat. § 1004.06(2).

37.    The vague and subjective language in the statute fails to provide further explanation or clarification.  It contains no description of the advocacy for "diversity, equity, and inclusion" or "political or social activism" engagement that it prohibits.  Rather, the statute references the State Board of Education's rules and the BOG's regulations as guides for interpreting the Legislature's vague language, providing no affirmative guidance on which programs or campus activities might land in the bill's crosshairs.

38.    S.B. 266 also "[r]equires the Board of Governors to provide a directive for universities to review programs [sic] violations of state law regarding discrimination and those based on specified theories" in the law.[17]  The law further mandates a "periodic review of general education core courses" and requires a public university BOT and the BOG to approve general education

---

[16] Section 1000.05 includes the Stop W.O.K.E. Act.  *See* Fla. Stat. § 1000.05(4) (2022).

[17] Pro. Staff of the S. Appropriations Comm. on Educ., *Bill Analysis and Fiscal Impact Statement* at 1, https://perma.cc/M2T4-G4QS (last accessed Dec. 3, 2024) (discussing section 1001.706(5)(a) (2023)).

courses at the institution.[18]  Under section 1007.25(3), general education courses "may not distort significant historical events or include a curriculum that teaches identity politics" and cannot be "based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities."[19]  The statute does not, however, define "distort" or "identity politics."  The statute also mandates the inclusion of "selections from the Western canon" in Humanities courses,[20] without defining what the "Western canon" means.

### C. *Enactment History*

39.    In April 2019, just three years before the Florida Legislature began its assault on academic freedom, Florida's BOG issued a Statement of Free Expression ("Statement") that was adopted by all twelve of the state's public universities.  In its Statement, the BOG recognized that the rights to freedom of speech and expression as enshrined in the United States and Florida Constitutions "are an integral part" of the BOG's "university mission" to "deliver a high quality academic experience," to "engage in meaningful and productive research," and to "provide valuable public service for the benefit of" local communities and the

---

[18] *Id.* at 2.

[19] Fla. Stat. § 1007.25(3)(c) (2023).

[20] Fla. Stat. § 1007.25(3)(d)(2) (2023).

state.[21]  The BOG observed, "A fundamental purpose of an institution of higher education is to provide a learning environment where divergent ideas, opinions, and philosophies, new and old, can be rigorously debated and critically evaluated."[22]

40.    To develop skills that are "an essential component" of Florida's "academic and research missions,"[23] the BOG maintained that individuals must be free to "express any ideas and opinions they wish, even if others may disagree with them or find those ideas and opinions to be offensive or otherwise antithetical to their own worldview."[24]  The BOG stressed that individuals should be "empower[ed] and enable[d]" to express ideas with which others disagree "without fear of being bullied, threatened, or silenced." [25]

41.    Florida's public universities continue to promote the principles underscoring this Statement on their websites despite the opposite principles being promoted and fostered in practice by S.B. 266 and the Regulations, and despite the

---

[21] *State University System Free Expression Statement*, STATE UNIV. SYS. OF FLA. (Apr. 15, 2019). https://perma.cc/W4KN-2CE8 (last accessed on Dec. 2, 2024).

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

punishment that accompanies embracing the Statement's principles.[26]

42.    More remarkable still: as recently as October 22, 2020, the BOG released a memorandum "making a clear and steadfast commitment to prioritize and support diversity, racial and gender equity, and inclusion in the State University System and to hold each university accountable for policies, programs, and actions that will codify and operationalize the System's commitment."[27]  The BOG recommended that "universities should consider the integration of D.E.I. best practices into their academic curriculum, knowing that a university's curriculum is under the purview of the faculty and the established academic curricular review and approval structure of the institution."[28]  The BOG also asserted that "processes and strategies that ensure that all is being done to attract, employ, and retain a fully diverse population of students, faculty, and staff are essential."[29]

43.    Even more recently, in 2021, the Florida Legislature amended section

---

[26] *See About FAMU*, FLA. AGRIC. & MECH. UNIV., https://perma.cc/8W29-A4MY  (last visited Dec. 3, 2024); *Freedom of Expression and Assembly Rights and Responsibilities*, FLA. AGRIC. & MECH. UNIV., https://perma.cc/FCK6-QLEU (last visited Dec. 3, 2024); *BOG Statement of Free Expression*, UNIV. OF S. FLA., https://perma.cc/7KSG-L7PZ (last visited Dec. 3, 2024).

[27] *Diversity, Equity, and Inclusion: Strategic Priorities* at 1, FLA. BD. OF GOVERNORS (Oct. 22, 2020), https://perma.cc/35S4-HCV5.

[28] *Id.* at 2.

[29] *Id.* at 3.

1004.097, also known as the Campus Free Expressions Act, to include an anti-shield provision aimed at encouraging intellectual freedom and viewpoint diversity.  The Campus Free Expressions Act sets forth requirements "designed to protect the expression of diverse viewpoints at Florida College System [] institutions and state universities."[30]  Those requirements include, as relevant here, (1) a prohibition against Florida College system institutions or state universities "shield[ing] students, faculty, or staff from expressive activities,"[31] and (2) protections against "material and substantial" disruptions of "another person's or group's expressive rights."[32]

44.    Section 1004.097(2)(f) defines "shield" as "limit[ing] students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive."

45.    Section 1004.097(3)(a) further provides that expressive activities are those protected under the First Amendment to the United States Constitution and Article I of Florida's Constitution.  Those activities include, "but are not limited to, any lawful oral and written communication of ideas," including "faculty

---

[30] Fla. S. Educ. & Emp. Comm., *CS/CS/HB 233 — Postsecondary Education* (2021), https://perma.cc/587W-52UY.

[31] Fla. H.B. 233 § 1004.097(3)(f) (2021).

[32] Fla. H.B. 233 § 1004.097(2)(c) (2021).

research, lectures, writings, and commentary, whether published or unpublished."
*Id.*

46.    And when, as here, an individual's expressive rights have been violated, section 1004.097(4)(a) provides a cause of action "against a public institution of higher education" to obtain "declaratory and injunctive relief" in addition to court costs and reasonable attorney fees.

47.    Now, the BOG and Florida's Legislature have made an abrupt about-face, directly undermining these still-applicable laws and guidelines, leaving educational institutions reeling and violating students' and faculty's First Amendment rights.

48.    The Florida Legislature took its first big step in its new crusade against academic freedom and diversity of thought in April 2022 with the Stop W.O.K.E. Act, seeking to suppress speech about diversity, equity, inclusion, systemic racism, white privilege, and critical race theory.  The Stop W.O.K.E. Act prohibited schools and businesses from any teaching or training that "espouses, promotes, advances, inculcates, or compels such individuals to believe" certain concepts regarding race, gender, racism, and privilege.[33]  The Stop W.O.K.E. Act has been challenged by students and professors and was enjoined by the United

---

[33] Fla. Stat. § 760.10 (8)(a) (2022).

