UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

SHARON AUSTIN, *et al.*,

      Plaintiffs,

v.

BRIAN LAMB, *et al.*,               Case No.: 1:25-cv-00016-MW-MJF

      Defendants.

_____/

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

With Senate Bill 266 ("S.B. 266"), the State of Florida censors speech it disfavors by targeting diversity, equity, and inclusion ("DEI"); political or social activism; and discussions of race and other aspects of identity. This motion seeks a preliminary injunction barring Defendants from enforcing two of S.B. 266's provisions and one of its related regulations statewide: (1) the funding ban and its enacting regulation, Florida Statutes Section 1004.06(2)(b) and Florida Board of Governors' ("BOG") Regulation 9.016; and (2) S.B. 266's restrictions on instruction in general education courses, Florida Statutes Section 1007.25(3)(c) (collectively, the "Laws"). The State's viewpoint-based restraints on speech threaten core academic and student speech, imperiling the free inquiry that characterizes higher education. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835–

36 (1995); *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967). The ambiguous draftsmanship of Section 1007.25(3)(c) enables Defendants to apply S.B. 266 in an arbitrary and discriminatory manner. *See Keyishian*, 385 U.S. at 604. And the Laws are so vague as to fail to give faculty and students fair notice of what they can and cannot discuss. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). The Constitution does not permit the government to suppress "free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Rosenberger*, 515 U.S. at 836.

Plaintiffs and declarants are professors, faculty members, and students at several of Florida's public universities, each of whom has already had and continues to have their professional and educational opportunities irreparably harmed by the Laws. They have lost funding and opportunities to engage in valuable and irreplaceable research, conduct peer review, learn about emerging trends in their fields, and engage in networking opportunities with other professionals. These harms will continue without the requested relief.

The Laws also restrict what may be discussed in on-campus programming at Florida's public universities. Professors' courses have been stripped of general education designation without explanation or instruction on how those courses can comply with S.B. 266 and reclaim that status, while courses teaching traditional, conservative viewpoints have remained unaffected. The Laws also broadly chill

student expression and threaten academic research that involves "student participation." Fla. BOG Reg. 9.016(1)(a)(4). The Laws are unconstitutionally overbroad, vague, and impose viewpoint discrimination in violation of the First and Fourteenth Amendments to the U.S. Constitution.

**FACTUAL BACKGROUND**

**I.     Abandoning its commitment to free expression on university campuses, Florida passed S.B. 266 to restrict disfavored viewpoints.**

In April 2019, Florida's BOG issued a Statement of Expression ("Statement"), recognizing the "integral part" freedom of speech plays in the BOG's "university mission." Edwards Ex. A.[1] The Statement noted that individuals must be free to "express any ideas and opinions they wish, even if others may disagree with them or find those ideas and opinions to be offensive or otherwise antithetical to their own worldview." *Id.* In 2021, the Florida legislature affirmed the BOG's commitment to free speech and expression on university campuses, amending Florida Statutes Section 1004.097. That amendment prohibited Florida state universities from shielding students, faculty, or staff from "ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. § 1004.097(2)(f), (3)(f).

---

[1] Citations in the format "Name ¶ X" or "Name Ex. X" refer to the declaration of the individual with that last name, filed simultaneously herewith.

Florida abruptly abandoned this commitment to free speech principles on university campuses, beginning an alarming trend of restricting expression in the state's public universities. *See generally Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022); *Austin v. Univ. of Fla. Bd. of Trustees*, 580 F. Supp. 3d 1137 (N.D. Fla. 2022). S.B. 266, passed in 2023, continues this trend. 2023 Fla. Laws 82.

The funding prohibition states in relevant part:

> [A] state university … or state university direct-support organization may not expend any state or federal funds to promote, support, or maintain any programs or campus activities that … [a]dvocate for diversity, equity, and inclusion, or promote or engage in political or social activism, as defined by rules of the State Board of Education and regulations of the Board of Governors.

Fla. Stat. § 1004.06(2)(b). On January 24, 2024, the BOG enacted Regulation 9.016, purportedly defining key terms in the statute, including "DEI," "political or social activism," and "social issues." *See generally* Reg. 9.016. Regulation 9.016 provides only vague definitions of "DEI," "political or social activism," and "social issues." Reg. 9.016(1)(a)(1)–(3).

S.B. 266 also seeks to limit the topics professors can discuss in general education courses. All students, regardless of major, must take a specified number of general education courses to graduate. The "[g]eneral education core courses" restriction mandates these courses must not "include a curriculum that teaches identity politics . . . or is based on theories that systemic racism, sexism, oppression,

and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities." Fla. Stat. § 1007.25(3)(c). S.B. 266 subjects general education courses to annual review by university administration and the BOG, with performance funding at risk. *See id.* § 1007.55(2), (4), (5).

## II. The Laws proscribe needed funding for professors, faculty, and students to develop scholarship and participate in conferences.

Professors, faculty, and students rely on university funding for their research, for academic conferences to develop their scholarship, and to host and participate in other programs. Smith ¶¶ 20–21. Participation in these programs is crucial to scholarship development and growth and is an important part of both getting and keeping tenure at Florida's universities. Univ. of Fla. Reg. 6-C1-7.019 § 4, available at https://perma.cc/N6J3-K2SJ; Smith ¶¶ 19–20. Participation in these programs is also essential to creating educational opportunities for students. As a result of the Laws, professors, faculty, and students have lost and will continue to lose access to these opportunities at key moments in their academic careers with devastating and irreparable consequences. *See* Smith ¶¶ 26–27.

