# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# GAINESVILLE DIVISION

SHARON AUSTIN, *et. al.*,

   Plaintiff,

           v.

BRIAN LAMB, *et al.*,

   Defendants.

Case No.:1:25-cv-00016-MW-MJF

## DECLARATION OF ANDREA QUEELEY

I, Dr. Andrea Queeley, hereby declare and state as follows:

**A. Background**

1. My name is Dr. Andrea Queeley, and I am over 18 years of age.

2. I have personal knowledge of the following facts and if called to testify could and would competently do so.

3. I currently serve as an Associate Professor in both the Department of Global and Sociocultural Studies ("GSS") and the African and African Diaspora Studies Program ("AADS") at Florida International University ("FIU").

4. I have seventeen years of professional experience in higher education. My teaching covers a wide range of topics, including Black Popular Cultures, African and African Diaspora Studies Theory, Intra-Caribbean migration,

1

Latin American migration to the United States, Race and Revolution in Cuba, the African Diaspora in Latin America, and Cultures of the Caribbean.

5. I received a bachelor's degree in Psychology and Afro-American Studies from Brown University. I received a Ph.D. in Cultural Anthropology from City University of New York Graduate School and University Center.

6. I have taught as a Professor in the Department of GSS and AADS Program at FIU since 2009. I taught as an Assistant Professor from 2009 to 2015. Since 2015, I have served as an Associate Professor. As an Associate Professor, I teach classes at both the undergraduate and graduate level. At the undergraduate level, I teach, as relevant here, "The Anthropology of Race and Ethnicity" and "Black Popular Cultures: Global Dimensions."

7. I currently serve on the Steering Committee for the AADS Program; the Graduate Committee for the AADS Program. I served as the Graduate Program Director for the AADS Program from 2015 to 2017 and again from 2022 to 2023.

8. I have served as a major professional on ten Ph.D. dissertations, chaired and/or supervised over a dozen master's projects, and served as a member on dozens of dissertations and master's committees.

9. My teaching experience prior to FIU includes serving as a Zemurray-Stone Post-Doctoral Teaching Fellow at Tulane University in the Stone Center for Latin American Studies.

10. My research focuses mainly on the critical understandings of the global Black experience, with a geographic focus on the Americas. My work contributes to a broader and interdisciplinary inquiry into how radicalized subjects negotiate structural inequalities in contexts of political, economic, social, and environmental crises.

11. I have published extensively in my discipline. In 2015, I authored a book, *Rescuing Our Roots: The African Anglo-Caribbean Diaspora in Contemporary Cuba*. In addition to publishing my book, I have also published five book chapters; six articles; an essay; and three reviews.

12. I am currently working on an edited volume dedicated to the life and work of Black Cuban filmmaker Gloria Rolando, as well as a research project on Black maternal health in South Florida.

13. Another way that I share my research is through presenting papers and lecturing. Over the course of my career in higher education, I have presented papers and lectured on my research on thirty-four occasions, in cities across the United States as well as internationally.

**B. Senate Bill 266's Restrictions on General Education**

14. It is my understanding that Senate Bill 266 ("S.B. 266") restricts which courses may qualify for general education designation based on the course's content. I am aware that S.B. 266 excludes from the general education curriculum, which FIU refers to as the University Core Curriculum (or "UCC"), courses that "distort a significant historical event"; "teach[] identity politics"; or are "based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities." It is unclear to me, however, what this legislation aims to prohibit. Without more specific information, I do not know how to determine whether a historical event is "significant"; if the way in which I instruct about that event somehow "distorts" it; or whether, by discussing experiences and perspectives based on one's race or ethnicity, I am teaching "identity politics" in violation of S.B. 266. I am not aware of any guidance from the Board of Governors or the FIU Board of Trustees that might assist me in making these determinations.

**C. The Impact of S.B. 266 on My General Education Core Courses**

15. Florida's Board of Governors has removed two of my courses, "The Anthropology of Race and Ethnicity" and "Black Popular Cultures: Global Dimensions," from the UCC for purportedly not conforming with S.B. 266.

16. Since 2014, I have taught "The Anthropology of Race and Ethnicity," a course that examines how the concepts of race, culture, and ethnicity have influenced or may explain socio-cultural phenomena in the United States and around the world. By examining anthropological research, students reflect on when, why, and to whom race and ethnicity matter. In doing so, students are asked to reflect on their own identities, experiences, and beliefs regarding race, culture, and ethnicity. By the end of my course, students will be able to conduct an ethnographic study on a contemporary socio-cultural phenomenon to explain the role and significance that race and ethnicity may have in that phenomenon.

