# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# GAINESVILLE DIVISION

SHARON AUSTIN, *et. al.*

   Plaintiff,

              v.

BRIAN LAMB, *et al.*,

   Defendants.

Case No.:1:25-cv-00016-MW-MJF

# DECLARATION OF ROBIN GOODMAN

I, Dr. Robin Goodman, hereby declare and state as follows:

## A. Background

1. My name is Dr. Robin Goodman, and I am over 18 years of age.

2. I have personal knowledge of the following facts and if called to testify could and would competently do so.

3. I currently serve as a Distinguished Research Professor of English at Florida State University ("FSU").

4. I have thirty-two years of professional experience in higher education. My teaching covers a wide range of topics, including feminism, critical and cultural theory, and postcolonial literature and theory. I am particularly interested in the interplay between feminism and political thought.

1

5. I received a bachelor's degree in English from the University of Pennsylvania. I received a master's degree in Comparative Literature from New York University. I also received a Ph.D. in Comparative Literature from New York University.

6. I have taught as a Professor of English at FSU since 2001. I taught as an Assistant Professor from 2001 to 2007 and as an Associate Professor from 2007 to 2011. Since 2011, I have served as a Professor of English.

7. I have twice served as Director of the English Department's literature program, first from 2011 to 2014 and again from 2016 to 2018.

8. My teaching experience prior to FSU includes serving as a: Visiting Assistant Professor and Global Fellow at the International Institute at University of California Los Angeles; Adjunct Assistant professor at the City University of New York and Montclair State University; Professor at the Department of Literature at the Universidad Mayor de San Andrés in Bolivia, as well as at the Department of Literature at the Universidad Nacional de San Antonio in Peru; and Visiting Assistant Professor in the Women's and Gender Studies Program at the College of New Jersey.

9. My research focuses mainly on how representations of women have been instrumental in affirming both structural inequalities and resistance to them.

For example, in my book, *Gender Work: Feminism After Neoliberalism*, I dissected how industrial capitalism's association of women with private life has evolved into neoliberal capitalism's ideologies of privatization. And in *Gender for the Warfare State: Literature of Women in Combat*, I examined how political advocacy and literary narratives of women in combat have transformed how society understands concepts such as the "frontline" and the "body at war." Recently, my research has expanded into other media, such as film, which led me to write and publish a book entitled *Cinema & The Political Imagination: Third Cinema and Its After-Image*. This book discusses how Marxist and postcolonial aesthetics affect film production and, thus, political thinking since the "Third Cinema" movement in the 1960s and early 1970s.

10. I have authored ten books, including *Cinema & The Political Imagination: Third Cinema and Its After-Image*, which I published in 2025. I am currently writing my eleventh book, *Milestones in Feminist Theory and Politics*, which is under contract for production in 2026. This book examines how feminism's major concepts affect political thinking as well as giving definition to feminism's evolving political concepts.

11. Besides publishing, I have participated in several invited interviews on cultural studies and feminist theory and refereed conferences both nationally and internationally.

12. FSU has long recognized and honored my research and scholarship. In 2009, I received a Developing Scholar Award from FSU, which culminated in FSU awarding me a Distinguished Research Professor Award in 2024. In 2024, I also received a Committee on Faculty Research Support Summer Research Award, which I used as a salary while working on *Milestones in Feminist Theory and Politics*.

**B. Senate Bill 266's General Education Core Course Requirements**

13. It is my understanding that Senate Bill 266 ("S.B. 266") sets forth, in part, requirements that courses must meet to receive a general education designation. I also understand S.B. 266 to include a variety of restrictions about what may be taught in general education courses and that might result in a course being stripped of its general education designation. It is my understanding that S.B. 266 includes prohibitions against teaching "identity politics" and "theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities." I am unsure,

however, what the Florida Legislature meant to prohibit when including these restrictions as I have not seen, and am unaware of, any definitions or guidance that clarifies what these restrictions mean.

**C. S.B. 266's Impact on My General Education Core Course**

14. Since 2015, I have taught "Third World Cinema," a course about the relationship between political intervention and cinematographic techniques. The course requires students to watch and discuss a range of films, including Academy of Motion Picture Arts and Sciences recognized films like "The Battle of Algiers." By dissecting films that depict a variety of cultures, the course asks students to explore their own cultural norms or values. By the end of my course, students should be able to identify and explain, both within the current national and international landscape, the benefits and potential conflicts that arise due to human differences.

