**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

SHARON AUSTIN, *et al.*,

     Plaintiffs,

v.                                                      Case No.: 1:25-cv-00016-MW-MJF

BRIAN LAMB, *et al.*,

     Defendants.

**FLORIDA BOARD OF GOVERNORS DEFENDANTS' RESPONSE AND
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

Senate Bill 266 reflects the State's directives to its own public universities on how taxpayer money should be spent and how every public university should provide a general education to its students. It is a regulation only upon these universities and is enforced only against these universities. It does not govern any person employed as a professor by the universities. Thus, Plaintiffs have no occasion to violate SB 266 as professors, and their challenge to the law under the First and Fourteenth Amendments fails for lack of standing.

As explained below, Plaintiffs have no First Amendment injury when their respective universities redesignate their courses as elective or upper-level courses rather than general education courses. A university has the inherent right to control its curriculum, and the State does not discriminate against or objectively chill

1

Plaintiffs' speech by shifting Plaintiffs' viewpoints away from general education courses into elective or upper-level courses. Plaintiffs can still teach the courses they previously taught; Plaintiffs can still speak on everything they previously spoke; the only impact upon Plaintiffs is their course designations, which is not a cognizable First Amendment injury.

Similarly, the State has the inherent right to direct and limit the use of public funds to accomplish the purposes of its own programs. Here, the State has decided that its program of public university education may not include the promotion of diversity, equity, and inclusion (DEI) or political or social activism using public funds. Again, no Plaintiff is prohibited from speaking in favor of DEI, engaging in political or social activism, or expressing any other viewpoints with their own resources; the only restriction is the availability of public funds for those activities. This limitation on public funds is not a cognizable First Amendment injury.

Plaintiffs' other alleged injuries are too speculative to justify a case or controversy, such as the allegation that they could be denied tenure or terminated for teaching fewer general education courses or attending fewer conferences at taxpayer expense. Moreover, there is no traceability between the challenged provisions of SB 266 and these other alleged injuries, and no redressability of those injuries if SB 266 were to be enjoined, because the universities retain significant discretion over their curricula and funds in the absence of SB 266.

Even if Plaintiffs had standing, their attempt to facially invalidate the provisions of SB 266 is deficient on the merits. Plaintiffs cannot demonstrate that the alleged, unconstitutional applications of SB 266 substantially outweigh the constitutional applications to warrant facial invalidation under the First Amendment. Most, if not all, of the applications of SB 266 regulate the universities' government speech to which the First Amendment does not even apply, let alone forbid. And, as noted above, the State retains control over the contours of its publicly funded programs, including the viewpoints the State funds as part of those programs, therefore Plaintiffs are not entitled to spend public funds in furtherance of their viewpoints.

Finally, Plaintiffs cannot challenge the vagueness of statutory provisions that do not even apply to them. Nor can Plaintiffs show that the challenged provisions are so vague that persons of common intelligence – let alone public universities to which they apply – must necessarily guess at to their meaning. Thus, Plaintiffs' Fourteenth Amendment vagueness challenge fails for lack of standing and on the merits.

For these reasons and more, Plaintiffs are not entitled to the preliminary injunction they seek.

# I.    **Background**

## A.    **The Challenged Statutes and Regulation**

On May 3, 2023, the Florida Legislature passed Senate Bill 266, titled "Higher Education" ("SB 266"), which imposed numerous reforms to Florida's public post-secondary educational institutions. Ch. 2023-82, Laws of Fla. The Governor signed SB 266 into law on May 15, 2023, and it became effective on July 1, 2023. *Id*. § 13.

Plaintiffs challenge the constitutionality of two provisions from SB 266: § 1007.25(3) (the "General Education Provision") and § 1004.06(2)(b) (the "Funding Provision"). They also challenge the constitutionality of one of SB 266's implementing regulations: the Board of Governor's Regulation 9.016.

### *1.  The General Education Provision*

The general education curriculum at Florida's public universities is intended to provide "broad foundational knowledge" to develop students into "effective and lifelong learners." Fla. Stat. § 1007.55(1). In view of this mission, the State has set criteria for the kinds of courses that may be offered such that the general education curriculum features established, fundamental subjects rather than unproven, speculative, or exploratory courses. *Id*. According to the Legislature, the latter category of courses are "best suited for designation as elective or specific program prerequisite credit." *Id*.

As part of the general education curriculum, each student must complete at least one course in each core subject area of communication, mathematics, social

sciences, humanities, and natural sciences. *See* Fla. Stat. § 1007.25(3). To earn a baccalaureate degree, a student must complete 120 total hours of coursework, including at least 36 hours of general education coursework (15 hours of core general education and 21 hours of additional general education). *Id*. § 1007.25(3),(10).

The law sets forth a process for faculty appointed committees to craft the general education curriculum using the standards laid out in statute. *See* Fla. Stat. § 1007.25(3). Additionally, the State requires university trustees and presidents to annually review and approve the additional general education courses offered at their institutions.  Fla. Stat. § 1007.55(2). The Board of Governors then approves or rejects the list of general education courses submitted by each university. Fla. Stat. § 1007.55(4).

At issue in this case are certain prohibitions SB 266 placed upon the general education curriculum for all state universities, which are codified in the General Education Provision as follows:

> General education core courses may not distort significant historical events or include a curriculum that teaches identity politics, . . . , or is based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities.

Fla. Stat. § 1007.25(3)(c). Courses that are ineligible to be taught as general education core courses may still be offered and taught as elective or upper-level courses.

The Board of Governors enforces the General Education Provision by withholding performance-based funding from any noncompliant university, as the statute directs. *See* Fla. Stat. § 1007.55(5) ("Public postsecondary educational institutions that fail to comply with the requirements of this section are not eligible to receive performance-based funding" pursuant to § 1001.92, Fla. Stat.). This means that a failure to adhere to the General Education Provision and other statutory curriculum criteria results in repercussions only to the university. There are no statutes or regulations that otherwise would provide an enforcement mechanism to apply the General Education Provision to individual professors or students.

### 2. *The Funding Provision and Regulation 9.016*

Plaintiffs also challenge SB 266's prohibition on the public funding of certain controversial expenditures (the "Funding Provision"). Fla. Stat. § 1004.06(2)(b)). The Funding Provision provides:

> [a] Florida College System institution, state university, Florida College System institution direct-support organization, or state university direct-support organization may not expend any state or federal funds to promote, support, or maintain any programs or campus activities that: . . . (b) [a]dvocate for diversity, equity, and inclusion, or promote or engage in political or social activism.

Fla. Stat. § 1004.06(2)(b).

The Board of Governors subsequently adopted Regulation 9.016 to implement and define key terms in the Funding Provisions. Fla. Stat. § 1004.06(4). Regulation 9.016 defines "programs or campus activities" as:

activities authorized or administered by the university or a university's direct-support organization(s) that involve:

    a. Academic programs . . . , other than classroom instruction;

    b. Student participation, other than classroom instruction;

    c. Hiring, recruiting, evaluating, promoting, disciplining, or terminating university employees or contractors.

Reg. 9.016(1)(a)(4).