States District Court for the Northern District of Florida because, among other things, "the First Amendment does not permit the State of Florida to muzzle its university professors, impose its own orthodoxy of viewpoints, and cast us all into the dark."[34]  The Eleventh Circuit maintained the preliminary injunction of provisions of the law that apply to public education and is currently reviewing the law's constitutionality.[35]

49.    Despite this law's enjoinment in higher education, Florida Representative Alex Andrade and Senator Erin Grall introduced H.B. 999 and S.B. 266 in early 2023 to their respective chambers to further restrict what ideas could be discussed on college campuses.  Rep. Andrade called the bills "a progression based on the work we have been doing."[36]  In line with the aims of the Stop W.O.K.E. Act, these bills sought to prevent public colleges and universities from spending federal or state dollars on programs that promote disfavored speech, including speech related to diversity, equity, and inclusion.

50.    Numerous members of the Florida Legislature, in both the Florida

---

[34] *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1230, 1277–78, 1289–91 (N.D. Fla. 2022), *stay denied* by *Pernell v. Lamb*, No. 22-13992-J (11th Cir. 2023).

[35] *See Pernell v. Lamb*, No. 22-13992 (11th Cir. 2023); *see also Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1230, 1277–78, 1289–91 (N.D. Fla. 2022) (finding the law unconstitutionally vague and a violation of the constitutional academic freedom doctrine under the First and Fourteenth Amendments to the United States Constitution).

[36] HBCU Pulse, *Florida House Subcommittee Hearing on House Bill 999, Ron DeSantis & Possible Impacts (Full)*, YOUTUBE, at 00:00:20 (Mar. 15, 2023), https://perma.cc/JBR9-F3M3.

State Senate and House of Representatives, warned of the potential negative impacts and constitutional violations of S.B. 266 before and after its enactment. While voting on H.B. 999, one Representative referred to bill as an "attack on academic freedom," while another opposed the bill "because it is unconstitutional."[37]  Similarly, some Senators expressed concern that "[b]y restricting what students can learn, the state is actively suppressing students' academic and intellectual freedom."[38]

51.    A number of members of the public also warned legislators of the impact of both H.B. 999 and S.B. 266, including fears that: (1) the bill will "destroy academic freedom";[39] (2) Florida students "will not be prepared for the workforce";[40] (3) Florida students were being condemned "to a second rate education";[41] (4) the bill will have "a chilling effect on students . . . and professors";[42] (5) universities "will not be able to hire and obtain top scholars any

---

[37] *Id.* at 02:33:15.

[38] Anthony Izaguirre, *DeSantis curtails diversity, equity and inclusion programs in Florida state colleges*, SENTINEL (May 16, 2023), https://perma.cc/Z3WS-5APV; *See also* Diane Rado, *A contentious overhaul for higher education: DeSantis pushes far right in bill signings*, FLORIDA PHEONIX (May 15, 2023, 6:03 PM), https://perma.cc/FKU6-64FX.

[39] HBCU Pulse, *supra* note 36, at 57:40.

[40] *Id.* at 00:59:32.

[41] *Id.* at 1:09:55.

[42] *Id.* at 1:38:00.

longer" because "people don't want to work for a university who is not recognizing how higher education works";[43] and (6) educators would leave the state if the bill were enacted.[44] Indeed, these fears already are being realized.

52.    Professors, including Plaintiff Austin and Plaintiff Goodman, have begun self-censoring when teaching their courses because they are afraid that they might run afoul of S.B. 266.  Professors are not only censoring what they say in the classroom; they are also removing sources and reading materials from their syllabi for fear of violating S.B. 266.  Students are also self-censoring in the classroom because they are afraid of starting conversations that might expose faculty to risk of being in violation of the law.  And professors are leaving Florida public universities en masse because they do not wish to contend with S.B. 266. A recent survey administered by the state chapters of the American Association of University Professors and the United Faculty of Florida union found that 39% of responding Florida faculty had already applied for jobs in other states, and another 5% plan to do so in the next academic year.[45]  A so-called "brain drain" of professors from Florida affects not only the viability and reputation of those

---

[43] *Id.* at 1:38:00.

[44] Danielle Brown, *Senators revise contentious higher ed bill after uproar over the state of FL's public universities*, FLORIDA PHEONIX (Apr. 12, 2023, 6:57 PM), https://perma.cc/C6TU-D3PW.

[45] Ian Hodgson & Divya Kumar, *More Florida faculty still looking to leave the state, survey shows*, TAMPA BAY TIMES (Sep. 18, 2024), https://perma.cc/ZND6-EY9K.

schools, but also current students' quality of education and ability to graduate. This is especially true for doctoral candidates who lose members of their dissertation committees, rendering the students unable to present their dissertations and graduate.

53.    Over the warnings and protestations from legislators and the public, on May 3, 2023, the Florida Legislature passed S.B. 266.  On May 15, 2023, Governor DeSantis signed S.B. 266 into law, announcing the bill's purpose of eliminating diversity, equity, and inclusion in Florida and instructing the public to "go to Berkeley" or similar places to study things like "gender ideology."[46]

## II.    <u>Regulation 9.016</u>

54.    Abandoning the State University System's stated mission to "serv[e] the needs of a diverse state and global society,"[47] on January 24, 2024, Defendant BOG members passed Regulation 9.016 to implement S.B. 266's restrictions on funding for "diversity, equity, or inclusion," and "political and social activism." In doing so, Defendant BOG members violated their statutory duties under section 1001.706(13)(c) by shielding students, faculty, and staff at state universities from speech protected under the First Amendment and contravened the BOG's own 2019 Statement of Free Expression.

---

[46] Bd. of Governors of the State Univ. Sys. of Fla., 2025 System Strategic Plan 8 (2025), https://perma.cc/3U9X-BADD.

55.    In accordance with S.B. 266, Regulation 9.016 prohibits any "state university or state university direct-support organization . . . [from] expend[ing] any state or federal funds to promote, support, or maintain any programs or campus activities that" violate the Stop W.O.K.E. Act;[48] advocate for diversity equity, or inclusion, as defined in Regulation 9.016; or promote or engage in political or social activism, as defined in that regulation.  Fla. BOG Reg. 9.016(2) (Jan. 24, 2024).

56.    Although S.B. 266 and Regulation 9.016 purport to prohibit certain conduct, neither the statute nor the regulation provides fair notice as to what behavior is prohibited or allowed.  This is due, in large part, to the use of vague definitions of key terms in Regulation 9.016, such as "Diversity, Equity, or Inclusion," "Political or Social Activism," and "Any program or campus activities."

57.    "Diversity, Equity, or Inclusion" is defined as:

> [A]ny program, campus activity, or policy that classifies individuals on the basis of race, color, sex, national origin, gender identity, or sexual orientation and promotes differential or preferential treatment of individuals on the basis of such classification.

Fla. BOG Reg. 9.016(1)(a)1.

---

[48] Section 1000.05 also includes anti-discrimination provisions that remain untouched by decisions involving the Stop W.O.K.E. Act.

58.    "Political or Social Activism" is defined as:

> [A]ny activity organized with a purpose of effecting or preventing change to a government policy, action, or function, or any activity intended to achieve a desired result related to social issues, where the university endorses or promotes a position in communications, advertisements, programs, or campus activities.