Sharon Austin is a Professor of Political Science at the University of Florida ("UF"). Austin ¶ 3. In 2023, fully funded by UF, Dr. Austin attended an academic conference ("Diversity Abroad"), where she presented on academic freedom. *Id.* ¶ 48. In 2024, Dr. Austin was invited back to present her scholarship on anti-DEI

legislation. *Id.* She initially sought funding from UF's International Center, which had provided her funding the previous year. *Id.* ¶¶ 49–50. UF denied her funding, citing S.B. 266. *Id.* Dr. Austin then asked her department chair if she could use her Political Science professional development funds to attend. *Id.* ¶ 51. Again, she was denied. *Id.* ¶ 53. Dr. Austin hopes to present her research at other conferences in the future but fears that UF will continue refusing funding because of the nature of her research and the conferences. *Id.* ¶¶ 56–57.

Dr. Jean Muteba Rahier is a Professor of Anthropology and African and African Diaspora Studies ("AADS") at Florida International University ("FIU"). Rahier ¶ 3. His research focuses on West and Central Africa and the African diaspora in the Americas, particularly Latin America. *Id.* ¶ 4. Due to the subject-matter of his research, Dr. Rahier fears he will no longer be eligible to receive funding to support his scholarship. *Id.* ¶ 28–31. Likewise, Dr. Matthew Marr, an Associate Professor of Sociology in FIU's Department of Global and Sociocultural Studies and the Asian Studies Program, fears that funding for his research will be limited because his research is policy focused. Marr ¶¶ 3, 42–46.

The funding restriction also impacts students. Kimberly Williams is a doctoral candidate in UF's English department. Williams ¶ 3. In March 2024, Ms. Williams requested funds from UF to attend a conference for underrepresented scholars—a conference for which UF had provided funds in the past. *Id.* ¶¶ 6, 11–

12. UF denied her request due to the Laws, despite acknowledging the conference's value. *Id.* ¶¶ 14–15. Ms. Williams lost this irreplaceable opportunity to network with other scholars as she prepared to enter the academic job market; she expects the Laws will continue to irreparably restrict her future opportunities. *Id.* ¶¶ 9, 16–21.

These limitations discourage students from pursuing educational opportunities available to students in other states. Due to fear that its funding request would violate S.B. 266 and thus the Student Conduct Code and the Student Organization Conduct Code, Florida State University's ("FSU") student chapter of OUTLaw, a law student group focused on the LGBTQIA+ community, did not request funding to attend Lavender Law—a nationwide conference geared towards LGBTQIA+ law students that serves as an important networking event for post-graduate employment. Weilhammer ¶¶ 20–23. Because of the Laws' restrictions on funding for certain disfavored subjects, educational and professional opportunities at Florida's public universities are already and will continue to be irreparably restricted.

### III. The Laws restrict free dialogue on campus by prohibiting funding for on-campus programming and events.

Florida's public universities have restricted the topics that may be discussed in on-campus programming and events due to the Laws, causing professors, faculty, and students to lose out on irreplaceable opportunities. Nicole Morse, a former

professor at Florida Atlantic University ("FAU"), ran the Lavender Languages Institute at FAU, a summer institute bringing together faculty and students to explore the intersection of language and sexuality. Morse ¶¶ 5, 10–11. Post-S.B. 266, FAU informed Dr. Morse that they should move the Institute to another university outside of Florida or they may be forced to cancel it due to the Laws. *Id.* ¶¶ 26–27. Dr. Morse relocated the Institute to a California university. *Id.* ¶ 15. This relocation and the Laws' limitations on funding to attend such institutes means Florida faculty and students are discouraged or effectively prohibited from participating in the Institute and are likely to lose out on similar opportunities going forward. *Id.* ¶¶ 28, 31.

Likewise, FSU's OUTLaw fears that its ability to host programming for law students related to LGBTQIA+ issues will be impaired—for example, at least one other student organization at FSU has become reluctant to participate in joint events with OUTLaw for fear such activities could violate S.B. 266. Weilhammer ¶¶ 24-26. As a result of the Laws, Florida's universities are restricting, and will continue to restrict, speech disfavored by the State, costing faculty and students valuable on-campus educational opportunities that can never be recovered.

## IV. The Laws restrict which courses may be offered for general education credit at Florida's state universities.

The Laws limit the viewpoints instructors may discuss in general education courses. Fla. Stat. § 1007.25(3)(c). Plaintiffs (among many others) have all had

courses removed from the general education curriculum because of S.B. 266. When courses lose general education status, they are likely to have lower enrollment and risk cancellation. *See* Austin ¶ 46; Goodman ¶ 25–26; Marr ¶¶ 30–31; Queeley ¶¶ 30–32. Removal of these courses from the general education curriculum has caused and will continue to cause irreparable harm to these professors, their departments, and their students by chilling faculty speech, threatening the financial health of professors and departments, and censoring students' educational opportunities. *See, e.g.*, Austin ¶¶ 41–46; Goodman ¶¶ 25–29; Smith ¶¶ 14, 18–19; Marr ¶¶ 30–37; *see also* Edwards Ex. B ("They're starving undergraduate enrollment in our courses. . . . The worry is they'll then be able to take away whole programs and justify it by saying courses aren't filling up."); Edwards Ex. C ("Many professors said [SB 266] will ultimately result in dwindling enrollments for departments, eventually leading to their removal. And students told the Miami Herald they don't want to pay for elective courses that don't fulfill requirements.").