17. "The Anthropology of Race and Ethnicity" has been a part of the UCC since 2014. I most recently taught "The Anthropology of Race and Ethnicity" as a general education course in Fall 2020.

18. I have taught my second course, "Black Popular Cultures: Global Dimensions," since Spring 2010. In this course, students examine how race is defined and discuss how, as a concept, race has been developed and

applied at a global level. Students consider how interrelated experiences, both historical and contemporary, are relevant to the cultural politics of people of African descent in both continental Africa and the Diaspora. By evaluating popular and scholarly texts, students comprehend a variety of perspectives associated with black subjectivities and diverse cultural backgrounds.

19. I have taught "Black Popular Cultures: Global Dimensions" as a general education course since 2014. I most recently taught it as a general education course in Summer 2023.

20. In Spring 2024, I learned that the Florida Board of Governors planned to review and determine which of FIU's courses, including my own, would be deemed compliant with S.B. 266 and be permitted to remain in the UCC. The Chair of the GSS Department told me that he had been given a list of courses that were going to be considered for general education designation by the Board of Governors, and that he needed to decide which courses to remove from the list before it could be submitted to the Faculty Senate for final review. It is my understanding that the Provost's Office pressured the Chair to remove courses from the list because, if FIU did not agree to remove courses from the UCC, performance funding would be withheld from the university.

21. Even though I disagreed, the Chair told me that he had decided to remove "The Anthropology of Race and Ethnicity" from the list of courses that would be submitted to the Board of Governors for review. He told me that he was removing my course from the list because he felt that the Board of Governors was going to remove my course from the UCC regardless. It is my understanding that the Chair anticipated that the Board of Governors would remove my course from the UCC because the Board of Governors would see the course as teaching "identity politics" in violation of S.B. 266. Unlike the Chair of the GSS Department, the Director of the AADS Program told me that she would not support the removal of "Black Popular Cultures: Global Dimensions" from the UCC. Thus, the final course lists that were sent to the FIU Faculty Senate for review included "Black Popular Cultures: Global Dimensions" but not "The Anthropology of Race and Ethnicity."

22. During its review, however, the Faculty Senate disagreed with the GSS Department Chair's decision not to apply for general education designation for "The Anthropology of Race and Ethnicity." The Faculty Senate amended the list of courses to include both of my courses before submitting the updated list to the Board of Governors for its review.

23. In Summer 2024, I learned that the Board of Governors nonetheless removed both "The Anthropology of Race and Ethnicity" and "Black

Popular Cultures: Global Dimensions" from the UCC. I did not receive an explanation as to why my courses were stripped of their general education designation. Nor was I provided any opportunity to appeal this decision.

24. I am very concerned about the opaque and arbitrary manner in which the Board of Governors has removed courses from the UCC. It is my understanding from colleagues in the GSS Department and based on information shared in faculty meetings, that, to determine whether a course was eligible to remain in the UCC, the Board of Governors reviewed only the course titles and conducted keyword searches. I do not know which keywords the Board of Governors used when reviewing a course's eligibility, making it difficult to understand or feel confident in the Board of Governors's decisions as to which courses qualify for general education designation.

25. Moreover, I do not understand how this process would enable the Board of Governors to conclude that a course complied with, or violated, S.B. 266. As mentioned above, I understand S.B. 266 to prohibit specific *content* from being taught in a general education course; specifically, it is my understanding that S.B. 266 prohibits general education courses from "distor[ing] a significant historical event" or covering "identity politics" or "theories that systemic racism, sexism, oppression, and privilege are

8

inherent in the institutions of the United States and were created to maintain social, political, and economic inequities." I do not know how the Board of Governors would be able to determine whether a course violates these restrictions based only on the *title* of the course or the presence of a particular keyword.

26. As an initial matter, I do not understand how the title of a course or a keyword in a course description would provide the Board of Governors with sufficient information to determine whether that course, in fact, runs afoul of S.B. 266. Moreover, I do not know how, without input from professors or other experts in the field, the Board of Governors could accurately assess whether a course engages in "identity politics." My confusion has only grown after learning that the Board of Governors has agreed to reinstate courses that it originally removed from the UCC after the professor agreed to change the course title. In my understanding, if only the title has changed, then the course either (1) should have been permitted to be a part of the UCC from the beginning or (2) should not have been reinstated as part of the UCC because, presumably, the content continues to violate S.B. 266.