15. "Third World Cinema" also requires students to think critically about a range of concepts, such as social responsibility and political oppression. By analyzing how films depict different histories of conflict or struggles for power, students are able to describe the ways in which historical, social, or cultural contexts shape one's ethical perspective. After discussing different ethical positions on when violence is legitimate, students articulate their own

5

perspectives on political oppression. Students then apply these perspectives to envisage new approaches to real-world scenarios dealing with conflict and struggles over power.

16. "Third World Cinema" had always been offered as a general education course at FSU. I most recently taught "Third World Cinema" as a general education course in Fall 2022.

17. To become a course at FSU, "Third World Cinema" went through FSU's rigorous course approval process. That process requires the professor wishing to teach the course must write and plan a proposal; the proposal must be reviewed by the Undergraduate Committee; the faculty member must rewrite the proposal to reflect any comments or questions by Committee; the department in which the course would be listed must vote on the proposed course; the Chair of the department must approve the proposed course; and, if the course is being requested to be part of the general education curriculum, both the Humanities Area Committee and the College and Dean must approve the course. The entire process to approve a new course takes anywhere from six months to a year.

18. There is an equally thorough process for removing a course from FSU's curriculum. At the initial stage, the Dean's office flags courses, typically

those that have not been taught in several years, for potential removal. After the course is flagged, the department which offers that course must vote on whether to remove it from the university's curriculum. In reaching this decision, the department considers any long-term impacts that could potentially be connected with the removal of the course. If, for example, the department hopes to hire a new faculty member to teach the course, it will not vote to remove the course from the curriculum, even if the course has not been taught in several years, because doing so would prevent the course from being taught at all. In this sense, my experience as a professor and my expertise in my field of study are invaluable in determining what changes, if any, should be made to FSU's curriculum.

19. The process by which the Board of Governors has stripped general education courses is, in my view, neither thorough nor informed. After the Florida legislature enacted S.B. 266 in July 2023, I learned that the Florida Board of Governors would review all of the general education courses at Florida public universities, including at FSU. FSU did not provide me with any information about the review process and I was not provided any opportunity to participate in the process. I only learned that FSU's general education courses, including my own, were being reviewed after I ran into an administrative coordinator for FSU in August 2024 while I was walking

my dog. She mentioned that she had spent the summer reviewing general education courses in order to submit a list to the Board of Governors for approval.

20. Several weeks into the Fall 2024 semester, I finally heard from FSU about the review process and the Board of Governors' determinations when the chair of the English department scheduled a meeting with me to discuss my courses. In that meeting, the chair told me that the Board of Governors had stripped "Third World Cinema" of its general education designation. I did not have any opportunity to appeal this decision, nor had I been able to provide any information for the Board of Governors to consider in making this decision.

21. After learning of the Board of Governors' decision to strip "Third World Cinema" of its general education designation, I requested information from the FSU administration about the criteria that the Board of Governors had considered when determining whether courses would be removed from the general education course curriculum. It is my understanding, based on the shallow feedback from the Board of Governors and the fact that the Board of Governors had conducted similar curricula reviews using keyword searches, that the Board of Governors reviewed only course titles, course numbers, and catalogue descriptions to determine whether the courses would be

eligible for general education status. In reviewing the course titles, it is my understanding that the Board of Governors considered keywords to determine whether the course could qualify for general education designation.

22. As an initial matter, it is unclear to me which keywords the Board of Governors is using to identify courses that purportedly conform with S.B. 266 and thus qualify for general education designation. I am not aware of any guidance issued by the Board of Governors or FSU's Board of Trustees as to the keywords that are used or as to how the keyword searches accurately and effectively identify the appropriate courses. But, looking at the courses that have been stripped of their general education designation, I do not believe that the keyword searches are capable of identifying which classes meet the general education requirements imposed by S.B. 266. For example, I am aware of the Board of Governors stripping "Introduction to Chemistry" of its general education designation because it was "not broad enough." It is my understanding that the Board of Governors determined that "Introduction to Chemistry" was too narrow because neither the title nor the course description included the keyword "experiment." It defies common sense to conclude that "Introduction to Chemistry" does not meet the general education requirements simply because its title and course

9

description do not include the keyword "experiment," when the Board of Governors has identified "General Chemistry I" as a general education "core course." The lack of explanation as to how general education courses are selected, compounded with the absurd application of this cryptic process, causes me great concern about the extent to which courses are losing their general education designation.