With respect to the Funding Provision's prohibition against expenditures on programs or campus activities that "advocate for diversity, equity, and inclusion," Regulation 9.016 defines "Diversity, Equity and Inclusion" or "DEI" as "any program, campus activity, or policy that classifies individuals on the basis of race, color, sex, national origin, gender identity, or sexual orientation and promotes differential or preferential treatment of individuals on the basis of such classification." Reg. 9.016(1)(a)1. And it further explains,

A state university or state university direct-support organization advocates for DEI when it engages in a program, policy or activity that:

(a) Advantages or disadvantages, or attempts to advantage or disadvantage an individual or group on the basis of color, sex, national origin, gender identity, or sexual orientation, to equalize or increase outcomes, participation or representation as compared to other individuals or groups; or

(b) Promotes the position that a group or an individual's action is inherently, unconsciously, or implicitly biased on the basis of color, sex, national origin, gender identity, or sexual orientation.

Reg. 9.016(3).

With respect to the Funding Provision's prohibition against expenditures on programs or campus activities that "promote or engage in political or social activism," Regulation 9.016 defines "Political or Social Activism" as "any activity organized with a purpose of effecting or preventing change to a government policy, action, or function, or any activity intended to achieve a desired result related to social issues, where the university endorses or promotes a position in communications, advertisements, programs, or campus activities." Reg. 9.016(1)(a)2.

There are exceptions and clarifications to the prohibitions in the Funding Provision. First, "student-led organizations" whose activities would otherwise run contrary to the Funding Provision or Regulation 9.016 are still entitled to receive student fees and to use university facilities. Fla. Stat. § 1004.06(2); Reg. 9.016(4). Second, the Funding Provision does not prohibit "programs, campus activities, or functions required for compliance with general or federal laws or regulations," for obtaining or retaining accreditation, or for "access programs for military veterans, Pell Grant recipients, first generation college students, nontraditional students, '2+2' transfer students from the Florida College System, students from low-income families, or students with unique abilities." Fla. Stat. § 1004.06(3); Reg. 9.016(5).

Regulation 9.016 further clarifies that the Funding Provision does "not prohibit expenditure of state or federal funds . . . for ministerial or administrative

8

activities of a program or campus activity that is not unique to that program or campus activity and that specific program or campus activity is otherwise supported by private funds." Reg. 9.016(6).

### B.    Plaintiffs' Action and Motion

Plaintiffs are professors at Florida public universities who allege that the General Education Provision, the Funding Provision, and Regulation 9.016 violate their free speech rights under the First Amendment. *See generally* Compl. for Decl. & Inj. Relief, ECF No. 1 (the "Complaint"). In their Complaint, Plaintiffs contend that the Funding Provision unconstitutionally discriminates against their viewpoints (Count I) and that the Funding and General Education Provisions are unconstitutionally overbroad and therefore chill their protected expression (Count II). *Id*. ¶¶ 123-31. In addition, Plaintiffs allege that certain phrases in the General Education Provision and Regulation 9.016 are unconstitutionally vague in violation of the Fourteenth Amendment (Count III). *Id*. ¶¶ 133-38. Finally, Plaintiffs contend that SB 266 violates another state law, the Campus Free Expression Act, codified at section 1004.097, Florida Statutes, by "shielding" students and faculty from "ideas and opinions that some may find unwelcome or disagreeable." (Count IV) *Id*. ¶¶ 140-44.

Shortly after filing their Complaint, Plaintiffs moved for a preliminary injunction on Counts I-III to enjoin the enforcement of the Funding Provision, the

General Education Provision, and Regulation 9.016 in their entirety. *See* Pls.' Mot. for Prelim. Inj. (ECF No. 22; the "Motion"). Plaintiffs' supporting memorandum focuses entirely on the Funding Ban (and its implementing Regulation 9.016) in conjunction with their First Amendment claims. *See* Pls.' Memo. of Law in Support of Pls.' Mot. for Prelim. Inj. (ECF No. 23; "Plaintiffs' Memorandum") at 13-25. It also sets forth argument that numerous phrases in the General Education Provision and Regulation 9.016 are "so vague as to be impossible to reasonably follow." *Id*. at 25-31. For the reasons below, the Court should reject these arguments and deny the Motion.

## II.    <u>Preliminary Injunction Standard</u>

To issue a preliminary injunction, a district court "must determine whether the evidence establishes: '(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest.'" *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Church v. City of Huntsville,* 30 F.3d 1332, 1342 (11th Cir. 1994)).

III.  **Argument**

    A.  **Plaintiffs Lack Standing To Obtain a Preliminary Injunction.**

Invoking a federal court's jurisdiction requires a plaintiff to establish Article III standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To meet this burden a plaintiff mush show (1) that they have suffered a "concrete and particularized" and "actual or imminent" (not merely "hypothetical" or "conjectural") injury-in-fact; (2) that is fairly traceable to the defendant and not the result of independent third party action; and (3) that it is "likely" not "merely speculative" that their injuries will be redressed by a favorable ruling. *Id*. at 560-61 (cleaned up, citations omitted). Further, "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).

Each plaintiff must establish standing as to each of their claims and each form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). A plaintiff must also establish standing as to each challenged provision. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006). At the preliminary injunction stage, the court decides standing "under the heightened standard for evaluating a motion for summary judgment," which precludes the plaintiff from resting on "mere allegations." *Falls v. DeSantis*, 609 F. Supp. 3d 1273, 1282 (N.D. Fla. 2022) (quotations omitted). Instead, a plaintiff must submit

affidavits or other evidence, which for purposes of the motion are taken as true. *See id.*

Plaintiffs say that they will be injured by SB 266's operation because they fear its enforcement in the future. A plaintiff has standing in a pre-enforcement context when he "has submitted evidence indicating 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and *there exists a credible threat of prosecution*.'" *Id.* (quoting with emphasis *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979); *see also NFC Freedom, Inc. v. Diaz*, 700 F. Supp. 3d 1057, 1063 (N.D. Fla. 2023). For example, a plaintiff can bring a pre-enforcement claim when his speech is chilled or silenced by the threat of enforcement consequences. *Wilson v. State Bar of Ga.,* 132 F.3d 1422, 1428 (11th Cir. 1998).

The key consideration in a pre-enforcement challenge is whether a plaintiff's fear of enforcement is "objectively reasonable." *See Wilson,* 132 F.3d at 1428 ("[I]f no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes. A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable.") (quoting *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir.1996)).

### i. *Plaintiffs Do Not Have Standing to Challenge the General Education Provision.*

#### 1. *The Loss of General Education Status Is Not a Legally Cognizable Harm and Downstream Injuries Are Too Speculative.*

Plaintiffs complain that the General Education Provision has already caused their courses to be removed from the general education curriculum. Plaintiffs highlight Austin's "Politics of Race" and "Black Horror and Social Justice"; Goodman's "World Cinema"; Queeley's "The Anthropology of Race and Ethnicity" and "Black Popular Cultures: Global Dimensions"; Rahier's "Black Popular Cultures: Global Dimensions"[1] and "Myth, Ritual, and Mysticism;" and Rainwater's "Sociology of Gender" as courses they teach that recently lost their general education status.[2] As Plaintiffs acknowledge, they are still able to teach their classes, but just not as courses that can fulfill an undergraduate's core graduation requirements.

There is no constitutional right to teach general education courses. *See NFC Freedom*, 700 F. Supp. 3d at 1066; *see also Bishop v. Aronov,* 926 F.2d 1066, 1074 (11th Cir. 1991) (highlighting public universities have authority to control the curriculum); *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517, 1522 (11th

---

[1] Queeley and Rahier apparently have both have taught Florida International University's "Black Popular Cultures: Global Dimensions" at various times.

[2] The Complaint alleges that Rainwater's "Sociology of Gender" also lost its designation, but Rainwater did not provide a declaration.