Fla. BOG Reg. 9.016(1)(a)2.

59.    "'Social Issues' are topics that polarize or divide society among political, ideological, moral or religious beliefs."  Fla. BOG Reg. 9.016(1)(a)3.

60.    "Any program or campus activities" are defined as:

> [A]ctivities authorized or administered by the university or a university's direct-support organization(s) that involve:
> a. Academic programs subject to review as outlined in sections 1001.706(5)(a) and 1007.25, Florida Statutes, other than classroom instruction;
> b. Student participation, other than classroom instruction;
> c. Hiring, recruiting, evaluating, promoting, disciplining, or terminating university employees or contractors.

Fla. BOG Reg. 9.016(1)(a)4.

61.    As written, Defendants UF BOT members, FSU BOT members, FIU BOT members, as well as all other public university trustees in Florida, are left to their own devices to interpret the unconstitutionally broad and vague language of S.B. 266 and Regulation 9.016—inspiring subjective and discriminatory enforcement for what constitutes "diversity, equity, or inclusion" and "political or social activism."  Given the context in which these laws were passed, Defendants

UF BOT members, FSU BOT members, FIU BOT members, and other public university trustees in Florida have interpreted S.B. 266 and Regulation 9.016 to align with Governor DeSantis's viewpoints.  In doing so, Defendants UF BOT members, FSU BOT members, FIU BOT members, and other public university trustees have pushed Governor DeSantis's viewpoints on faculty and students, chilled expression of viewpoints disfavored by the State, and constrained the freedom of faculty, students, and employees of State universities to engage in expressive conduct.

### III.   <u>Viewpoint-Based Discrimination on University Campuses</u>

62.    As the Eleventh Circuit has recognized, "Nowhere is free speech more important than in our leading institutions of higher learning." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022).  Stifling the "marketplace of ideas" for Florida university students and professors is detrimental to the state, as well as the entire nation. *See Healy v. James*, 408 U.S. 169, 180 (1972).

63.    The Florida Legislature and Defendant BOG members have used S.B. 266 and the Regulations to eradicate expression of views in State institutions of higher learning with which they disagree, committing the "greatest First Amendment sin." *Honeyfund.com, Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024) (warning against viewpoint-based discrimination).

64.    Viewpoint-based discrimination is particularly harmful in higher

33

education environments because it interferes with fundamental principles of academic freedom. *See Rosenberg v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835–36 (1995).

65.    The First Amendment protects all university educators and researchers from viewpoint-based restrictions.

66.    In addition to general viewpoint discrimination, the Florida Legislature and Defendant BOG members have also targeted speech intended to influence government policy or action, *see* Fla. BOG Reg. 9.016(1)(a)2, a direct infringement on the most core protected speech—political speech.

### A. The Role of a Professor

67.    As forewarned by the United States Supreme Court, "[n]o one should underestimate the vital role in a democracy that is played by those who guide and train our youth." *Sweezy*, 354 U.S. at 250.

68.    According to UF's internal regulations, "the professor encourages the free pursuit of learning in students.  The professor maintains and represents the best scholarly standards of his or her discipline.  The professor demonstrates respect for the student as an individual and adheres to the proper role of intellectual guide and counselor."[49]

69.    Plaintiffs like Dr. Austin, as tenured faculty members, are held to high

---

[49] *Faculty Evaluation*, Univ. of Fla., https://perma.cc/QK2K-54DT (last visited Dec. 3, 2024).

standards.  At UF, the broad criteria for granting tenured positions include:

(1) instruction, including classroom teaching, theses, dissertations, academic

advisement, extension programs, and "all preparation for this work including

study to keep abreast of one's field"; (2) research or other creative activity; and

(3) professional and public service.[50]  Tenured faculty members are further

required to, among other things, produce "[e]vidence of a high level of

professional impact, including regular participation in invited presentations or

conferences."[51]  Accordingly, research, publications, and participation in

academic gatherings and conferences are critical to the hiring, retention, and

advancement of faculty.

70.    Given the vague and overbroad prohibitions in S.B. 266, professors at

Florida's colleges and universities fear how their ordinary conduct, potentially

violative of S.B. 266, may impact their ability to retain their jobs at all.  Tenured

professors must now undergo "a comprehensive post-tenure review every 5

years."[52]  Without any clear guidance as to how to comport their conduct to

---

[50] *See* Univ. of Fla. Reg. 6C1-7.019 § 4.

[51] *University Criteria for Post-Tenure Review*, UNIV. OF FLA., https://perma.cc/4HZ8-FK7W
(last visited Jan. 13, 2025).  Similarly, at FSU, when evaluating a candidate's folder, the Office
of the Provost "expects[s] every successful candidate to demonstrate a substantial commitment to
both quality and quantity in teaching and research/creative activities as well as in public service."
*Promotion and Tenure*, FLA. STATE UNIV., https://perma.cc/SYA3-BEHN (last visited Dec. 3,
2024).

[52] Fla. Stat. § 1001.706(6)(b) (2023).

S.B. 266's broad-sweeping provisions, professors work in fear that anything they say or do may eventually lead them to lose their tenure or jobs.

### B. Denial of Plaintiff Austin's Request for UF's Support

71.    Plaintiff Austin is a tenured Professor of Political Science at UF.  She teaches courses and conducts research on African American politics, minority politics, American government, public law, and public policy.  As a Professor, Plaintiff Austin is expected to present her research at conferences to share her findings with other experts, to receive feedback on her work, and to contribute to the advancement of her field.  Because of this expectation, UF provides funds that professors, like Dr. Austin, use to cover expenses associated with attending or presenting at a conference.

72.    Each year, members of UF, including faculty, staff, and students, attend the Diversity Abroad Conference, a conference for education professionals, students, and stakeholders "dedicated to advancing student success through access to the benefits of global education."[53]

73.    In 2023, Plaintiff Austin, in her capacity as a professor and fully funded by UF, attended the Diversity Abroad Conference where she presented her scholarship on academic freedom as well as on international courses and study

---

[53] *Global Inclusion Conference*, Diversity Abroad, https://perma.cc/B7MS-XUCA (last visited Dec. 26, 2024).

abroad experiences.  The next year, Diversity Abroad asked Plaintiff Austin to

return and to present her scholarship at the 2024 conference.  She planned to

present, and receive feedback on, a book that she is writing, focused on academic

freedom and restrictions on diversity, equity, and inclusion across the United

States.  As she had done the year before, Plaintiff Austin requested funding to

attend the Diversity Abroad Conference from UF's International Center.

74.    In March 2024, UF's International Center denied Plaintiff's request

because UF believes that Diversity Abroad's focus on minority representation and

diversity of thought runs afoul of S.B. 266 and Regulation 9.016.  On March 30,

2024, Plaintiff asked her department chair if funds from the Political Science

Department could be utilized instead of funds from the International Center.  In an

email on April 8, 2024, UF again rejected Plaintiff's request, reiterating that "state

dollars may not be used" to pay for the Diversity Abroad Conference due to S.B.