Dr. Andrea Queeley is an Associate Professor in the Department of Global and Sociocultural Studies ("GSS") and AADS at FIU. Queeley ¶ 3. FIU has two types of general education courses: Tier 1 courses, which satisfy state-mandated requirements, and Tier 2 courses, which satisfy university-mandated requirements. Marr ¶ 12. Dr. Queeley has historically taught two Tier 2 general education courses: (1) "The Anthropology of Race and Ethnicity" and (2) "Black Popular Cultures:

Global Dimensions." Queeley ¶¶ 15–19. In spring 2024, the FIU Senate Faculty approved both these courses for Tier 2 inclusion. Queeley ¶¶ 21–22. But, in summer 2024, the BOG challenged the committee recommendations and worked with the Provost's Office to remove courses from the general education curriculum, including Dr. Queeley's two courses. Marr ¶ 26; Queeley ¶¶ 20, 24–25. The FIU Faculty Senate convened an emergency meeting to object to removing certain courses. Marr ¶ 27. Notwithstanding this vocal faculty objection, and without clear guidance about the scope of the Laws or the basis for its determination, the BOG removed both of Dr. Queeley's courses. Queeley ¶ 23.

Dr. Marr had taught "Introduction to Sociology" as a Tier 1 general education course since 2009. Marr ¶¶ 10, 13. After S.B. 266 was passed, the entire field of sociology came under attack, with Florida Commissioner of Education Manny Diaz tweeting that it had "been hijacked by left-wing activists." *Id.* ¶ 16. As a result, the BOG removed "Principles of Sociology" from the Tier 1 list of general education courses in Regulation 8.005. *Id.* ¶ 19. Dr. Marr continues to teach "Introduction to Sociology" as a Tier 2 general education course, but he is left guessing as to how to comply with S.B. 266, particularly given its removal from the Tier 1 curriculum. *Id.* ¶ 36.

At UF, Dr. Vincent Adejumo, a Senior Lecturer of African American Studies, has taught a variety of general education courses, including "Introduction to African

American Studies," "Mentoring At-Risk Youth," "Black Masculinity," and "The Wire." Adejumo ¶¶ 3, 11–15. Dr. Adejumo's courses were removed from the general education curriculum after the enactment of S.B. 266, and he was given no opportunity to explain how the courses satisfied general education requirements. *Id.* ¶ 17. He believes no course in UF's African American Studies program currently maintains general education status. *Id.* ¶ 21. Because Dr. Adejumo never received feedback regarding his courses' compliance with S.B. 266, he does not know how he could bring his courses in compliance with the Laws. *Id.* ¶ 22.

Likewise, because of S.B. 266, Dr. Austin has lost general education status for both of her general education courses: "The Politics of Race" and "Black Horror and Social Justice." Austin ¶¶ 22, 25, 33, 36. She does not know why her courses were removed or how to comply with S.B. 266 moving forward. *Id.* ¶¶ 37–40. At FSU, Dr. Robin Goodman, a Distinguished Research Professor of English, had taught "Third World Cinema" as a general education course since 2016. Goodman ¶¶ 3, 14, 16. The BOG removed "Third World Cinema" from FSU's general education curriculum based on the BOG's determination that it violated S.B. 266. *Id.* ¶ 19–20.

Because these courses have lost general education status, they will likely lose enrollment and risk cancellation. Austin ¶ 46; Goodman ¶ 25; Marr ¶¶ 30–31; Queeley ¶¶ 30–32. Removal of these courses results in students learning only state-

approved viewpoints in Florida's general education courses. This is by design. For example, while Dr. Austin's and Dr. Adejumo's courses have been removed from UF's general education curriculum, courses teaching traditional, conservative viewpoints maintain their general education status. *See* Edwards Ex. E (course list approved by University of Florida's Board of Trustees on October 3, 2024). These courses include "The Search for Meaning in a Secular Age" featuring a module that discusses "identity politics" and "wokeism," *id.* Ex. F, and "What is the Common Good?" featuring a module on the "structure of traditional marriage and family," *id.* Ex. G. *See also* Adejumo ¶ 23.

## ARGUMENT

A party seeking a preliminary injunction must show: (1) "a substantial likelihood of success on the merits"; (2) an "irreparable injury will be suffered unless the injunction issues"; (3) that "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party"; and (4) "if issued, the injunction would not be adverse to the public interest." *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 860 (11th Cir. 2020) (citation omitted). "When the government is the opposing party, as it is here, the third and fourth factors merge." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1292 (11th Cir. 2022). Plaintiffs satisfy each of these elements.

## I.   Plaintiffs are likely to succeed on the merits of their constitutional claims.

### A. S.B. 266's Funding Ban imposes a viewpoint-based restriction in violation of the First Amendment.

Section 1004.06(2) and Regulation 9.016 (collectively, the "Funding Ban") prohibit using "state or federal funds" to "[a]dvocate for diversity, equity, and inclusion" or "[p]romote or engage in political or social activism."  Fla. Stat. § 1004.06(2)(b).  In denying Plaintiffs (and other professors and students) generally available funding because of disfavored viewpoints, the State has violated and continues to violate their free speech rights.

The First Amendment forbids the government from "abridging the freedom of speech."  U.S. Const. amend. I.  The government cannot "restrict[] or burden[] expression because of its message, its ideas, its subject matter, or its content."  *Vidal v. Elster*, 602 U.S. 286, 292 (2024) (citation omitted).  Viewpoint discrimination is "a particularly egregious form of content discrimination."  *Id.* at 293 (citation omitted).  The Eleventh Circuit recently described viewpoint discrimination as "the greatest First Amendment sin" and "likely [] invalid per se."  *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277–78 (11th Cir. 2024).