**D. The Harms Caused by S.B. 266's General Education Requirements**

27. Because "The Anthropology of Race and Ethnicity" and "Black Popular Cultures: Global Dimensions" were removed from the UCC, as of Fall 2025, I will no longer be allowed to teach them as general education courses. Although I have been told that I will be permitted to teach my courses as an elective, students are unlikely to enroll in my courses because they no longer fulfill the general education requirement. Students have busy schedules, and with the cost of tuition and the need to ensure that all of their graduation requirements are met, significantly fewer students are likely to enroll in my courses because they not count toward their major or other graduation requirements.

28. I have already experienced the effects of low enrollment due to S.B. 266. Before the Board of Governors removed "The Anthropology of Race and Ethnicity" from the UCC, an average of thirty students would enroll in the course each semester. From 2014 when I started teaching "The Anthropology of Race and Ethnicity" to the last time I taught it in Fall 2020, student enrollment for the course had never slipped into the single digits, the course had never been cancelled, and there was never any threat of the course being cut. However, after the Board of Governors removed "The Anthropology of Race and Ethnicity" from the UCC, only six students

enrolled to take the course in the Spring 2025 semester. As a result, the course was canceled and I was unable to teach it in person during Spring C.

29. Similarly, "Black Popular Cultures: Global Dimensions" is likely to see a drop in enrollment now that it is no longer a general education course. "Black Popular Cultures: Global Dimensions" has historically been a popular class at FIU. The AADS Program offered several sections of the course, and usually forty to fifty students enrolled in the course each semester. Because of high enrollment, the AADS Program hires Teaching Assistants (or "TAs") to support the professor teaching the course. The TAs are either (1) AADS masters students who are fully funded by the AADS Program or (2) Ph.D. students who receive funding from the AADS Program for their masters and then receive funding for the doctorate portion of their degree through their respective Ph.D. programs. The number of TA positions depends on the number of "full-time equivalent students," or the number of students enrolled in the class.

30. With fewer students enrolling in "Black Popular Cultures: Global Dimensions," the AADS Program will be impacted at both the undergraduate and graduate level. At the undergraduate level, lower enrollment increases the likelihood that, as was the case with "The Anthropology of Race and Ethnicity," "Black Popular Cultures: Global

Dimensions" will be cancelled. If cancelled, not only will I be unable to teach the course, but students will lose the opportunity to engage with materials to which they might not otherwise have access.

31. Cancelling "Black Popular Cultures: Global Dimensions" will also impact students' ability to participate in and earn a certificate in Global Black Studies. The Global Black Studies Certificate enables students to receive a credential for complementing their studies in their respective majors by taking courses that explore the experiences and presence of people of African descent. To receive the Certificate, students must take fifteen credit hours from a variety of disciplines, however, every student is required to take "Black Popular Cultures: Global Dimensions" at the start of the program. If fewer sections of "Black Popular Cultures: Global Dimensions" are available, or if the course is cancelled, students will be unable to participate in the Global Black Studies Certificate Program, putting its existence at risk.

32. Lower enrollment in "Black Popular Cultures: Global Dimensions" will also negatively affect the AADS master's program. Because the number of TA positions is directly tied to the number of students enrolled in the class, a drop in enrollment will limit the number of TA positions that the AADS master's program is able to fund. With fewer TA positions, the master's

program will be unable to recruit or retain high-quality students, jeopardizing the viability of the program.

33. S.B. 266 also impacts FIU's ability to recruit and retain high-quality professors. As a Professor, part of my job is to network with faculty at other universities in the hope of attracting them to FIU. Legislation like S.B. 266 that threatens the ability of professors to teach freely makes it difficult to convince candidates to accept a position at FIU. For example, in a faculty search for a recent faculty position, we lost a well-qualified candidate because she was concerned about the political climate created by the Governor and the Board of Governors when it censored books and rejected an AP in African American Studies.

34. In addition to impacting recruitment, S.B. 266 has also resulted in FIU professors leaving the university for positions in other states. For example, the prior Chair of the GSS Department left FIU in 2024 in part because of the climate in Florida, which extends and has impacts beyond higher education to K-12. The loss of FIU faculty, coupled with the challenge in attracting new candidates due to S.B. 266 has made FIU an uncompelling place to be. Moreover, the removal of my courses from the UCC and accompanying threat to: enrollments; my program and department; undergraduate and graduate students; and to the quality of education at FIU,

due to the creation of an environment in which faculty are subject to being accused of violating a law that is neither clear nor constitutional is demoralizing, both personally and professionally.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed on January 15, 2025.

Dr. Andrea Queeley