23. Besides the specific keywords search, I am not aware of the Board of Governors considering any other criteria to determine whether a course would qualify for a general education designation. For example, to my knowledge, the Board of Governors did not review, or request, any syllabi when deciding whether to remove a course's general education designation.

24. I do not believe that the Board of Governors could properly assess in such a short time whether courses from Florida's public universities qualified for general education designation. The fact that the Board of Governors was able to reach a decision as to the general education status of thousands of courses from higher education institutions across the states in such a short time causes me serious doubt about the propriety of the decisions that it reached.

## D. The Harms Caused by S.B. 266

25. Because the Board of Governors stripped "Third World Cinema" of its general education designation, I am no longer permitted to teach it as a general education course. Students have to balance taking courses required for graduation, including general education courses, with courses required for their majors, thus, they are far less likely to enroll in elective courses that do not count toward their graduation requirements. As a result, students are less likely to enroll in "Third World Cinema," even if they are interested in the subject matter of the course. Because a significant number of classes have lost their general education designation, students have fewer classes that they can take and, thus, fewer opportunities to engage with material and concepts to which they would not otherwise be exposed. Moreover, because the classes that have been stripped of their general education designation are those that cover concepts and viewpoints that are disfavored by the State and the Board of Governors (i.e., "identity politics" and "theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities"), students are siloed into receiving a one-sided, biased education.

26. It is not only students, however, that are impacted by S.B. 266. S.B. 266 affects entire departments as well as professors, like myself. As to the former, because numerous courses within a department have been stripped of their general education designation, the department will see lower enrollment and, as such, may be forced to offer fewer courses. If fewer courses are offered, professors may be unable to teach courses that they have historically taught, which may drive them to look for positions at other universities. Because fewer courses are being taught, however, FSU has less incentive to fill these vacancies, further limiting the number and variety of courses that might be offered.

27. As a professor, I am also affected by S.B. 266. To the extent that I am able to teach "Third World Cinema" as a non-general education course, I am left guessing as to whether my course materials conform to Florida law. The law's ban on (1) teaching identity politics and (2) discussing theories of systemic racism, sexism, oppression, and privilege as being inherent in the United States, fail to provide me fair notice of what I can and cannot teach. Specifically, I am concerned that by asking students to identify and discuss the potential social and political implications of different cultures' values and norms, I will be teaching "identity politics" in violation of S.B. 266. And because "Third World Cinema" covers how political oppression and

power struggles are understood through cinematographic portrayals, I am worried that I will also be in violation of S.B. 266's prohibition on discussing theories of oppression and privilege.

28. My concerns about inadvertently violating S.B. 266 also arise in my other courses. In my course, "Feminist Theory," for example, I instruct students on a range of concepts that, over time, have influenced feminist thinking on literature, culture, politics, and theory. Students are asked to identify and discuss how practices, like abortion, have affected how society and feminist thinkers, like Simone de Beauvoir, understand and perceive women. In doing so, however, I am concerned that I will either be (1) teaching "identity politics" or (2) discussing theories of systemic racism, sexism, oppression, and privilege as being inherent in the United States in violation of S.B. 266.

29. Because of this lack of clarity, I am left with an impossible decision: (1) continue to teach my courses, like "Third World Cinema," as I always have, risking potential punishment, such as discipline or reporting, including losing my tenure because of the new post-tenure review law and regulation; or (2) self-censor. I am concerned that if I continue to teach my courses as I have in the past, students will report me and I will be subject to time consuming and embarrassing disciplinary procedures, which will distract from my research and scholarship. My concern that students will report

professors was confirmed when a student in my "Feminist Theory" course asked if there was a "mole" in the class before engaging in class discussion. Because of S.B. 266, I have been forced to refrain from instructing students on topics that I had previously covered for fear that I would violate the law's prohibitions on identity politics and theories of oppression.

30. Despite raising my concerns to the Dean of Arts and Sciences, I have received no guidance from FSU as to how I might continue teaching "Third World Cinema" while conforming to Florida law. Instead, FSU has told me not to change anything in my course curriculum, while at the same time telling me that it will not defend me legally if I am found to be in violation of S.B. 266.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed on January 22, 2025.

_____
Dr. Robin Goodman