Cir. 1989) (recognizing that a school board could control curricular material). Indeed, just as professors do not have a First Amendment right to mandate the use of a certain textbook or to teach a particular course, Plaintiffs have no First Amendment right to override "[t]he State's valid exercise in prescribing a university's curriculum," *Pernell v. Fla. Bd. of Governors of State Univ. Sys.,* 641 F. Supp. 3d 1218, 1237 (N.D. Fla. 2022), by contesting whether a given course with particular viewpoints is classified as "core" or "elective," *see Oller v. Roussel*, 609 Fed. App'x. 770, 773 (5th Cir. 2015) (affirming that the university's rejection of the plaintiff's textbook as a primary textbook and its failure to assign the plaintiff to teach certain courses were not adverse employment actions under the First Amendment). That decision is up to the universities, which have the "right . . . to make academic judgments as to how best to allocate scarce resources or 'to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'" *Widmar v. Vincent*, 454 U.S. 263, 276 (1981) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in result)).

Implicitly acknowledging that mere loss of general education status does not equate to an Article III injury, Plaintiffs say they are injured by the downstream effects of the designation changes. They catastrophize that the change in designation could cause a decline in enrollment going forward, which could cause the class to

be cancelled, or their departments to lose funding, or impact the number of available teacher assistant positions, or hurt their compensation or tenure review. One professor also claimed that the loss of general education status creates a "stigma."[3]

But standing requires concrete, imminent injuries—not speculation and conjecture about harm in the indefinite future. *See Lujan,* 504 U.S. at 564 n.2 (1992) (explaining an injury is too speculative when there is "only an injury at some indefinite future time"). It is axiomatic that the "'threatened injury must be certainly impending to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Georgia Republican Party v. Sec. & Exch. Comm'n,* 888 F.3d 1198, 1202 (11th Cir. 2018) (quoting with emphasis *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). And where the future injury is contingent on third

---

[3] "Briefly, the "stigma" of a course not being part of the general education curriculum is not a cognizable constitutional deprivation. *See Smith ex rel. Smith v. Siegelman*, 322 F.3d 1290, 1296 (11th Cir. 2003). To establish deprivation of a constitutional right based on harm to reputation, an "individual must be not only stigmatized but also stigmatized in connection with a denial of a right or status previously recognized under state law." *Id.* (quoting *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1302–03 (11th Cir.2001)); *see also Paul v. Davis,* 424 U.S. 693, 701 (1976) ("stigma . . . apart from some more tangible interests such as employment" is insufficient to invoke constitutional protections). And as highlighted here, Florida does not recognize a professor's right to teach general education classes. *See e.g., Behrens v. Regier*, 422 F.3d 1255, 1261 (11th Cir. 2005) (plaintiff could not bring a constitutional claim based on the harm the state inflicted on his reputation by labeling him a sex offender, which prevented him from adopting a child, because Florida does not recognize a right to adopt or to have an adoption application approved).

party choices (like student preferences in class selection) the injury is "less likely to establish standing." *Id.*

Plaintiffs' injury allegations are largely speculative and feature attenuated language.[4] *See, e.g., Fla. Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel*, 194 F.3d 1227, 1230 (11th Cir. 1999). Their contingent harms, if any, exist well into the indefinite future. *See Elend v. Basham,* 471 F.3d 1199, 1206-07 (11th Cir. 2006). For example, as the Plaintiffs explain: losing the general education designation might cause students to choose other classes; if enough students make that choice not to enroll in their class there might not be enough students to hold the class; if not enough students enroll to hold the class, the class might be cancelled; if the class is cancelled the department might lose funding and TA assistants, or compensation or tenure reviews might be impacted. It is unclear at what threshold any of these hypothetical results might happen.[5]

---

[4] *See e.g.*, Marr Dec. ¶¶ 31, 32, 33, 34 ("Marr") (ECF No. 23-2); Rahier Dec. ("Rahier") ¶¶ 24, 27 (23-3); Queeley Dec. ¶¶ 31 ("Queeley") (ECF No. 24-4); Goodman Dec. ¶¶ 26, 29 ("Goodman") (ECF No. 23-4); Austin Dec. ¶ 46 ("Austin") (ECF No. 23-1).

[5] Plaintiff Austin says she teaches general education courses over the summer to supplement her income. Austin ¶ 43. She says she is concerned that if she cannot teach her general education courses then she will not earn the extra income. *Id*. She does not provide any details about her concerns but regardless, there is nothing in the law that prevents her from teaching (and receiving pay for teaching) a previously designated general education course as an elective. *Id*.

Reenforcing the speculative nature of these injuries—so far, only one of the eleven classes[6] removed from the general education curriculum that Plaintiffs have evidenced in this case has actually seen enrollment decline to a level sufficient for the class to be cancelled. Plaintiffs present no corollary evidence indicating that the class cancellation caused department funding to dry up or loss of TA positions or loss of compensation. Plaintiffs also do not present evidence that any of their other courses have declined in enrollment—much less enough to warrant cancellation and reduced funding and compensation.

Other than the actual cancellation of "The Anthropology of Race and Ethnicity," Plaintiffs' downstream injuries regarding class cancellation, loss of department funding, and impacts on TAs and compensation do not present an immediate threat of future harm and so are insufficient to establish standing, much less entitlement to an injunction. *See Elend*, 471 F.3d at 1207-09.

Plaintiffs therefore lack a concrete and actual or imminent injury sufficient to establish standing.

---

[6] The "eleven" cancelled classes identified here include the four courses witness Vincent Adejumo taught that recently lost their general education designation. Adejumo Dec. ¶ 25 ("Adejumo") (ECF No. 23-9). The two versions of "Black Popular Cultures: Global Dimensions" are counted as a single course.

### 2. *Loss of General Education Designation and Downstream Injuries Are Not Traceable to the Board of Governors or Redressable by a Favorable Decision.*

Even if a class cancellation is a sufficient injury, a plaintiff still "must allege and prove that the personal injury is 'fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Fla. Ass'n of Med. Equip. Dealers, Med-Health Care v. Apfel*, 194 F.3d 1227, 1230 (11th Cir. 1999). In other words, the Plaintiffs must show that the General Education Provision is what will cause a decline in their classes' enrollment leading to cancellation (and resulting dire consequences) and that a favorable decision here would cause the classes to be added back to the general education curriculum.

"The Anthropology of Race and Ethnicity" is the only course Plaintiffs raise that has been cancelled ostensibly due to an enrollment drop. To show traceability and redressability, Plaintiffs must establish that the General Education Provision is what caused the course to lose its designation, that the loss of the general education designation is what caused the decline in enrollment, that a favorable decision would result in the university adding the class back to the general education curriculum and enough students deciding to enroll in the class. Plaintiffs have not met their evidentiary burden.

Declines in course enrollment can be the result of a variety of other things. Further, courses come and go throughout the natural lifespan of a university

curriculum. It would be bizarre for a university's curriculum to remain static as knowledge advances and student needs evolve. So even absent SB 266, the university is free to change its course offerings at will, regardless of Plaintiffs' preferences.