266's expenditure restrictions.

75.    Conferences like Diversity Abroad are not just important

opportunities for educators to engage with other experts in their fields to enrich

their own perspectives, but they are also invaluable chances for educators to

present their own research and promote their work to new audiences.  Plaintiff

Austin hoped to rely on these types of events to showcase her forthcoming book

and other research.  However, as a result of S.B. 266, Plaintiff Austin lost this

important educational and professional opportunity.

76.     Dr. Austin plans to seek funding from UF for additional conferences that focus on diversity, equity, and inclusion where she can present her research—research focused on that topic.

77.     Dr. Austin is not alone in being denied funding.[54]  UF has refused to fund diversity-, equity-, and inclusion-related research and travel to conferences for graduate students.  In doing so, UF has deprived these students of opportunities for academic enrichment and professional development.

### C.  Defendants' Viewpoint-Based Discrimination Violates Plaintiffs' First Amendment Rights

78.     Academic freedom encompasses "speech related to scholarship or teaching."  *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006).

79.     Conferences like Diversity Abroad are an integral part of scholars' efforts to workshop, develop, and communicate their scholarship.  Further, UF's university-wide criteria for post-tenure review requires faculty members to produce "evidence of a high level of professional impact" by participating in

---

[54] At FIU, for example, the Global and Sociocultural Studies Department was denied funding to host a guest lecturer for their departmental graduate colloquium—a core community building series for the department and a cornerstone for graduate student academic enrichment and professional development.  The department requested funds to cover the lecturer's travel costs, however, that request was initially denied because the lecturer's talk was about "Blackness." Although the funds were eventually awarded, members of the Global and Sociocultural Studies Department are concerned about upcoming talks which may relate to racial inequities.

"invited presentations [and] conferences . . . within one's field."[55]

80.    Plaintiff Austin was invited to the Diversity Abroad Conference to communicate her scholarship and to teach an audience about an array of issues related to her work and research.

81.    Attending and presenting at the Diversity Abroad Conference is protected by Plaintiff's First Amendment rights and falls plainly under UF's criteria for tenured faculty.

82.    Although Defendants are authorized to make decisions regarding the allocation of UF resources, they cannot apply viewpoint discriminatory conditions to generally available funds.  *See Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 837 (1995).

83.    UF's International Center and Department of Political Science denied Plaintiff Austin's request for funding because S.B. 266 and Regulation 9.016 prohibit the use of state funding for conferences where she expresses her particular viewpoint—as an expert and contributor to education and scholarship promoting minority representation and diversity of thought.

84.    Defendants unconstitutionally infringed on Plaintiff Austin's academic freedom and free speech rights because of S.B. 266 and Regulation 9.016.

---

[55] *University Criteria for Post-Tenure Review*, *supra* note 51.

### D. The State's Continued Support of Favored Speech

85.    While discriminating against disfavored speech, Defendants continue to provide support for speech they favor.

86.    The Hamilton Center, an independent university academic center at UF "devoted to research and teaching on Western civilization,"[56] has received $30 million dollars in state funding in 2023.[57]  By contrast, the university's only other independent academic center, the Center for Latin American Studies, received only $3.5 million in the same period.[58]

87.    The Hamilton Center hosts events like "Philosophy of Religion in an Age of Growing Non-religion"[59] and "The Political Thought of David Hume: The Origins of Liberalism and the Modern Political Imagination."[60]  These topics fall within the State's preferred view of the Western Canon and related speech that Defendants favor, although they also arguably fall within "political or social

---

[56] *Promoting Scholarship and Shaping Leaders for a Free Society*, UNIV. OF FLA.: HAMILTON CTR., https://perma.cc/GX43-EF6R (last accessed Jan. 9, 2025).

[57] *See* Sophia Bailly and Alissa Gary, *Hamilton Center: Emphasizing apolitical position following controversial foundation*, THE INDEPENDENT FLORIDA ALLIGATOR (Dec. 4, 2023), https://perma.cc/F48H-EH6K.

[58] *See id.*

[59] *Philosophy of Religion in an Age of Growing Non-religion*, UNIV. OF FLA.: HAMILTON CTR. (Nov. 19, 2024), https://perma.cc/D5PS-UDKG.

[60] *The Political Thought of David Hume: The Origins of Liberalism and the Modern Political Imagination*, UNIV. OF FLA.: HAMILTON CTR. (March 25, 2024), https://perma.cc/6GJN-B38N.

activism" but have not been targeted.

88.     This preference extends to the general education curriculum, as well. At FIU, there are five Humanities general education requirement options dedicated solely to Western Civilization or American Civilization, while African, Latin American, and World Civilizations get only one option each.  When selecting courses to satisfy their general education requirements, students will be more likely to select a course focused on Western or American Civilization, simply because of the options that are available to them.  In short, the BOG and BOTs have used control over the general education curriculum to preference the viewpoints they favor.

### IV.     The Sweeping Effects of Unconstitutional Restrictions

#### A. Overbreadth and Vagueness

89.     S.B. 266 and Regulation 9.016 are substantially overbroad because their scope expands beyond government speech to private expression and results in a chilling effect on both faculty and students.  Furthermore, the targeting of any activity intended to promote change in government policy or action is likewise unconstitutionally overbroad, as it could cover any form of political expression. Here, although S.B. 266 and Regulation 9.016 were plainly drafted to target certain disfavored viewpoints and have been enforced to limit only those viewpoints, their language sweeps so broadly as to ostensibly prohibit funding for

all speech related to "political and social activism."  Because political speech lies

at the core of the First Amendment, the State cannot restrict speech merely

because it is political, nor can it avoid the First Amendment's restriction on

viewpoint discrimination by broadly restricting all political expression and

enforcing the law only as to disfavored viewpoints.  *Cf. Elrod v. Burns*, 427 U.S.

347, 356 (1976) ("[P]olitical belief and association constitute the core of those

activities protected by the First Amendment."); *Legal Services Corp. v. Velazquez*,

531 U.S. 533, 548 (2001) ("It is fundamental that the First Amendment was

fashioned to assure unfettered interchange of ideas for the bringing about of

political and social changes desired by the people") (internal quotations omitted).

Because S.B. 266 and Regulation 9.016 burden a substantial amount of protected

speech, they are violative of the First Amendment.

90.    S.B. 266 and Regulation 9.016 are also void for vagueness under the

First and Fourteenth Amendments as they (1) fail to provide notice that would

allow "ordinary people to understand what conduct [they] prohibit" and (2)

"authorize and even encourage arbitrary and discriminatory enforcement."  *City of

Chicago v. Morales*, 527 U.S. 41, 56 (1999).