When the government offers generally available funds, it may not deny access to those funds based on a speaker's viewpoint.  *See Rosenberger*, 515 U.S. at 834; *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 543 (2001).  Florida has done

exactly that: because Dr. Austin seeks to discuss her scholarship about legislative attacks on DEI at conferences supportive of DEI, she is denied funding she would ordinarily receive to promote her scholarship. Austin ¶¶ 55–57. And other professors similarly fear they will not receive funding for future research projects because of the subject-matter of their work. Rahier ¶¶ 28–31; Marr ¶¶ 44–46. Though Plaintiffs are public employees, the State may not deny them access to generally available funding to promote their academic research and scholarship simply because it disagrees with their views.[2] *See Rosenberger*, 515 U.S. at 834; *Velazquez*, 531 U.S. at 543.

Courts recognize that "professors at public universities are paid—if perhaps not exclusively, then predominantly—to speak, and to speak freely, guided by their own professional expertise, on subjects within their academic disciplines." *Heim v. Daniel*, 81 F.4th 212, 226–27 (2d Cir. 2023). This is why academic "freedom is . . . a special concern of the First Amendment." *Keyishian*, 385 U.S. at 602–03. Every circuit to consider a post-*Garcetti* academic-freedom dispute has applied the *Pickering-Connick* framework, which asks whether the government has an adequate

---

[2] The speech here is not subject to *Garcetti*'s official duties test because it is "expression related to academic scholarship." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 425 (2006). However, Plaintiffs do not concede if *Garcetti*'s official duties test applies, their expression at an academic conference is necessarily speech pursuant to their official duties. *See Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 564 (4th Cir. 2011).

justification for treating employees differently from members of the general public. *See Heim*, 81 F.4th at 228. When assessing professorial speech outside the classroom, this Circuit also applies *Pickering-Connick* balancing. *See, e.g.*, *Maples v. Martin*, 858 F.2d 1546, 1552 (11th Cir. 1988); *Duke v. N. Tex. State Univ.*, 469 F.2d 829, 838 (5th Cir. 1972).[3] Because the expression at issue is not in-class speech, the *Pickering-Connick* test applies.[4]

Under *Pickering* and its progeny, when a government restriction on public-employee speech is a "wholesale deterrent to a broad category of expression by a massive number of potential speakers," as here, rather than a "single supervisory decision," the government has an even greater burden. *United States v. Nat'l Treasury Emps. Union (NTEU)*, 513 U.S. 454, 467–68 (1995) (discussing *Pickering*). Under this more exacting standard, "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that

---

[3] The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[4] Even if this Court applies the standard from *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), Plaintiffs should prevail for the same reasons the plaintiffs in *Pernell* prevailed under that test. *See Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1277–78 (N.D. Fla. 2022).

expression's 'necessary impact on the actual operation' of the Government." *Id.* at 468 (citation omitted).

The Funding Ban cannot survive this standard. Dr. Austin seeks to speak on matters of public concern. *See NTEU*, 513 U.S. at 466. The research she planned to present at Diversity Abroad and plans to present at future conferences criticizes anti-DEI legislation. Austin ¶¶ 7, 48. Looking to "the content, form, and context" of the speech, *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1051 (11th Cir. 2022), the content is political speech that sits at the core of the First Amendment— discussion of governmental policy and advocacy for political change; the form is a public presentation at an academic conference; and the context is Dr. Austin informing others about legislative attacks on DEI. *See Meyer v. Grant*, 486 U.S. 414, 421 (1988) ("The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (citation omitted)). Similarly, Ms. Williams wishes to speak about issues concerning race, Williams ¶ 17, and Dr. Marr's scholarship is focused on specific policy recommendations, including racial equity, Marr ¶ 46. This is all quintessential speech on matters of public concern. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

The State cannot show that its interest in suppressing advocacy for DEI and political or social activism outweighs the interests of Plaintiffs' potential audiences.

UF hired Plaintiffs "to speak, and to speak freely, guided by [their] own professional expertise." *See Heim*, 81 F.4th at 227. In seeking to workshop her scholarship at conferences, Dr. Austin is abiding by her university's professional standards and expectations. Smith ¶ 20. The topic of her work is within her area of expertise and is the type of research she was hired to conduct. Austin ¶¶ 4–21. Research, publishing, and participation at academic conferences are core to Dr. Austin's role as a professor and central to her ability to advance in her field. Austin ¶¶ 64–65; Smith ¶ 20. Dr. Austin's audience has a strong interest in engaging with her scholarship. *Cf. Kleindienst v. Mandel*, 408 U.S. 753, 762–65 (1972) (recognizing students' and professors' "constitutional interest" in accessing scholarly ideas).

Nor can the State prove that it is acting to remedy real harms. *See NTEU*, 513 U.S. at 475–76 (government must prove real, not speculative, harms). The government cannot ban ideas it disagrees with from its public universities merely because it labels them discriminatory. *See Pernell*, 641 F. Supp. 3d at 1277–78; *see also Meriwether v. Hartop*, 992 F.3d 492, 509–12 (6th Cir. 2021). Nor can the State argue that by prohibiting speech, it is somehow protecting free expression. *See Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1247 (11th Cir. 2007) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927)). The purpose

of academic freedom is to preserve higher education's truth-seeking function. *See Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). The State cannot prevent Dr. Austin from presenting her research simply because it disagrees with her viewpoints. *See Meriwether*, 992 F.3d at 506 (academic freedom prevents the government from "compel[ling] ideological conformity").

The State cannot meet its burden here. The Funding Ban should be enjoined as viewpoint discrimination in violation of the First Amendment.

B. <u>The Funding Ban is facially overbroad.</u>

The Funding Ban is overbroad on its face. The Funding Ban impermissibly limits university professors' academic freedom outside the classroom and burdens students' ability to engage in protected speech. Accordingly, the Funding Ban is unconstitutionally overbroad and violates the First Amendment.