Indeed, universities consider a variety of factors, beyond the General Education Provision, when setting a curriculum. These additional considerations can account for changes to course offerings. *See, e.g.*, ECF No. 23-9 (Ex. A to Adejumo) at 16 (email from the associate dean of the UF College of Liberal Arts explaining that certain courses lost general education status because "rotating topics are disallowed for GE [] since I can remember" but that the university is starting to crack down on it more); *see also id.* (explaining UF's "definition of Gen Ed is that courses should be introductory in nature and not specialized"); Structure of General Education Courses, UF Undergraduate Affairs, available at https://undergrad.aa.ufl.edu/general-education/gen-ed-courses/structure-of-gen-ed-courses/ (last visited Feb. 7, 2025) (explaining general education classes "should present a breadth of knowledge and *should not narrowly focus* on those skills, techniques, and procedures specific to a particular occupation or profession") (emphasis added).

So, even if the Court were to enjoin the General Education Provision, Plaintiffs' general education designations could still be impacted by the university's

independent curriculum decisions and other unchallenged provisions of the law governing the general education curriculum. *See KH Outdoor, L.L.C. v. Clay Cnty., Fla.*, 482 F.3d 1299, 1304 (11th Cir. 2007) (no redressability because "a favorable decision, that is, invalidation of the Old Sign Ordinance provisions KH Outdoor challenged, does not mean KH Outdoor would then receive approval of its sign permit applications, because Clay County could block the proposed signs by enforcing other state statutes and regulations not challenged"); *see also Tinsley Media, LLC v. Pickens Cnty., GA*, 203 F. App'x 268, 274 (11th Cir. 2006) (no redressability where striking a challenged law would not benefit the plaintiffs as they would still be subject to other permitting requirements); *M.A. v. Fla. State Bd. of Educ.*, No. 4:22-CV-134-AW-MJF, 2023 WL 2631071, at *3 (N.D. Fla. Feb. 15, 2023), *appeal dismissed sub nom.* No. 23-10866-GG, 2024 WL 1348273 (11th Cir. Mar. 22, 2024) (plaintiffs lacked standing where the defendant may have taken the adverse action for reasons unrelated to the enforcement of the challenged law).

Further, this Court has no control over the decisions third-party students might make regarding course selection—making traceability and redressability that much further out of Plaintiffs' reach. *See Lewis v. Governor of Alabama*, 944 F.3d 1287, 1301 (11th Cir. 2019) (explaining "'it must be *the effect of the court's judgment on the defendant*'—not an absent third party—'that redresses the plaintiff's injury, whether directly or indirectly.'") (quoting with emphasis *Dig. Recognition Network,*

*Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015)). Plaintiffs have supplied no evidence regarding student enrollment trends.

Thus, enjoining the General Education Provision will not necessarily result in or ensure that the universities add these courses back to their respective general education curricula, nor will it necessarily cause an increase in the number of students who enroll in these classes. *See M.A*, 2023 WL 2631071, at *3 (injunction precluding enforcement of a library rule would not necessarily lead to the return of a removed book in dispute). Plaintiffs' future injuries are therefore neither traceable to the Board of Governors nor would their injuries be redressed by relief from this Court. S*ee Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1200 (11th Cir. 2021).

Plaintiffs lack standing to challenge the General Education Provision based on the changes to their course designations.

### 3. *Unfounded Speculation About How the General Education Provision Will Operate Cannot Manufacture Standing.*

Plaintiffs also do not have standing to challenge the General Education Provision in a pre-enforcement posture by claiming it chills their classroom speech. The challenged provisions do not regulate individual professors. The Board of Governors has not adopted any regulations that target individual professors. And the Plaintiffs have not supplied any evidence to suggest that the Board of Governors or

21

the universities will enforce the provisions of SB 266 in a way that will directly punish individual professors. *See, e.g., NFC Freedom*, 700 F. Supp. 3d at 1062.

Plaintiffs challenge the General Education Provision as if it were a direct restriction on their speech in the classroom, rather than a provision that simply establishes standards for an undergraduate curriculum. The idea that the General Education Provision places any restrictions on professor or student speech in the classroom is a misunderstanding of what the General Education Provision does and how it fits into the underlying statute. The General Education Provision does not regulate professor or student speech in the classroom; it just sets the standards for whether certain professor speech is available to students within the general education curriculum.

The only impact an individual professor might notice from the General Education Provision is a change in how his or her course is categorized. Indeed, most of the Plaintiff professors in this suit complain that their courses have already lost general education status. Plaintiffs Marr and Austin are the only two Plaintiffs scheduled to teach a general education course in the identifiable future. Marr ¶¶ 10, 12, 29; Austin ¶ 37. But they cannot establish that their fears of repercussions from teaching these courses, *see* Marr ¶ 37; Austin ¶ 41, are objectively reasonable. *See NFC Freedom*, 700 F. Supp. 3d at 1068 ("Notwithstanding Plaintiffs' subjective fears, [the General Education Provision] is not a mandate to individual professors or

students, nor does it set out any disciplinary consequences for individual professors whose in-class speech runs counter to the criteria's restrictions."). Plaintiffs have additional vague "fears" about the General Education Provision—for example, that it will impact classroom speech or be used against professors in tenure reviews—but those fears bear little relationship to what the General Education Provision actually does and how it operates within the larger statutory scheme. Because these claimed harms could not be the result of conduct proscribed by the General Education Provision, they are insufficient to manufacture standing.

None of the Plaintiffs have standing to challenge the General Education Provision.

### ii. *Plaintiffs also Lack Standing to Challenge the Funding Provision and Regulation 9.016*

Plaintiffs express concerns that the Funding Provision and Regulation 9.016 will prevent them from obtaining funding for (a) research, (b) travel to conferences, (c) bringing speakers to campus, and (d) hiring student researchers. Plaintiffs' funding complaints are largely in a pre-enforcement posture. Regardless, Plaintiffs cannot establish standing to challenge the Funding Provision and Regulation 9.016 as Plaintiffs' concerns that these provisions will be enforced against them are not "objectively reasonable." *Wilson,* 132 F.3d at 1428.

### 1. Plaintiffs' Research Funding Claims

Neither the Funding Provision nor Regulation 9.016 place restrictions on funding for professor research, as explained below. *See infra* Part III.B.ii. As a result, there is no credible threat that either provision would be enforced against the Plaintiffs if they seek or already have state or federal funding for their research.

Even if there were an application of the Funding Provision to research activities, the two Plaintiffs who attempt to provide evidence of a research-related injury—Marr and Rahier—offer only subjective and entirely hypothetical fears about how the Funding Provisions will apply to them.

Plaintiff Marr says he expects "to apply for state and federal funding in the future" but does not say when he plans to apply for funding or what that expected research might entail. Marr ¶ 43. And Plaintiff Rahier similarly expresses concern that he will be denied funding because he "cannot be sure if by simply studying and publishing on the African diaspora in the Americas, [he is] 'advocating for diversity, equity, and inclusion' or 'promoting or engaging in political or social activism.'" Rahier ¶ 28. He does not state an intention to apply for funding; he just expresses confusion about what is required for him to make funding requests. *Id*. ¶ 31. Even if the Funding Provision applied to professor research (it does not), this is insufficient to establish standing because neither Plaintiff offers concrete plans to violate the statute. *See Elend,* 471 F.3d at 1209; *Wilson v. State Bar of Ga.,* 132 F.3d 1422, 1428

(11th Cir. 1998) (requiring evidence indicating a plaintiff will engage in a course of conduct that is proscribed by the law).

The other Plaintiffs do not raise clear concerns about research funding.

### 2. Plaintiffs' Conference Funding Claims

Professor Austin says that she was not able to get funding to attend and present at a Diversity Abroad conference this past fall in Washington, D.C., even though she got funding to attend in 2023. Austin ¶¶ 47-48. Austin planned to present a chapter from her book criticizing anti-DEI laws. *Id*. ¶ 48.