**B. The Impact on General Education Curricula**

91.    Since S.B. 266 became effective, faculty and students at state-funded,

higher education institutions—such as UF, FSU, and FIU—have suffered from the

law's devastating impact on their institutions' general education curricula.  Under

S.B. 266, the general education curricula at Florida's state colleges and

universities are subject to periodic review and approval by the BOG and such

colleges' or universities' BOT for compliance with its restrictions.  S.B. 266 does

not provide clear guidance as to what may qualify or disqualify a course from

receiving general education status.  Rather, section 1007.25(3)'s vague language

broadly restricts any course from receiving general education status if it "distort[s]

significant historical events," "teaches identity politics," or is "based on theories

that systemic racism, sexism, oppression, and privilege are inherent in the

institutions of the United States and were created to maintain social, political, and

economic inequities."[61]

92.    S.B. 266 is unconstitutionally vague.  For several reasons, it is

impossible for institutions or faculty members, looking at the plain language of

section 1007.25(3), to know whether a course will be disqualified from receiving

general education status.

93.    *First*, a university or professor asking whether a course "distort[s]" a

"significant historical event" would have to determine whether the event covered

by the course is "significant."  But this would fall to the independent judgment of

the university or professor, as section 1007.25(3) does not provide a list of

---

[61] Fla. Stat. 1007.25(3).

"significant historical events," nor does it present any criteria to determine whether a historical event was significant.  If the event is deemed significant, then the university or professor would have to identify the "State-accepted" or "true" account of the historical event because one can only "distort" (i.e., present a misleading or false account of) a historical event if there is an "accepted" or "true" recounting of the event.  This necessarily assumes that there is a singular perspective of the historical event that the Legislature expects professors to teach. If the university or the professor were able to identify that correct perspective of the event in question, they would then be tasked with determining whether the course "distorts" that event.  It could be that presenting different accounts about an event counts as distortion, or this could be seen as teaching critical thinking. Section 1007.25(3) does not provide meaningful guidance as to what may qualify as "distort[ing] a significant historical event."

94.    *Second*, section 1007.25(3) does not define "identity politics."  Nor is that term defined in S.B. 266 or Regulation 9.016.  Left to their own devices, universities and faculty members are forced to determine whether a course impermissibly discusses any political movements or issues pertaining to a particular social group.  Without more, any course touching on the abolition of slavery, the Civil War, the civil rights movement, women's suffrage, or even Anglo-Christian American history could teach "identity politics" in violation of

S.B. 266.

95.    The possibility that a course could be seen as teaching "identity politics" is a real concern that universities face when determining whether a course can qualify for general education status.  For example, at a November 21, 2024, FSU BOT Meeting, FSU's Dean of Academic Affairs addressed concerns that S.B. 266 would impact classes such as "A History of the United States Since 1877," a survey course that teaches about "the United States from the end of the Civil War to the present with a special emphasis on the social, economic, and political problems of the twentieth century."[62]  Without commenting on whether "A History of the United States Since 1877" qualified for general education designation, the Dean replied that although such classes may continue to be offered at the university, those classes would not qualify for general education status if they did not meet the "definitions" of communications, mathematics, social sciences, humanities, or natural sciences.[63]  Appearing to build on the Dean's remarks, the Chair of Trustees, Peter Collins, replied, "The BOG and the Legislature isn't trying to restrict people from learning where they decide to seek

---

[62] FSU Board of Trustees | General Meeting | November 21, 2024, at 2:21:13, YOUTUBE (streamed live on Nov. 21, 2024), https://perma.cc/7RQY-NRBE (last accessed Jan. 14, 2025); *see also* Course Description, *A History of the United States Since 1877*, FLA. STATE UNIV. https://perma.cc/CD39-3MA9 (last visited Dec. 3, 2024).

[63] FSU Board of Trustees | General Meeting | November 21, 2024, *supra* note 62, at 2:21:38.

knowledge,"[64] before implying that, when determining whether to approve a course for general education status, the BOG would consider whether the course involved perspectives on race, for example, with which the BOG disagreed. Specifically, Collins remarked that a mathematics course could qualify as a general education course because "Math is math.  Math isn't racist.  Math is math."[65]

96.    When it comes to the prohibition on "teach[ing] identity politics," the BOG has applied this prohibition in an arbitrary and discriminatory manner.  For example, despite the fact that "A History of the United States Since 1877" demands that students "[c]ritically examine, interpret, and explain how personal, political, economic, and social experiences and/or structures shape the history of the United States," which arguably involves teaching "identity politics," the BOG approved the course for general education status.  At the same time, however, the BOG denied general education status to "Introduction to the African American Experience," a 2000-level course that examines "the ways that Black people have historically and presently shaped politics, economies, cultures, and intellectual spheres of thought within the Americas."[66]  Although both of these courses

---

[64] *Id.* at 2:22:34.

[65] *Id.* at 2:22:54.

[66] Shantel Gabrieal Buggs, *AFA 2000: Intro to the African American Experience*, https://perma.cc/MW82-BLET (last visited Jan. 14, 2025).

discuss the evolution of the United States, only "Introduction to the African American Experience" was removed from the general education catalog. These inconsistent results demonstrate the arbitrary and discriminatory implementation of a vague statute that fails to provide universities and faculty members with needed clarity as to whether a course may qualify for general education status.

97. Moreover, S.B. 266's prohibition against courses "based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities" has disproportionately affected faculty members teaching social science courses (e.g., sociology and anthropology) and humanities courses because such courses are more likely to cover topics disfavored by the State (i.e., systemic racism, critical race theory, gender, white privilege, etc.) that may violate the statute.[67]

98. Sociology, Anthropology, English, and African American Studies professors, for example, have experienced significant scrutiny from the leaders of their institutions, who wield S.B. 266's sword at the direction of Florida's BOG

---

[67] The language of the prohibition also fails to provide faculty members with guidance on what has been banned from their curriculum. For example, faculty members have wondered whether these theories can be taught as "inherent in the institutions of the United States" if they are not taught as being "created to maintain social, political, and economic inequities," or vice versa.

and their institutions' boards of trustees.[68]  When their courses were flagged by

their university's provost—acting under the direction of the BOG—for potentially

violating the statute, these professors were asked to either edit the title and/or the

description of the course or risk the course's removal from the general education

course catalog.

99.    At UF, two of Plaintiff Austin's courses were flagged by the Provost's

Office for non-compliance with S.B. 266: "Politics of Race" and "Black Horror

and Social Justice."  These courses previously satisfied UF's general education

requirements, but, according to the Assistant Provost, the courses now violated

S.B. 266's "text about identity politics and systemic racism."  At the Provost

Office's instruction, Plaintiff Austin made changes to the course descriptions and

altered a module on microaggressions.  On December 6, 2024, Plaintiff Austin

was notified that both of her courses had not been approved for general education

credit.  Plaintiff Austin was also informed by the Associate Dean of the College of

Liberal Arts and Sciences that while the Board of Governors did not provide an

explanation for the course rejections, it appeared likely that any courses dealing

---

[68] This scrutiny has come from all levels of the Florida University system.  For example, on December 8, 2023, Florida Commissioner of Education Manny Diaz posted on X, formerly Twitter, "Sociology has been hijacked by left-wing activists and no longer serves its intended purpose as a general knowledge course for students.  Under @GovRonDeSantis, Florida's higher education system will focus on preparing students for high-demand, high-wage jobs, not woke ideology."  Manny Diaz Jr. (@CommMannyDiazJr), X (Dec. 8, 2023, 11:32 AM), https://perma.cc/P2YY-UKLX.

with identity, culture, race, or gender did not make it on the final approval list,

regardless of the approach or the value of the course.