"[T]he overbreadth doctrine allows a party to challenge a law on its face because it also threatens others not before the court." *Cheshire Bridge Holdings, LLC v. City of Atlanta*, 15 F.4th 1362, 1370 (11th Cir. 2021) (citation omitted). First Amendment facial overbreadth challenges are appropriate where there is (1) "substantial" overbreadth and (2) "no apparent saving construction of the statute." *Bd. of Airport Com'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574–75 (1987). Substantial overbreadth exists where there is "a realistic danger that the statute itself will significantly compromise recognized First

Amendment protections of parties not before the Court." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). The court must analyze whether the law at issue "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (quotation marks omitted). A preliminary injunction is an appropriate remedy for a finding of overbreadth. *See HM Florida-Orl, LLC v. Governor of Florida*, No. 23-12160, 2023 WL 6785071, at *3–4 (11th Cir. Oct. 11, 2023).

The Funding Ban is substantially overbroad. Section 1004.06(2)(b) states:

> A … state university … or state university direct-support organization may not expend any state or federal funds to promote, support, or maintain any programs or campus activities that: …
> (b) Advocate for diversity, equity, and inclusion, or promote or engage in political or social activism, as defined by rules of the State Board of Education and regulations of the Board of Governors.

This is an expansive restraint on broad swaths of student and faculty speech.[5] Regulation 9.016(1)(a)(1) broadens the scope of the provision, defining "diversity, equity, and inclusion" as "any program, campus activity, or policy that classifies individuals on the basis of race, color, sex, national origin, gender identity, or sexual orientation and promotes differential or preferential treatment of individuals on the

---

[5] The statute's limited exemptions for things like "student fees" supporting "student-led organizations," *see* § 1004.06(2)-(3), do little to limit its enormously expansive sweep.

basis of such classification."  Further, Regulation 9.016(1)(a)(2) defines "Political or Social Activism" as "any activity organized with a purpose of effecting or preventing change to a government policy, action, or function, or any activity intended to achieve a desired result related to social issues, where the university endorses or promotes a position in communications, advertisements, programs, or campus activities." "Social Issues" means any "topics that polarize or divide society among political, ideological, moral, or religious beliefs." Reg. 9.016(1)(a)(3).[6] And the definition for "[a]ny programs or campus activities" includes "activities authorized or administered by the university or a university's direct-support organization(s) that involve . . . [s]tudent participation, other than classroom instruction."  Reg. 9.016(1)(a)(4).  With these expansive definitions, the Funding Ban burdens a substantial amount of protected speech.

Three examples demonstrate the Funding Ban's unconstitutional overbreadth.

*First*, the Funding Ban is so broad that it could plausibly reach all research and scholarship that might involve "student participation."  Reg. 9.016(1)(a)(4). Many faculty research projects, for example, employ students as study participants. Smith ¶ 28.  At least one university has interpreted such participation as placing

---

[6] It is hard to understand how universities can continue to be "vital centers for the Nation's intellectual life" if they must stifle activities intended to impact controversial topics that "divide society" in some way. *Rosenberger*, 515 U.S. at 836; Reg. 9.016(1)(a)(3).

faculty research within the Funding Ban's ambit. Edwards Ex. A. Faculty commonly hire student research assistants to help them with their projects. Austin ¶¶ 60–61; Marr ¶¶ 45–46. Section 1004.06(2)(b) and Regulation 9.016 require universities to defund this research if it could be seen as promoting political or social activism—categories that sweep in seemingly endless potential subjects—or advocating for DEI. Professors have reason to fear punishment if they produce scholarship or conduct research that violates Florida law, through the post-tenure review process, *see supra* Section II, or retaliatory denial of further research funding. Austin ¶ 61; *c.f.* Smith ¶ 19. The Constitution prohibits such restrictions. *See Sweezy*, 354 U.S. at 250.

*Second*, Section 1004.06(2)(b) imperils debates, invited talks, and panel discussions at Florida universities. *See* Smith ¶ 26; Williams ¶ 18; Marr ¶¶ 39–41. The definition of "social issue" is so broad that it encompasses any salient issue. *See* Reg. 9.016(1)(a)(3). The Regulation's requirement that "the university endorse[] or promote[] a position in [the] campus activit[y]," is easily satisfied by hosting a speaker and advertising an event. Reg. 9.016(1)(a)(2).[7] For example, UF's Bob Graham Center hosted "A Conversation with Mark Oppenheimer" on January 31,

---

[7] The terms "endorse" and "promote" are not defined in the regulation. "Promote" means "to contribute to the growth . . . of" an idea, to "further" it. *Promote*, Merriam-Webster Dictionary (last accessed Jan. 6, 2025), https://perma.cc/36CF-V7YX.

2023, where Dr. Oppenheimer discussed the recent increase in antisemitism.[8] Antisemitism is certainly a "topic that polarize[s] or divide[s] society among political, ideological, moral or religious beliefs," Reg. 9.016(1)(a)(3), meaning that the event would violate the Funding Ban's plain text. Prohibiting open discourse on issues that are, by definition, polarizing plainly runs counter to the First Amendment. Further, by making faculty and guest speakers ineligible for funding like honoraria covering travel expenses, the Funding Ban penalizes professors for speaking and penalizes students and other members of the public who wish to access a diverse range of ideas. *Cf. Kleindienst*, 408 U.S. at 762–65.