Even if Austin was denied funding due to the Funding Provision, Austin cannot establish the requisite traceability and redressability necessary to show standing. *See Lujan,* 504 U.S. at 560–61. As she states in her declaration, the decision not to fund the trip was made by UF based on the mandates of SB 266, and UF retains the discretion to decline funds for any number of reasons, notwithstanding the Funding Provision. Thus, an injunction against the Funding Provision does not necessarily redress her lack of funding.

Insofar as Austin is "concerned" that future requests for conference funding will be denied, Austin ¶ 57, she has not provided any actual plan to engage in conduct that is prohibited under the Funding Provision such that it would result in a denial of funding absent a preliminary injunction. *See NFC Freedom*, 700 F. Supp. 3d at 1063.

Similarly, Plaintiff Rahier raises a generalized concern about the Funding Provision's impact on conference travel, but zero details about future plans to seek funding to attend one. Rahier ¶¶ 26, 29-31. This too is insufficient to generate a pre-enforcement challenge to the Funding Provision or Regulation 9.016.

The other Plaintiffs do not raise concerns about conference travel.

### 3. *Plaintiffs' Speaker Denial Claims*

Plaintiff Marr says that SB 266 threatens his ability to bring speakers to present at on-campus events. Marr ¶ 38. Last year, his department requested and received funding to host a guest speaker to opine on "Blackness." *Id*. ¶ 39. Although the funding was initially denied, the department ultimately received the funds and hosted the "Blackness" speaker. *Id*. ¶¶ 39-41. Marr says his "understanding [is] that this funding was denied based on SB 266." *Id.* ¶ 40. Marr is concerned that "future talks about racial inequities and other issues may be denied due to S.B. 266." *Id.* ¶ 41. He does not identify any specific plans to seek funding for any future speakers.

Marr's allegations are insufficient to establish standing because he offers no concrete plans to violate the statute. *See Elend,* 471 F.3d at 1209; *Wilson,* 132 F.3d at 1428.

The other Plaintiffs do not raise concerns about bringing speakers to campus.

#### *4. Plaintiffs' Student Researcher Concerns*

As noted above and explained below, the Funding Provision does not apply to research. *See supra* Part III.A.ii.1, *infra* Part III.B.ii. Even if it did, Plaintiffs do not have a First Amendment right to hire student research assistants with state and federal funds. Regardless, none of the Plaintiffs have supplied evidence sufficient to establish an injury based on an inability to hire student research assistants under the Funding Provision or Regulation 9.016.

Furthermore, Plaintiff Austin does not say whether the research fellows she intends to hire will be paid with state or federal funds. Austin ¶ 61. Without more, there is nothing tying Austin's concerns to the funding restrictions under the Funding Provision and Regulation 9.016. *See Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1229–30 (11th Cir. 2000) ("[W]e should not speculate concerning the existence of standing, nor should we imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none.").

Similarly, Plaintiff Marr says he is concerned that SB 266 will limit his ability to work with student research assistants. Marr ¶ 46. He currently has students assisting him with his "Equitable Pathways from Unsheltered to Housing" project. *Id*. ¶ 45. But that project is being funded by a private, nonprofit organization. *Id*. ¶ 42. There is no indication that the students assisting Marr with his privately funded

research are being paid with state or federal funds such that the Funding Provision and Regulation 9.016 are even implicated. Fla. Stat. § 1004.06(2). This too is insufficient for standing to challenge the Funding Provision or Regulation 9.016. *See Wilson,* 132 F.3d at 1428; *see also Miccosukee Tribe*, 226 F.3d at 1229–30.

Plaintiff Rahier also says he is concerned SB 266 will hamper his ability to hire student researchers but offers no future or current plan to hire any students or any details about what those students might work on or how they might be paid. Rahier ¶ 29. Plaintiff Rahier's concerns are too speculative and indefinite to support standing. *Elend,* 471 F.3d at 1209.

The other Plaintiffs do not raise concerns about student researchers.

### iii. *Plaintiffs Cannot Sustain a Vagueness Claim Based on Provisions that Do Not Regulate Them.*

Finally, for standing purposes, a vagueness claim requires a plaintiff to show he wishes to engage in speech that would be affected by the challenged provisions but "the [challenged provisions are] ***at least arguably vague as they apply to him***." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010) (emphasis added). Additionally, the plaintiff must show "there is at least a minimal probability that the rules will be enforced, if they are violated." *Id.*; *see also Equal. Fla. v. Fla. State Bd. of Educ.*, No. 4:22-CV-134-AW-MJF, 2022 WL 19263602, at *4 (N.D. Fla. Sept. 29, 2022) (no vagueness challenge where "the law is enforced against school districts and not individuals") (citations omitted).

Plaintiffs cannot make any allegations suggesting that they want to engage in behavior that would make the provisions arguably vague *as applied to them*. *See Harrell*, 608 F.3d at 1254. There is nothing in statute or rule to conclude that the Funding Provision or Regulation 9.016 are enforced against individual professors— they are entirely enforced against the universities. *See* § 1004.06; Reg. 9.016. Accordingly, Plaintiffs do not have standing to challenge the vagueness of these laws.

\*　　\*　　\*

Ultimately, none of the Plaintiffs have shown an injury sufficient for standing to challenge the General Education Provision, the Funding Provision, or Regulation 9.016. Moreover, even if they had, they cannot show traceability or redressability under the challenged provisions. *See Support Working Animals*, 8 F.4th at 1205–06.

### iv.    *Plaintiffs Cannot Rest Standing on Third Party Harms.*

Plaintiffs highlight the injuries additional witnesses raise in declarations to the Court. But Plaintiffs cannot achieve standing based on the alleged injuries of third parties. "Even under the more lenient prudential requirements for standing applicable to First Amendment overbreadth challenges, it still remains the law that plaintiffs must establish that they have suffered some injury in fact as a result of the defendant's actions." *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257,

1271-72 (11th Cir. 2006) (quoting *Bischoff v. Osceola Cnty., Fla.,* 222 F.3d 874, 884 (11th Cir. 2000)).

Since Plaintiffs cannot establish standing based on their own claimed injuries, they do not have standing to assert the injuries of third parties. Nevertheless, the injuries detailed in the nonparty declarations suffer from the same deficiencies as the Plaintiffs' because, among other reasons, the General Education Provision, Funding Provision, and Regulation 9.016 are not enforced against professors and students. These provisions regulate the universities and are enforced against the universities.

**B.    Plaintiffs Are Unlikely to Succeed on the Merits**

**i.    *Plaintiffs' Facial Challenge to SB 266 and Regulation 9.016 Fails Because their Allegedly Unconstitutional Applications of SB 266 Do Not Substantially Outweigh Its Constitutional Applications (Counts I & II)***

Plaintiffs' action is a facial challenge to the Funding and General Education Provisions of SB 266. *See* Compl. at 64-65; Mot. at 1-3; Pl.'s Memo. at 18. As such, Plaintiffs "confront a heavy burden," because "[f]acial invalidation is, manifestly, strong medicine that has been employed … sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (internal quotations and citations omitted). Because facial challenges "'often rest on speculation' about the law's coverage and its future enforcement" and "'threaten to short circuit the democratic process'" the Supreme Court "has therefore made facial challenges hard

to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450–451 (2008)).