100.    Meanwhile, other courses at UF that cover traditional, conservative

viewpoints have not been affected by S.B. 266's enactment.  These courses

include: (i) "What is the Common Good?," a general education course that

features a module on the "structure of traditional marriage and family"[69]; and (ii)

"God and Science," a general education course that "considers the relationship of

thinking about God and thinking about nature from classical antiquity until the

early twentieth century."[70]

101.    At FIU, courses such as "Sociology of Gender," "Black Popular

Cultures: Global Dimensions," "Anthropology of Race and Ethnicity," and "Myth,

Ritual, and Mysticism" were among those targeted and ultimately removed after

the BOG ran keyword searches on course syllabi to confirm compliance with or

violation of S.B. 266 and Regulation 9.016.  In some cases where professors

complied with the provost's later request to revise the courses, such courses still

were not approved and were removed from the general education course catalog—

as was the case for FIU's "Myth, Ritual, and Mysticism," an introductory course

---

[69] Syllabus for "IDS 2935: What is the Common Good?" https://perma.cc/46KH-BXMS (last accessed Jan. 14, 2025).

[70] Syllabus for "IDS 2935: God and Science," https://perma.cc/MNY4-PTJ2 (last accessed Jan. 14, 2025).

to the anthropological study of religion.  Even where FIU's Faculty Senate reviewed and voted against the general education course list curated by FIU's provost, FIU's BOT disagreed with the Faculty Senate and ultimately approved the general education course list that excluded certain social science courses (including "Sociology of Gender," "Black Popular Cultures: Global Dimensions," "Anthropology of Race and Ethnicity," and "Myth, Ritual, and Mysticism").

102.   At FSU, courses like "Women in Literature" and "Third World Cinema" lost their general education course designation and/or their Ethics requirement.  Although FSU reviewed and submitted these courses to be approved for general education designation, the BOG determined that the courses violated S.B. 266, even though it is not clear by their names or descriptions that these courses actually violate the law.  In one case, a class, "Perspectives on the Short Story," a 3000-level class, was denied general education status; it was, however, later allowed to remain a general education course after FSU changed it to a 2000-level class; removed the term "perspective" from the title, changing the name of the course to "Introduction to the Short Story"; and updated its course description to provide that the course included selections from the "Western Canon."  These changes were deemed sufficient, even though the content of the course did not change—demonstrating that compliance with S.B. 266 is merely form over substance in some cases and not in furtherance of any legitimate state

interest.

103.   Not only is S.B. 266 unconstitutionally vague, S.B. 266 and its

implementing regulations are overbroad in violation of the First Amendment.

They coerce educators to err on the side of avoiding discussion of viewpoints

disfavored by the State for fear of losing general education status for their courses.

104.   For example, Regulation 8.005 removed introductory sociology

courses from the list of state-level general education core courses wholesale due to

the belief that concepts in the courses purportedly teach "woke ideology."[71]

Moreover, because of S.B. 266, introductory courses at FSU that would otherwise

fall squarely within the categories enumerated by the Legislature as general

education are being removed, such as "Introduction to Shakespeare" and

"Criminology."

105.   It is not just introductory courses that have been removed.  Indeed, the

BOG has removed hundreds of courses from the general education catalog.  At

FSU, for example, 571 courses were submitted to the BOG to receive general

education status.[72]  As of November 2024, the BOG removed 425 of those

courses, approving only 129 courses for general education.

---

[71] Manny Diaz, Jr., *supra* note 68.

[72] As of November 2024, seventeen courses were updated and are still pending before the BOG for approval.

106.   Changes to a course's status as a general education course carry potential long-term effects on entire departments and students.  When a course no longer qualifies for general education credit, students are less likely to enroll in that course even if interested in the subject, especially when the course is outside of their major of study.  Such a drop in enrollment could prove fatal to a course's viability, the university's ability to employ Assistant Professors, the amount of funding provided to a certain department or program, and professors' overall compensation as teaching fewer general education courses would lower their merit-based compensation.  This is so because the Florida Department of Education uses student enrollment to calculate "Full-Time Equivalent" (or "FTE").[73]  FTE is used by Florida's universities to determine funding and space needs, among other things.  If FTE drops, (i) departments could rapidly lose funding due to this artificial lack of demand for such courses; (ii) instructors, like Plaintiffs, will lose teaching opportunities and/or compensation; (iii) faculty will lose opportunities to mentor graduate students in their fields; and (iv) students will lose their ability to explore other disciplines while still progressing through their major and toward a timely graduation.

107.   Additionally, courses like "Third World Cinema" at FSU, which the

---

[73] Fla. Dep't of Educ., *Florida College System Full Time Equivalent (FTE) Procedures*, at 4 (Jul. 1, 2020), https://perma.cc/N8RE-C8BK.

BOG has not reinstated as a general education course, are likely to have fewer students enrolled.  As a result, professors like Plaintiff Austin and Plaintiff Goodman may have their classes cancelled.  Cancelling classes would not only impact professors teaching the course, but it could affect students who rely on certain courses for their majors as well as a department's viability if multiple courses within that department are cancelled.  Plaintiffs Rahier and Queeley fear this fate for the African and African Diaspora Studies Program at FIU, which is especially vulnerable because of the small size of the program and the fact that the BOG removed several of the program's courses from the general education curriculum.

108.    S.B. 266's impact on undergraduate student enrollment has a ripple effect on graduate programs and a university's ability to fund their graduate programs.  As the former director of FIU's African and African Diaspora Studies master's program, Plaintiff Queeley is concerned that declining enrollment in undergraduate courses will cause FIU to limit the number of Teaching Assistant ("TA") positions that the department allots for those courses.  Fewer TA positions means that the university cannot recruit and fund the same number of graduate students, jeopardizing the viability of the master's program.

109.    Course reductions also affect universities and colleges' ability to hire and retain high-caliber professors.  Many professors at Florida universities,

including Plaintiff Rainwater, are employed on a contingent basis, with their employment status for the following year or semester largely dependent on student enrollment in their respective departments or courses.  Any reduction in demand for these professors' courses, or even courses within the department due to the correlation between enrollment and funding, threatens their livelihood and ability to serve as instructors and mentors to students.