*Third*, the Funding Ban prevents scholars and students from attending conferences and discussing viewpoints the State disfavors. *See, e.g.*, Williams ¶¶ 16–18. The Funding Ban burdens speech by removing the only, or primary, sources of funding to attend such conferences, making attending these conferences and speaking impossible or extremely costly. *Id.* This is protected speech that is integral to academic endeavors, both for professors and graduate students. *See* Smith ¶ 20; *Sweezy*, 354 U.S. at 250. Attending these conferences helps graduate students obtain jobs. Williams ¶ 19. Denying faculty and students generally available

---

[8] Event details available at https://perma.cc/SNH8-XXP8.

funding based on such broad categorization abridges constitutionally protected speech. *See Rosenberger*, 515 U.S. at 836.

The Funding Ban has only a narrow "plainly legitimate sweep," *United States v. Stevens*, 559 U.S. 460, 472 (2010) (quotation marks omitted), namely any expression actually qualifying as government speech. *See Shurtleff v. City of Bos.*, 596 U.S. 243, 251 (2022). Government speech may include university policies, official university press releases, and the university's recruitment efforts. Government speech does *not* include speech by professors or students on diversity or political or social issues. *See Pernell*, 641 F. Supp. 3d at 1236-37, 1241. The Funding Ban's legitimate sweep is therefore exceedingly narrow.

The Funding Ban's suppression and chilling of protected expression is overwhelmingly substantial compared to its legitimate applications. Under the overbreadth doctrine, the government may not pursue means "that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Keyishian*, 385 U.S. at 602 (citation omitted). This is particularly important in the university environment, "a traditional sphere of free expression . . . fundamental to the functioning of our society." *Rust v. Sullivan*, 500 U.S. 173, 200 (1991).

While the legitimate applications of the Funding Ban are few, the Funding Ban broadly covers speech of professors, faculty, and students. *See supra* at 20-23. Student writing, discussion, and research on a vast set of topics violate the Funding

Ban, burdening free expression across Florida universities. *See* Reg. 9.016(2)(b)–(c). The First Amendment does not tolerate chilling student speech in the university setting. *See Rosenberger*, 515 U.S. at 835–36; *see also Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125, 1128–29 (11th Cir. 2022).

Faculty are in a particularly perilous position. Any scholarship or speech involving "student participation" may fall within the Funding Ban's reach. Putting aside the Funding Ban's impact in prohibiting university funds to attend certain conferences, faculty must worry that when they speak at campus events, they may violate Section 1004.06(2)(b)'s prohibition on advocating for DEI or promoting or engaging in political or social activism. Professors also routinely give presentations or speak on panels outside the context of academic conferences. Smith ¶ 26. Under the Funding Ban's oppressive regime, whenever Dr. Austin, for example, speaks at one of Florida's public universities, she must weigh whether or how to curtail her expression to avoid violating S.B. 266. The same holds true for countless other faculty at Florida's public universities. This self-censorship is anathema to the First Amendment.

There is no saving construction this Court could give to the Funding Ban. Federal courts "are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) (quoting *Boos v. Barry*, 485 U. S. 312, 330 (1988)

(quotation marks omitted)). "A statute found to be overbroad is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 890 (11th Cir. 2023) (cleaned up). The Court cannot provide that limiting construction here, where the Funding Ban is plainly designed to sweep in the vast amount of speech it prohibits. The Funding Ban unlawfully shrinks the "marketplace of ideas" in Florida's public universities. *See Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Keyishian*, 385 U.S. at 603). Enforcement of the Funding Ban is "totally forbidden." *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1303 (11th Cir. 2017).

C. The Laws are unconstitutionally vague.

The Laws force professors and students to decide whether the topics they study, research, and discuss might "polarize or divide society among political, ideological, moral, or religious beliefs," Reg. 9.016(1)(a)(3), as nearly every topic can. This prohibition, and similar provisions throughout S.B. 266 and its implementing regulations, are so vague as to be impossible to reasonably follow. Such vagueness violates the First and Fourteenth Amendments.

"[A] vague law is no law at all." *United States v. Davis*, 558 U.S. 445, 447 (2019). A law is unconstitutionally vague where it: (1) "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits;"

or (2) "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *Morales*, 527 U.S. at 56. "When [a legislature] passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite [the legislature] to try again." *Davis*, 558 U.S. at 447.

When laws implicate free speech rights, as here, "a more stringent vagueness test" applies. *Wollschlaeger v. Governor*, 848 F.3d 1293, 1320 (11th Cir. 2017) (en banc) (quotation marks omitted). This is because "First Amendment freedoms need breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433 (1963). Consequently, the "government may regulate in the area of First Amendment freedoms only with narrow specificity." *Wollschlaeger*, 848 F.3d at 1320 (quotation marks omitted).

### 1. S.B. 266's Funding Restrictions

The Funding Ban fails to give Plaintiffs fair warning of what expression it defunds, leaving Plaintiffs unsure what speech they can engage in while at university-funded events or conferences. Marr ¶ 41. Section 1004.06(2)(b) is effectively a broad and largely boundless prohibition on speech. To the extent Regulation 9.016 and its sweeping definitions sought to cure any vagueness issues, it failed. To the contrary, the sweeping definitions in Regulation 9.016 merely

enable arbitrary and discriminatory enforcement of Section 1004.06(2)(b). Both Section 1004.06(2)(b) and Regulation 9.016 are unconstitutionally vague.