"Even in the First Amendment context, facial challenges are disfavored[.]" *Id*. at 744. Although a lower standard applies in First Amendment cases, it is still a "rigorous" burden to meet. *Id*. at 723. In such cases, "[t]he question is whether 'a substantial number' of the law's applications 'are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id*. (quoting *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021)). Only if a law's "unconstitutional applications substantially outweigh its constitutional ones" will the law be "struck down in its entirety." *Id*. at 723-24.

Thus, "[t]he first step in the proper facial analysis is to assess the state law's scope." *Id*. at 724. The Court must ask, "What activities, by what actors, [does the law] prohibit or otherwise regulate?" *Id*. The next step is to decide which of the law's "full range of applications" "violate the First Amendment, and to measure them against the rest." *Id*. at 725-26. Only by "compar[ing] the two sets" can the Court decide the facial challenge. *Id*. at 726.

Plaintiffs acknowledge the plainly legitimate sweep of SB 266, but they dedicate little discussion to the full comparison a facial challenge requires. *See* Pls.' Memo. at 23. Plaintiffs only discuss a small portion of the activities regulated by SB 266. According to Plaintiffs, the allegedly unconstitutional applications of SB 266

include (1) the denial of "generally available funding" to professors like Austin who seek to attend or make presentations at conferences that promote DEI or political activism, (2) the denial of funding for future research projects that promote DEI or political activism, and (3) the denial of funding for debates, talks, and panel discussions that promote DEI or political activism.    Pls.' Memo. at 13-23. These applications of SB 266, they note, are "outside the classroom" and do not involve "in-class speech." *Id*. at 15, 18.[7] On the other side of the line, Plaintiffs concede that SB 266's Funding Provision is constitutionally applied to government speech, but Plaintiffs' perception of the government speech at issue is "exceedingly narrow" and involves little more than "university policies, official university press releases, and the university's recruitment efforts." Pls.' Memo. at 23. For the following reasons, Plaintiffs' balance of the alleged unconstitutional applications of SB 266 against the constitutional applications is far afield from the actual scope of the law.

### 1. General Education Provision

The General Education Provision determines whether a course is included within the general education curriculum or not, therefore its full scope applies only to curriculum decisions. Curriculum decisions are unquestionably government

---

[7] Plaintiffs further conclude more generally that the Funding Provision covers "[s]tudent writing, discussion, and research on a vast set of topics," Pls.' Memo. at 23-24, but there are no supporting facts to substantiate this alleged application of SB 266 to student scholarship, and the BOG Defendants deny any application of the Funding Provision to student scholarship.

speech. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995) ("When the University determines the content of the education it provides, it is the University speaking . . . ."). And when the university "is the speaker," it may "regulate the content of what is or is not expressed," including "viewpoint-based restrictions" in the dissemination of its own speech. *Id*. at 833-34. Indeed, this Court recently recognized "the State's valid exercise in prescribing a university's curriculum." *Pernell*, 641 F. Supp. 3d at 1237. Accordingly, as government speech, the curriculum decisions regulated by the General Education Provision cannot be invalidated under the First Amendment. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."). For that reason, the General Education Provision has no unconstitutional applications that could support a facial challenge. It is constitutionally applied to all university courses.

## 2. *Funding Provision*

With respect to the Funding Provision, Regulation 9.016 defines the full scope of "programs or campus activities" to which the Funding Provision applies. Pls.' Memo. at 20. According to that Regulation, "programs or campus activities" are broadly defined as "activities authorized or administered by the university or a university's direct-support organization(s) that involve: (a.) Academic programs

subject to review as outlined in sections 1001.706(5)(a) and 1007.25, Florida Statutes, other than classroom instruction; (b.) Student participation, other than classroom instruction; [and] (c.) Hiring, recruiting, evaluating, promoting, disciplining, or terminating university employees or contractors." Reg. 9.016(1)(a)4.

First, the "academic programs" that are subject to the Funding Provision are degree programs that are managed at the curriculum level. *See* Fla. Stat. § 1001.706(5)(a) (mandating review of academic programs for certain curriculum); Fla. Stat. § 1007.25 (listing overall course and credit requirements for various "degree programs").[8] As explained above, curriculum-level decisions are government speech. *See supra* Part III.B.i.1. The Funding Provision is therefore constitutionally applied to academic programs.[9]

Second, the Funding Provision applies to all activities authorized or administered by the university that involve "student participation." Reg. 9.016(1)(a)4.[10] These activities could include freshman orientations, pep rallies, job fairs, campus tours, athletic competitions, graduation ceremonies, alumni events,

---

[8] Regulation 9.016 appears to align with how this Court understood the word "program" prior to BOG's promulgating the rules. *See NFC Freedom*, 700 F. Supp. 3d at 1073.

[9] Because "classroom instruction" is outside the scope of the Funding Provision, *see* Reg. 9.016(1)(a)4, the classroom-related free speech issues in *Pernell* are not implicated.

[10] Again, "classroom instruction" is expressly outside the scope of the Funding Provision. Reg. 9.016(1)(a)4.

conferences, receptions, professional workshops, study abroad programs, and more. In general, these "school-sponsored" programs and expressive activities "bear the imprimatur of the school" and therefore enable the university to control the viewpoints expressed during those activities. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271-72 (1988) (recognizing that a school must retain the authority to refuse to sponsor speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with the shared values of a civilized social order"). Accordingly, a Florida university must retain the authority to refuse to fund speech or activity at its own university-sponsored activities and programs. In the university context, "when the government appropriates public funds to promote a particular policy of its own," viewpoint-based restrictions are allowed because the university speaks for itself or subsidizes the transmittal of a message it favors. *Rosenberger*, 515 U.S. at 833-34. After all, the State of Florida "may refuse to lend its name *and resources* to the dissemination" of expression with which it disagrees. *Hazelwood*, 484 U.S. at 272-73 (emphasis added). Thus, the Funding Provision is constitutionally applied to university-sponsored activities that involve student participation.

Finally, the Funding Provision applies to all activities that involve "[h]iring, recruiting, evaluating, promoting, disciplining, or terminating university employees or contractors." Reg. 9.016(1)(a)4. These management functions of the university

are undoubtedly actions and expressive conduct of the university itself, therefore these activities would also fall within the government speech protections. Even Plaintiffs concede that a university's "recruitment efforts" fall within its government speech. Pls.' Memo. at 23. SB 266 is therefore constitutionally applied to the university's employment actions.

Given all of the above constitutional applications of the Funding Provision with respect to the university's own speech, it does not matter whether Plaintiffs' allegedly unconstitutional applications of the Funding Provision – professors' conference speeches, academic research, and other on-campus speeches or discussions – are considered unconstitutional. Plaintiffs' facial challenge fails regardless, because these alleged applications do not substantially outweigh the many constitutional applications of the Funding Provision to the university's own speech. To be sure, the Funding Provision is not unconstitutional as to the alleged applications, as explained below. *See infra* Part III.B.ii,iii,iv. Nevertheless, even if these applications were unconstitutional, the Funding Provision has far more constitutional applications and therefore survives a facial challenge.

Plaintiffs have failed to carry their burden of demonstrating that SB 266's unconstitutional applications substantially outweigh its constitutional ones, which burden is "the price of [Plaintiffs'] decision to challenge the law[] as a whole." *NetChoice*, 603 U.S. at 744.

### ii. *The Funding Provision Does Not Cause Unconstitutional Viewpoint Discrimination. (Count I)*[11]

The Funding Provision is not a direct regulation on speech. It prohibits the expenditure of state or federal funds on certain programs or campus activities. Fla. Stat. § 1004.06(2).