### C. The Impact on Student Expression

110.    Connection outside of the classroom is particularly important for free expression in the university context.  Fostering connection often requires creating or allowing spaces for student and faculty bonding and discussion, and for smaller communities among the larger campus population.  It is within these spaces that students and faculty are often most comfortable expressing their views on campus.[74]  After S.B. 266's enactment, however, students and faculty alike are

---

[74] Univ. of Fla. Student Senate Bill 2024-1234: "A Resolution Condemning the University of Florida's Decision to Terminate Diversity, Equity and Inclusion Offices and Employees," https://perma.cc/D6YE-LNXZ (Mar. 21, 2024) (providing that DEI initiatives help students "feel valued, supported, and included," by creating "inclusive and equitable educational environments for University of Florida students").  The termination of DEI policies, among other things, has caused students of color and other marginalized groups to feel unsafe in classrooms and has exposed them to "physical aggression and verbal attacks."  *Under Siege: Attacks on DEI and its Implications for Students*, DIVERSEEDUCATION.COM, https://perma.cc/252G-C4JT (last visited Jan. 14, 2025) (summarizing a University of Southern California's survey of undergraduate students of color, in which high percentages of Black, mixed-race, Latino, and Asian American students (1) described their respective college campuses as racist; (2) reported experiencing physical aggression and verbal attacks; (3) noted racist experiences from white-faculty; and (4) reported that their emotional-wellbeing had reduced from such incidents).

unsure whether or how they are allowed to express their views and are self-censoring out of a justified fear of legal repercussions.

111.    This self-censorship arises, in part, because Regulation 9.016's vague definitions fail to provide clarity as to what conduct is allowed or prohibited and only add to the confusion of students and faculty trying to determine how they can express their views on campus.  This self-censorship is coupled with the fear that their conduct may jeopardize funding for research or affinity group-based student organizations if the university determines that their conduct violates S.B. 266 or Regulation 9.016.

112.    Students in particular are forced to self-censor because any "student participation" falls within the ambit of S.B. 266 and Regulation 9.016.  Because "student participation" is defined by Regulation 9.016 as including anything "other than classroom instruction," and students often live, work, or research on campus, the regulation covers much of their lives.  A myriad of activities, ranging from planning a social event, to attending an academic meeting or participating in academic research, to merely partaking in a conversation with a fellow student or faculty member, may be deemed to violate Florida law.

113.    Similarly, Regulation 9.016's vague definition of "social issues" could affect hundreds of student organizations in Florida's public universities—those deemed by Defendants as drivers of political or social activism, advocating for

change to government policies or actions, or promoting topics that are

"polarizing" or "divide society."  This list of nominally affected organizations

would be unconstitutionally incomplete without the University of Florida's

College Republicans and Federalist Society.  The UF College Republicans is an

organization that "push[es] an America First platform in alignment with a truly

conservative Republican Party."[75]  This involves hosting events like "You Can't

Say That!," a discussion with Professor Mark Bailey on "censorship and who

benefits from it,"[76] and a talk with Derek Paul, an "Occupational Therapist who

personally overcame same-sex attraction through Christian faith."[77]  The UF

Federalist Society has recently hosted events including "A Post-*Dobbs* World."[78]

These events all fall under Regulation 9.016's language wide sweep, yet, as

examples of State-favored speech, they have not been targeted in practice.

114.    Supporting over 1,000 student organizations, UF is no stranger to

---

[75] *College Republicans: Purpose*, GATORCONNECT, https://perma.cc/9V34-VTK5 (last visited Jan. 9, 2025).

[76] UF College Republicans (@ufcollegerepublicans), INSTAGRAM (Mar. 19, 2024), https://perma.cc/P774-LG8X (last visited Jan. 15, 2025).

[77] UF College Republicans (@ufcollegerepublicans), INSTAGRAM (Aug. 2, 2023), https://perma.cc/Z927-HZ2X (last visited Jan. 15, 2025).

[78] *A Post-Dobbs World*, FEDERALIST SOCIETY (Oct. 12, 2022), https://fedsoc.org/events/a-post-dobbs-world, also available at https://perma.cc/W2PH-999P (last visited Jan. 15, 2025).

community engagement in its student body.[79]  However, S.B. 266 and Regulation 9.016 cast a frigid chill on Florida's colleges' and universities' student organizations, which is likely to cause many of them to limit their programming and activities on campus for fear of risking their access to funding while violating a law that they do not understand.  Although S.B. 266 provides a carve out for student fees for student-led organizations, student organizations nevertheless experience a chill in their ability to program and hold events because, among other reasons, they may not know the source of their funding and whether their organization is using university funds to hold an event that could arguably advocate for diversity, equity, and inclusion.  And universities have already been cutting back on their support for certain groups.  At UF, for example, the Center for Inclusion and Multicultural Engagement ("CIME") had long been a pivotal resource for student organizations, hosting culture-enriching programs, creating listservs for student groups, participating in university sponsored mentorship programs, and so much more.  Because of S.B. 266 and Regulation 9.016, CIME has now shuttered, while equivalent offices continue to operate for First Generation students and others.

115.    The overbreadth and vagueness of the law and its implementing

---

[79] *Student Activities & Involvement: Get Involved*, UNIV OF FLA., https://perma.cc/MWY3-EBXQ (last visited Aug. 3, 2024).

regulations leave too much room for individual interpretation—permitting

Defendant UF BOT members to classify some groups as violative of S.B. 266

whose viewpoints they may disagree with, like programs or activities focused on

supporting abortion rights, the rights of the lesbian, gay, bisexual, and transgender

community, or those focused on exposing racial injustices in the United States.

116.   Florida is a large state with a varied population.  Without clarification,

the number of actions that may be considered "political or social activism" and

topics deemed "social issues" among a university's student population are

virtually infinite.  Indeed, a course on the American Revolution that discusses the

value and effectiveness of American colonists' protest in the face of British

tyranny may be interpreted as promoting political and social activism.

### D. Unsupportive and Unwelcoming for Minority Populations

117.   S.B. 266 and Regulation 9.016 prohibit the use of university funds to

advocate for diversity, equity, and inclusion.

118.   Regulation 9.016's definition of diversity, equity, and inclusion also is

vague, contributing to misguided implementation and overbroad enforcement.  As

an example, it is unclear whether, under the regulation's vague and overbroad

definition of "diversity, equity, and inclusion," gendered sports groups would be

deemed impermissible.  This raises the question of whether exempting gendered

athletic clubs from the statute's sweeping definition of diversity, equity, and

inclusion would be arbitrary.

119.   S.B. 266's prohibitions against advocating for diversity, equity, and inclusion threaten fundamental First Amendment rights.  Under the legislation's vague language, one could argue that providing news coverage of an event run by student affinity group might be considered "advocat[ing] for diversity, equity, and inclusion" under its vague and overbroad definition.  In fact, this concern has already been raised at UF.  In Fall 2024, a student-run media outlet avoided covering an affinity group event aimed at discussing how the recent legislation had impacted their community for fear of losing their school funding.

120.   Relatedly, if a Black professor at UF, like Plaintiff Austin, encourages a fellow Black professor at UF to apply for a leadership role to expand diversity in faculty, Defendants may interpret this as unlawful hiring or recruiting under S.B. 266.  Such bans on advocating for diversity, equity, and inclusion and providing opportunities for political and social activism jeopardize the ability of Florida universities to support a diverse faculty and to prepare their students to enter society with the knowledge, understanding, and well-rounded mindset they need to contribute to our democracy.

121.   S.B. 266 and the Regulations leave faculty and students with too many fundamental, unanswered questions about what conduct is permitted or prohibited; how they can teach; what they can teach; and what words they can or

cannot use, all resulting in self-censorship and a chilling effect across campuses.