The State's definition of "Political or Social Activism" does not provide fair warning of the expression it covers. The regulation classifies an activity as political or social activism when it (1) is "organized with a purpose of effecting or preventing change to a government policy, action, or function," or (2) is "intended to achieve a desired result related to social issues." Reg. 9.016(1)(a)(2). The definition of "social issues" in Regulation 9.016(1)(a)(3) only further obscures: "topics that polarize or divide society among political, ideological, moral, or religious beliefs." Such a highly subjective definition could encompass almost any issue discussed on a university campus. Two people could easily differ on whether a topic is divisive or polarizing, preventing any possibility of understanding the Regulation's scope. *See Wollschlaeger*, 848 F.3d at 1321–22. For example, while some would pay no mind to a comment that vaccines are safe and effective, others see it as deeply divisive. The definition of "Political or Social Activism" does not give fair notice when read in conjunction with the definition of social issues.[9] Reg. 9.016(1)(a)(2)–(3).

The provision requiring the "university" to "endorse[] or promote[] a position in communications, advertisements, programs, or campus activities" for the activity

---

[9] The word "intended" also creates uncertainty; it is not clear if the relevant "intent" must be the university's, the organizer's, or the speaker's.

to fall within the definition of political or social activism is similarly vague.  Reg. 9.016(1)(a)(2).  A university that funds expression, hosts a speech, or advertises an event all could "promote" the ideas expressed by the speakers.  *See* Morse ¶¶ 21, 24. The Regulation does not make clear if a university must officially adopt the position or merely bring attention to the idea to violate the Regulation.  By not making this clear, the Regulation does not give Plaintiffs fair notice.

*2.  S.B. 266's General Education Course Restrictions*

Section 1007.25(3)(c)'s prohibition on "teach[ing] identity politics" in general education courses is also unconstitutionally vague.[10]  *Cf. Wollschlaeger*, 848 F.3d at 1323 ("In this quintessential First Amendment area, the State may not hinge liability on a phrase so ambiguous in nature.").  It is unclear what the Florida legislature meant by "identity politics," as it is not defined anywhere in S.B. 266 or Florida's statutory law.  *See, e.g.*, Fla. Stat. §§ 1004.04(2)(e)(1), 1004.85(2)(a)(6), 1007.25(3)(c), 1012.56(8)(b)(1), 1012.562(4)(a); *see also* Smith ¶¶ 11, 13. Merriam-Webster defines "identity politics" as "politics in which groups of people having a particular racial, religious, ethnic, social, or cultural identity tend to

---

[10] Section 1007.25(3)(c) states that "General education core courses may not … include a curriculum that teaches identity politics, violates s. 1000.05, or is based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities."

promote their own specific interests or concerns without regard to the interests or concerns of any larger political group."[11]  It is unclear how one could teach *any* political science courses at the university level without discussing group interests or concerns.  Smith ¶ 12.  Even the political science course "American Government," which is currently included on the State's list of approved general education courses, could violate Section 1007.25(3)(c) under a broad reading of "teaches identity politics."  Fla. BOG Reg. 8.005(1)(f)(4); *see also* Richard D. Parker, *Five Theses on Identity Politics*, 29 HARV. J.L. & PUB. POL'Y 53, 53 (2005) ("All politics is identity politics.").  Professors and universities must guess at what "identity politics" means and how to comply with the Laws.  Goodman ¶¶ 27–29.

The prohibition on discussing "theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities" is also unconstitutionally vague.  § 1007.25(3)(c).  It is unclear whether the "and" creates a conjunctive or disjunctive list.  *See* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 116 (2012).  Generally, "and" is conjunctive, requiring all listed conditions, *id.*, but it occasionally can be disjunctive,

---

[11] *Identity politics*, Merriam-Webster Dictionary (last accessed Jan. 14, 2025), https://perma.cc/R3RG-DSXT.

requiring only one condition, *see United States v. Garcon*, 997 F.3d 1301, 1306 (11th Cir. 2021) (concluding "and" was "disjunctive").[12] Universities appear to interpret at least some of the "ands" in this provision as disjunctive. Austin ¶ 39. Plaintiffs do not know, for example, whether they would violate the statute by teaching about systemic racism if they do not mention sexism.

This vagueness is reflected in the arbitrary and discriminatory nature in which universities have already enforced the Laws. As mentioned above, Dr. Austin's and Dr. Adejumo's courses have been removed from UF's general education curriculum, while courses teaching traditional, conservative viewpoints have maintained their general education status. Edwards Ex. E–G. This selective enforcement highlights how universities are interpreting vague provisions like "teach[ing] identity politics" arbitrarily and discriminatorily, with an obvious preference. *Cf. Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991) (noting the heightened risk of "discriminatory enforcement" for speech critical of the government). It is impossible for university professors to reasonably conform their conduct to such capricious standards. Austin ¶ 62.

---

[12] The en banc Eleventh Circuit reversed the panel decision in *Garcon*, but the Supreme Court later reversed the en banc decision and upheld this interpretation of the statute. *See Pulsifer v. United States*, 601 U.S. 124, 153 (2024).

The vagueness doctrine proscribes this sort of uncertainty in the university environment. *See Keyishian*, 385 U.S. at 604 ("The danger of . . . chilling effect[s] upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed.").

\* \* \*

Plaintiffs have demonstrated that they are likely to succeed on their First Amendment viewpoint discrimination and overbreadth claims and their Fourteenth Amendment vagueness claim. The Laws broadly stifle professors' and students' speech in the university environment. Neither the First nor the Fourteenth Amendment permit this.

## II.     Without an injunction, Plaintiffs will continue to suffer irreparable harm.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). The Eleventh Circuit has found a presumption of irreparable harm when, as in many cases here, "pure speech" is chilled or prevented altogether. *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc); *Wood v. Fla. Dep't of Educ.*, 2024 WL 1536749, at \*18-19 (N.D. Fla. Apr. 9, 2024).