The State "can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). For that reason, government programs that take the form of speech "do not normally trigger the First Amendment rules designed to protect the marketplace of ideas." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

Thus, when the State "appropriates public funds to establish a program it is entitled to define the limits of that program." *Rust*, 500 U.S. at 194. In other words, when the government establishes a subsidy for specified ends, it may impose certain restrictions to define the limits and purposes of the subsidy. *Legal Servs. Corp. v.*

---

[11] It does not appear that Plaintiffs challenge the General Education Provision under Count I as unconstitutional viewpoint discrimination. *See* Compl. ¶¶ 122-26. Nevertheless, as explained above, the General Education Provision only regulates curriculum-level decisions, and those curriculum-level decisions are government speech not subject to First Amendment scrutiny. *See supra* Part III.B.i.1. Accordingly, the General Education Provision does not restrict the viewpoints of private speakers.

*Velazquez*, 531 U.S. 533, 543–44 (2001). The constitutionality of those limits depends on the distinction "between conditions that define the limits of the government spending program—those that specify the activities [the government] wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). Accordingly, conditions that attach speech restrictions to the *recipient* of the funds, rather than to the program itself, have been struck down. *Id.* at 215-17. But a spending regulation that does not prohibit the recipient "from engaging in the protected conduct outside the scope of the [government] funded program" does not run afoul of the First Amendment. *Id.* at 217.

Here, the Funding Provision "neither prevents anyone from speaking nor coerces anyone to change speech." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 558–59 (2001) (Scalia, J., dissenting). It also does not compel a recipient "to adopt a particular belief as a condition of funding." *Agency for Int'l Dev.*, 570 U.S. at 218. Although Plaintiffs contend that professors "have lost and will continue to lose access" to academic conferences, *see* Pls.' Memo. at 5, nothing in the Funding Provision prevents these professors from attending or speaking at such conferences or programs. They are perfectly free to espouse whatever viewpoints they wish by

paying their own way or receiving non-government funding. For that reason, the Funding Provision is not an unconstitutional restraint on their viewpoints.

To be sure, the Supreme Court has emphasized that universities "enjoy 'a significant measure of authority over the type of officially recognized activities in which their students participate.'" *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 686–87 (2010) (quoting *Board of Ed. of Westside Community Schools (Dist.66) v. Mergens,* 496 U.S. 226, 240 (1990)). For example, schools may "decline to subsidize with public monies and benefits" conduct that the State has proscribed within constitutional limits. *Id*. at 689-90. Similarly, the Eleventh Circuit has acknowledged that a State "traditionally has had great control over its spending, especially for education." *Fac. Senate of Fla. Int'l Univ. v. Winn*, 616 F.3d 1206, 1210 (11th Cir. 2010). Thus, Florida has a strong interest "in managing its own spending and the scope of its academic programs." *Id*. at 1211.

The Florida Legislature has defined the limits of the public university education to exclude the expenditure of taxpayer dollars on DEI efforts or political or social activism. As a result, the program of public education in this State draws the line to protect and advocate for the equality of all its constituents and to remove controversial activity from State-sponsored education. Under the overarching program of public university education, the universities must then restrict their

39

individual programs and activities under these same limits. Because none of these limits restrict the speech rights of professors outside the context of the State-funded, university educational programs, the funding restrictions are constitutional. *Agency for Int'l Dev.*, 570 U.S. at 217-18.

Finally, Plaintiffs' focus on research as a potential violation of the Funding Provision is misguided. The Funding Provision prohibits university expenditures aimed at *advocating* for DEI or *promoting* political or social activism. Fla. Stat. § 1004.06(2)(b). Research, on the other hand, is the "diligent and systematic inquiry or investigation into a subject in order to discover or revise facts, theories, applications, etc." *Research*, DICTIONARY.COM, https://www.dictionary.com/browse/research (last visited Feb. 21, 2025). Because research is foremost an inquiry or investigation, research should be neutral in its outlook with no preordained outcome. Thus, properly understood, research is not advocacy or activism, both of which inherently strive for a particular outcome. The Funding Provision therefore does not regulate research.[12]

---

[12] If a professor believes that his or her research may violate the Funding Provision, then it raises questions about the objectivity and sincerity of his or her inquiries conducted through research.

### iii.   Neither SB 266 Nor Regulation 9.016 Are Unconstitutionally Overbroad (Count II)

Plaintiffs next claim that, although SB 266 and Regulation 9.016 have legitimate application to government speech, they are nevertheless overbroad because they "are chilling in-class discussions." *See* Compl. ¶¶ 89, 128-31.

The Supreme Court has recognized that the overbreadth doctrine is "strong medicine" that should be employed "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). The overbreadth doctrine "instructs a court to hold a statute facially unconstitutional" if the plaintiff "demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep[.]'" *United States v. Hansen*, 599 U.S. 762, 769–70 (2023) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *Id*. "In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do—case-by-case." *Id*. Satisfying the overbreadth doctrine's burden "is not easy to do." *Id*. (quoting *Doe v. Valencia Coll.*, 903 F.3d 1220, 1232 (11th Cir. 2018)).

For the same reasons that Plaintiffs' overall First Amendment facial challenge fails, *see supra* Part III.B.i, the overbreadth challenge fails, as well. The plainly legitimate sweep of SB 266 and Regulation 9.016, as applied to government speech,

is not outweighed by the alleged unconstitutional applications. Furthermore, Plaintiffs' emphasis on an "in-class" chilling of speech is unavailing, Compl. ¶ 130, because Regulation 9.016 expressly excludes "classroom instruction" from the scope of the Funding Provision. Reg. 9.016(1)(a)4. Besides, student speech is not regulated by any of SB 266, directly or indirectly. Plaintiffs therefore have not demonstrated a lopsided ratio of realistic, unconstitutional applications of the Funding Provision or Regulation 9.016.

The General Education Provision similarly does not reasonably chill Plaintiffs' speech. Rather, it only implicates the "authority of the State to prescribe the content of its universities' curriculum." *Pernell*, 641 F. Supp. 3d at 1237; *see also supra* Part III.B.i.1 (explaining the State's clear power to regulate curriculum and Plaintiffs' lack of a cognizable First Amendment injury from having to teach their classes as electives). To hold that a professor has the right to insist that his or her own courses constitute "general education" courses would violate the Eleventh Circuit's pronouncement that academic freedom "cannot be extrapolated to deny schools command of their own courses." *Bishop*, 926 F.2d at 1075; *see also Urofsky v. Gilmore*, 216 F.3d 401, 409-10 (4th Cir. 2000) (rejecting the argument that "a university professor possesses a constitutional right to determine for himself, without the input of the university (and perhaps even contrary to the university's desires), the subjects of his research, writing, and teaching"). Again, the General

Education Provision allows for Plaintiffs to espouse their viewpoints in any non-general-education course, so their speech is not objectively chilled.

For these reasons, Plaintiffs' overbreadth challenge is unlikely to succeed on the merits.

### iv.    Neither SB 266 Nor Regulation 9.016 Are Unconstitutionally Vague (Count III)

Plaintiffs claim that numerous phrases are unconstitutionally vague under the Fourteenth Amendment.  Within the General Education Provision, Plaintiffs take issue with the phrases "distort significant historical events," *see* Compl. ¶¶ 93, 136, "identity politics," *id*. ¶¶ 94-96, 136, and "theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities," *id*. ¶¶ 97, 136. Within Regulation 9.016, Plaintiffs criticize the definitions of "social issues," *id*. ¶ 113, and "diversity, equity, and inclusion," *id*. ¶ 118.