## CAUSES OF ACTION

## Count I

## Violation of the First Amendment to the United States Constitution, 42 U.S.C. § 1983: Viewpoint Discrimination

122.    Paragraphs 1–121 are incorporated here by reference.

123.    The First Amendment binds the State of Florida pursuant to the incorporation doctrine of the Fourteenth Amendment. References below to the First Amendment include the First Amendment as applied to states through the Fourteenth Amendment.

124.    Viewpoint-based discrimination is presumptively unconstitutional and especially dangerous in higher education.  And when, as here, that viewpoint-based discrimination prohibits advocacy to change government policy or action, it infringes on core political speech and the right to petition the government.

125.    Defendants violated Plaintiff Austin's First Amendment rights by denying her funding to attend and present her scholarship at the Diversity Abroad Conference because of her disfavored viewpoint.  Dr. Austin plans to continue to seek funding for conferences on topics related to diversity, equity, and inclusion to present her research.

126.   S.B. 266 and the Regulations impose unconstitutional viewpoint-based restrictions on faculty and students that contradict the principles of academic freedom.  Specifically, they prohibit otherwise generally available funding for viewpoints disfavored by the State, while permitting financial assistance for programs and activities that condemn those same viewpoints.

## Count II

**Violation of the First Amendment to the United States Constitution, 42 U.S.C. § 1983: Overbreadth**

127.   Paragraphs 1–121 and 123 are incorporated here by reference.

128.   S.B. 266 and Regulation 9.016 violate the First Amendment because they are overinclusive and otherwise overbroad.

129.   S.B. 266 and Regulation 9.016 are not narrowly tailored to accomplish a legitimate government purpose.  The law expands beyond the legitimate sweep of government speech to a substantial amount of constitutionally protected private expression, chilling faculty and student speech.

130.   S.B. 266's broad and imprecise restrictions on general education courses are chilling in-class discussions, as educators seek to comply with Florida law and ensure their courses retain general education status.

131.   Due to its lack of specifications or helpful guidelines, S.B. 266 and Regulation 9.016 create an expansive curtailment of any expression favoring

diversity, equity, and inclusion, as well as political and social activism.  As such,

they are substantially overbroad, expanding beyond government speech to private

expression and resulting in a chilling effect on both faculty and students.

## Count III

**Violation of the Fourteenth Amendment to the United States Constitution,**

**42 U.S.C. § 1983: Void for Vagueness**

132.   Paragraphs 1–121 are incorporated here by reference.

133.   The void for vagueness doctrine arises when a law: (1) "fail[s] to

provide the kind of notice that will enable ordinary people to understand what

conduct it prohibits"; or (2) "authorize[s] and even encourage[s] arbitrary and

discriminatory enforcement."  *Morales*, 527 U.S. at 56.

134.   S.B. 266 and Regulation 9.016 violate the Fourteenth Amendment

because their terms are impermissibly vague, making it impossible to determine

what conduct is prohibited, and they encourage arbitrary and discriminatory

enforcement.

135.   Regulation 9.016's ambiguous definitions provide no insight into

understanding S.B. 266's scope or determining how faculty and students can

express their views.

136.   S.B. 266's and Regulation 9.016's vague language prohibiting general

education courses from "distort[ing] significant historical events"; teaching

"identity politics"; or being "based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities" fails to provide sufficient notice as to (1) which courses may receive general education designation and (2) what professors are permitted to teach.

137.   The vagueness of the law and Regulation 9.016 leaves too much room for individual interpretation—permitting Defendants to classify some groups as violative of the law whose viewpoints they may disagree with, while supporting others' whose viewpoints they favor.

138.   S.B. 266 and Regulation 9.016 leave faculty and students with too many fundamental, unanswered questions about what conduct is prohibited, resulting in self-censorship and a chilling effect across campuses.

## Count IV

### Violation of Florida's Campus Free Expression Act

139.   Paragraphs 1–121 are incorporated here by reference.

140.   Section 1004.097(3)(f) provides, "A Florida College System institution or a state university may not shield students, faculty, or staff from expressive activities."

141.   Section 1004.097(2)(f) defines "shield" as conduct that "limit[s] students', faculty members', or staff members' access to, or observation of, ideas

and opinions that they may find uncomfortable, unwelcome, disagreeable, or

offensive."

142.   Section 1004.097(3)(a) further provides that expressive activities are

protected under the First Amendment to the United States Constitution and Article

I of the Florida Constitution.  These activities include, as pertinent here, faculty

research, lectures, writings, and commentary, whether published or unpublished.

143.   Through selective enforcement of S.B. 266 and the Regulations,

Defendant BOT members have prohibited faculty from teaching, and students and

faculty from engaging in discussions, about ideas and opinions that some may find

unwelcome or disagreeable.

144.   Defendants have, therefore, shielded students and faculty at Florida's

public universities in violation of section 1004.097(3)(f).

## REQUEST FOR RELIEF

**WHEREFORE**, considering the foregoing facts and arguments, Plaintiff

respectfully requests that this Court enter judgement in their favor and:

A.     Issue preliminary and permanent injunctive relief restraining

Defendants and their successors from enforcing Fla. Stat. §§ 1004.06(2)(b) and

1007.25(3) and Regulation 9.016;

B.     Declare Fla. Stat. §§ 1004.06(2)(b) and 1007.25(3) and

Regulation 9.016 unconstitutional in violation of the First and Fourteenth

Amendments to the United States Constitution under 42 U.S.C. § 1983;

C.    Pronounce Defendants' enforcement of Fla. Stat. §§ 1004.06(2)(b) and 1007.25(3) and Regulation 9.016 in violation of Fla. Stat. § 1004.097.

D.    Award to Plaintiffs costs incurred in pursuing this action, including reasonable attorneys' fees and other necessary expenses, pursuant to 42 U.S.C. § 1988, Fla. Stat. § 1004.097(4)(a), and other applicable authority; and

E.    Grant such additional relief as the interests of justice may require.

Dated: January 16, 2025          Respectfully submitted,

By: /s/ Jerry C. Edwards

Jerry C. Edwards (FBN 1003437)
Samantha J. Past (FBN 1054519)
Amien Kacou (FBN 44302)
Michelle Morton (FBN 81975)
Daniel B. Tilley (FBN 102882)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF FLORIDA
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel.: (786) 363-2714
jedwards@aclufl.org
spast@aclufl.org
akacou@aclufl.org
mmorton@aclufl.org
dtilley@aclufl.org

-and-

Lee R. Crain (*pro hac vice* forthcoming)
Martie Kutscher Clark (*pro hac vice* forthcoming)

Laura M. Sturges (*pro hac vice* forthcoming)
Janiel Myers (*pro hac vice* forthcoming)
Caelin Moriarity Miltko (*pro hac vice* forthcoming)
A. Nell Tooley (*pro hac vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212-351-4000
lcrain@gibsondunn.com
mkutscherclark@gibsondunn.com
lsturges@gibsondunn.com
jjmyers@gibsondunn.com
cmoriaritymiltko@gibsondunn.com
ntooley@gibsondunn.com

*Co-Counsel for Plaintiffs*