If the State is permitted to continue enforcing S.B. 266, it will continue to broadly stifle and chill speech in Florida's public universities. Professors and students are left guessing as to whether they can host certain types of events on campus. Williams ¶ 18; Morse ¶ 25–27; Marr ¶ 38; Weilhammer ¶¶ 24–26. And professors and students are forced to either forego attending conferences to advance their scholarship or find ways to pay out of pocket (where possible) to attend these conferences. Austin ¶ 55, 57; Williams ¶¶ 16–17; Rahier ¶ 29. Absent injunctive relief, Plaintiffs will have to continue to choose between not speaking at or attending academic conferences, avoiding the protected speech the State has banned, or risking punitive consequences to their tenure status or contract. *See NTEU*, 513 U.S. at 469 (denial of financial incentives curtails expression); *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (financial harm when state immunity prevents recovery is irreparable).

Entire departments risk elimination from the decreased revenue their classes may generate after losing general education status due to arbitrary and discriminatory enforcement of S.B. 266. Marr ¶ 34; Adejumo ¶¶ 21, 26–27; Queeley ¶¶ 30–32. Professors who can still teach their general education courses are left guessing as to how to comply with the Laws or risk removal of their courses. Marr ¶¶ 29–30. And faculty continue to fear losing tenure if they run afoul of the State's

prohibitions on certain viewpoints. *See* Fla. Stat. §§ 1007.25(3)(c), 1001.706(6)(b); Fla. BOG Reg. 10.003(1)(b); *see also* Smith ¶ 19; Austin ¶ 61.

The vagueness plaguing these Laws harms Plaintiffs and those similarly situated. For example, Dr. Austin is in the impossible situation of having to conform her instruction and course materials to these indeterminate Laws or suffer harm. Austin ¶ 41. Her instruction could unintentionally violate state law, putting her tenure in jeopardy. *See* Reg. 10.003(1)(b). UF cannot "guarantee that others will find [Dr. Austin's] course to be in compliance with SB 266," even after making suggested changes. Austin ¶ 34. UF's emails imply that others reviewing the courses may have different perspectives on what constitutes teaching "identity politics." *Id.* Ex. A. Dr. Austin is uncertain how to structure a political science course that discusses race without risking being seen as teaching identity politics. *Id.* ¶ 38. Likewise, while Dr. Marr may no longer teach "Introduction to Sociology" as a state-required general education course, it continues to be offered at FIU as a Tier 2 general education course, leaving him confused as to whether he needs to change his teaching to account for S.B. 266 to maintain general education status. Marr ¶ 36. FSU has told Dr. Goodman she need not change her course curriculum, but it also informed her it will not defend her if she is found to have violated S.B. 266. Goodman ¶ 30. Student organizations remain forced to guess as to whether

their programming conforms to Laws and are forced to self-censor for fear of violating them.  Weilhammer ¶¶ 20–21, 27.

### III. The balance of equities favors granting an injunction, which is in the public interest.

The injury to Plaintiffs' constitutional rights and the rights of innumerable students and professors outweighs any harm an injunction might cause the State, because the government "has no legitimate interest in enforcing an unconstitutional [statute]."  *KH Outdoor*, 458 F.3d at 1272.  Accordingly, "the public interest is served when constitutional rights are protected."  *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019).  This factor favors the entry of a preliminary injunction.[13]

The Laws attack the free inquiry that is critical to intellectual and academic excellence, which is at the core of our universities' mission.  *See Sweezy*, 354 U.S. at 250.  A preliminary injunction allows Florida's public universities to continue to cultivate vital scholarship and "prepare young citizens to participate in the civic and political life of our democratic republic," maintaining the free exchange of ideas on

---

[13] While courts in this circuit generally require a bond before issuing injunctive relief under Federal Rule of Civil Procedure 65(c), it is within the discretion of the district court to waive the security requirement. *See Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130 (11th Cir. 2018).  Because important constitutional rights of public interest are at stake and damage to the State resulting from a wrongful issuance of a preliminary injunction cannot be shown, Plaintiffs request that this Court waive the bond requirement here.

Florida's university campuses until the Court has an opportunity to fully consider the merits of Plaintiffs' claims. *Speech First*, 32 F.4th at 1128.

<span style="text-align:center">C<span style="font-variant:small-caps">ONCLUSION</span></span>

Plaintiffs respectfully request that this Court enter an order enjoining Defendants from enforcing Section 1004.06(2)(b), Regulation 9.016, and Section 1007.25(3)(c) statewide for the pendency of this action.

Dated: January 27, 2025          Respectfully submitted,

By: /s/ Jerry C. Edwards
Jerry C. Edwards (FBN 1003437)
Samantha J. Past (FBN 1054519)
Amien Kacou (FBN 44302)
Michelle Morton (FBN 81975)
Daniel B. Tilley (FBN 102882)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF FLORIDA
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel.: (786) 363-2714
jedwards@aclufl.org
spast@aclufl.org
akacou@aclufl.org
mmorton@aclufl.org
dtilley@aclufl.org

-and-

Lee R. Crain
Martie Kutscher Clark
Laura M. Sturges
Janiel Myers
Caelin Moriarity Miltko

A. Nell Tooley
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212-351-4000
lcrain@gibsondunn.com
mkutscherclark@gibsondunn.com
lsturges@gibsondunn.com
jjmyers@gibsondunn.com
cmoriaritymiltko@gibsondunn.com
ntooley@gibsondunn.com

### CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

I hereby certify that this Motion and Memorandum of Law contains 7,985 words, excluding the parts of the document omitted by the rule, which is less than the 8,000 word limit.


/s/ Jerry C. Edwards
Jerry C. Edwards