A statute is impermissibly vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits . . . [or] if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  A statute must have terms that are "so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) (cleaned up) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629

(1984)). While the Constitution bars vague laws, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); *see also Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (finding an anti-noise statute not vague and explaining "[c]ondemned to the use of words, we can never expect mathematical certainty from our language"). Inherent in the vagueness doctrine is the idea that "[t]here are limitations in the English language with respect to being both specific and manageably brief, and . . . although the prohibitions may not satisfy those intent on finding fault at any cost" where the statute is "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with" the statute "will not be struck down as vague, even though marginal cases could be put where doubts might arise." *Arnett*, 416 U.S. at 159 (quoting *United States v. Hariss*, 347 U.S. 612, 618 (1954)).[13]

The provisions Plaintiffs highlight as impermissible either use plain, common language that have an "ordinary or natural meaning" that is readily understandable or easily determined, or they use well-known phrases that are akin to terms of art in an educational or employment setting. *Tracy*, 980 F.3d at 807 (considering dictionary definitions and context to determine a statute was not unconstitutionally

---

[13] Note too that federal courts may adopt a narrowing construction of a state statute if "such a construction is reasonable and readily apparent." *Boos v. Barry*, 485 U.S. 312, 330 (1988).

vague). First, the phrase "distort significant historical events" is understandable with reference to ordinary definitions. *See Distort*, MERRIAM-WEBSTER DICTIONARY, available at https://www.merriam-webster.com/dictionary/distort (last visited Feb. 21, 2025) (defining "distort" to mean "to twist . . . out of the true meaning or proportion : to alter to give a false or unnatural picture or account"). Plaintiffs do not address this phrase in their Motion or Memorandum, but in their Complaint they contend that a university professor might have trouble determining whether an event is significant. Compl. ¶ 93. They also contend that the presentation of "different accounts about an event" could be distortion. *Id*. Neither contention is strong in view of the plain meaning of the words used.

Next, Plaintiffs' criticism of the phrase "identity politics" is curious given that Plaintiffs even recite the dictionary definition of "identity politics." Pls.' Memo. at 28-29. It should similarly not be difficult to recognize "theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities." Fla. Stat. § 1007.25(3)(c).

As for Regulation 9.016, the definition of "social issues" might be broad but it is not vague, and the definition of "diversity, equity, and inclusion" is quite narrow and easy to understand. The latter definition only targets programs, campus activities, or policies that "promote[] differential or preferential treatment of

individuals on the basis of" race, color, sex, national origin, gender identity, or sexual orientation. Regulation 9.016(1)(a)1.

Plaintiffs' argument is full of "marginal cases … where doubts might arise," but the phrases themselves are sufficiently understood by an "ordinary person exercising ordinary common sense." *Arnett*, 416 U.S. at 159. Overall, the challenged provisions do not feature language that would lead a person of ordinary intelligence left to guess at whether the law applies. *Equal. Fla.*, 2022 WL 19263602, at *4. While Plaintiffs may find outlier examples of opacity, an ordinary person equipped with a modicum of common sense can sufficiently understand the provisions Plaintiffs challenge. *See O'Laughlin*, 30 F.4th at 1055.

Finally, as explained above, *supra* Part III.A.iii, these phrases do not even apply to Plaintiffs but to the universities that employ them. That said, even assuming Plaintiffs must understand and comply with these phrases, the standard for unconstitutional vagueness in this employment context is different. While speech regulations imposed on the general public are held to a standard of relative precision, courts treat government employee speech differently and apply a more lenient standard of review when reviewing statutes for vagueness. *See Waters v. Churchill*, 511 U.S. 661, 673 (1994) (explaining "surely a public employer may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large"). As the

Supreme Court has explained: "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters*, 511 U.S. at 675. Thus, under the framework applicable to this case, government employers receive more leeway in vagueness determinations. *See, e.g.*, *Arnett v. Kennedy*, 416 U.S. 134, 158-59 (1974) (statute requiring removal or suspension without pay "for such cause as will promote the efficiency of the service" was not vague or overbroad); *Tracy v. Fla. Atl. Univ. Bd. of Trustees*, 980 F.3d 799, 807 (11th Cir. 2020) (the term "professional practice" was not unconstitutionally vague); *Wishart v. McDonald*, 500 F.2d 1110, 1114 (1st Cir. 1974) (the standard of "conduct unbecoming a teacher" was not unconstitutionally vague); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992) ("Dismissal for failure to maintain 'standards of sound scholarship and competent teaching' does not fail to specify *any* standard for dismissal but rather provides a standard which encompasses a wide range of conduct.").

Accordingly, Plaintiffs are not likely to succeed on the merits of Count III.

### v.   *Plaintiffs Did Not Seek an Injunction Based on the Campus Free Expressions Act (Count IV)*

Even though there is no private cause of action against the Board of Governors under the Campus Free Expressions Act, codified at Section 1004.097, Florida Statutes, the BOG Defendants maintain that Plaintiffs' Count IV fails on the merits.

Regardless, Plaintiffs did not move for an injunction of SB 266 based on Count IV. *See generally* Mot.; Pls.' Memo.

### C.    Plaintiffs Have Not Satisfied the Other Factors to Support a Preliminary Injunction.

Plaintiffs depend on the alleged deprivation of their First Amendment rights to claim an irreparable injury.  Pls.' Memo. at 31-32.  But because they have not shown a substantial likelihood of success on their First Amendment challenge, *see supra* Part III.B, Plaintiffs cannot demonstrate irreparable harm, either.

An injunction would cause the BOG Defendants more harm than the Plaintiffs.  "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up). Furthermore, the requested injunction would infringe on the State's "authority to control curriculum," *Bishop*, 926 F.2d at 1078, and would infringe upon each university's right to "disassociate itself" from Plaintiffs' viewpoints which "students, parents, and members of the public might reasonable perceive to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271-72.

For the foregoing reasons, Plaintiffs are not entitled to a preliminary injunction against the enforcement of SB 266 and Regulation 9.016.

Dated: March 4, 2025                    Respectfully submitted,

/s/ Raymond F. Treadwell
**RAYMOND F. TREADWELL**
FLORIDA BAR NUMBER: 93834
**CAROLINE MAY POOR**
FLORIDA BAR NUMBER: 1018391
**LAWSON HUCK GONZALEZ, PLLC**
215 South Monroe Street, Suite 320
Tallahassee, FL 32301
Telephone: 850-825-4334
ray@lawsonhuckgonzalez.com
caroline@lawsonhuckgonzalez.com
michelle@lawsonhuckgonzalez.com

*Counsel for Defendants BRIAN LAMB,
ASHLEY BELL BARNETT, JOHN
BRINKMAN, TIMOTHY M. CERIO,
MANNY DIAZ, JR., AUBREY EDGE,
PATRICIA FROST, CARSON GOOD,
EDWARD HADDOCK, KEN JONES,
ALAN LEVINE, CHARLES H.
LYDECKER, CRAIG MATEER, JOSE
OLIVA, AMANDA J. PHALIN, and ERIC
SILAGY, in their official capacities as
members of the Florida Board of
Governors of the State University System*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been filed

with the CM/ECF website and served on March 4, 2025 to all counsel of record.

/s/ Raymond F. Treadwell

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

I hereby certify that the foregoing motion, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains <u>10,990</u> words as measured by Microsoft Word.

<i>/s/ Raymond F. Treadwell</i>