## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

SHARON AUSTIN, DANIEL BELGRAD, ROBIN
GOODMAN, MATTHEW MARR, ANDREA
QUEELEY, JEAN RAHIER, and KATIE
RAINWATER,

*Plaintiffs*,

v.

Case No. 25-cv-16-MW/MJF

BRIAN LAMB, ASHLEY BELL BARNETT, JOHN
BRINKMAN, TIMOTHY M. CERIO, MANNY
DIAZ, JR., AUBREY EDGE, PATRICIA FROST,
CARSON GOOD, EDWARD HADDOCK, KEN
JONES, ALAN LEVINE, CHARLES H.
LYDECKER, CRAIG MATEER, JOSE OLIVA,
AMANDA J. PHALIN, and ERIC SILAGY, in their
official capacities as members of the Florida Board of
Governors of the State University System; MORTEZA
HOSSEINI, DAVID L. BRANDON, JOHN
BRINKMAN, RICHARD P. COLE, CHRISTOPHER
T. CORR, JAMES W. HEAVENER, SARAH LYNNE,
DANIEL T. O'KEEFE, RAHUL PATEL, MARSHA
D. POWERS, FRED S. RIDLEY, PATRICK O.
ZALUPSKI, and ANITA G. ZUCKER, in their official
capacities as members of the University of Florida
Board of Trustees; PETER COLLINS, BOB SASSER,
JOHN THIEL, VIVAN DE LAS CUEVAS-DIAZ,
JORGE GONZALEZ, JUSTIN ROTH, KATHRYN
BALLARD, BRIDGETT BIRMINGHAM, JACKSON
BOISVERT, JIM HENDERSON, DEBORAH
SARGEANT, DREW WEATHERFORD, and
MAXIMO ALVAREZ, in their official capacities as
members of the Florida State University Board of
Trustees; ROGELIO TOVAR, CARLOS A. DUART,
NOËL C. BARENGO, FRANCESCA CASANOVA,
DEAN C. COLSON, ALAN GONZALEZ, GEORGE

HEISEL, JESUS LEBEÑA, ALEXANDER M.
PERAZA, YAFFA POPACK, CHANEL T. ROWE,
MARC D. SARNOFF, and ALBERTO R. TAÑO, in
their official capacities as members of the Florida
International University Board of Trustees; and
WILLIAM WEATHERFORD, MICHAEL E.
GRIFFIN, CHARBEL J. BARAKAT, SANDRA
CALLAHAN, MICHAEL CARRERE, N. ROGAN
DONELLY, SURYAKANTH GOTTIPATI, OSCAR
HORTON, LAURAN MONBARREN, SHILEN
PATEL, FREDRICK PICCOLO, MELISSA SEIXAS,
and DAVID SIMMONS, in their official capacities as
members of the University of South Florida Board of
Trustees,

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    Plaintiffs are professors at public universities in the State of Florida whose curricula and expressive activity have been fundamentally restrained and chilled in violation of the First Amendment to the United States Constitution. Plaintiffs' harms stem from the latest legislative effort in a series of attempts by the State of Florida to levy an attack on disfavored speech, including anything which the State perceives to fall within the ambit of diversity, equity, and inclusion.

2.    In recent years, the Florida Legislature has enacted laws seeking to suppress disfavored speech.  One of these laws, 2022's House Bill 7, also known

as the Stop W.O.K.E. Act, prohibited public university faculty from instructing on certain topics related to "race, color, national origin, or sex."[1]  The United States Court of Appeals for the Eleventh Circuit, in affirming an injunction of the Stop W.O.K.E. Act's private-employer provision, concluded that the law unconstitutionally "penalize[d] certain viewpoints—the greatest First Amendment sin."[2]

3.    Continuing its effort to police the marketplace of ideas, the Florida Legislature again passed vague, viewpoint-discriminatory legislation that broadly restricts academic freedom and imposes the State's favored viewpoints on public higher education, punishing educators and students for expressing differing and disfavored viewpoints.[3]

4.    This legislation, passed in 2023 and collectively referred to here as

---

[1] The Stop W.O.K.E. Act deemed the instruction of certain topics related to "race, color, national origin, or sex" in public schools and state universities to "constitute discrimination on the basis of race, color, national origin, or sex," unless such "instruction is given in an objective manner without endorsement of the concepts."  Fla. Stat. § 1000.05 (4)(a)–(b) (2022).

[2] The Eleventh Circuit in *Honeyfund* considered sections of the Stop W.O.K.E. Act that banned mandatory workplace trainings that promoted certain beliefs related to race, color, sex, or national origin.  *See Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277, 1281 (11th Cir. 2024) ("Banning speech on a wide variety of political topics is bad; banning speech on a wide variety of political viewpoints is worse.").

[3] *See* Fla. Stat. § 1004.06(2); *see also* Press Release, Gov. Ron DeSantis, *Governor Ron DeSantis Signs Legislation to Strengthen Florida's Position as National Leader in Higher Education*, FLGOV.COM (May 15, 2023), https://perma.cc/34K2-WXUM ("SB 266 takes several steps to prevent woke ideologies from continuing to coopt our state universities and state colleges.").

Senate Bill 266 ("S.B. 266"), bans the funding of expression that "[a]dvocate[s] for diversity, equity, and inclusion, or promote[s] . . . political or social activism," Fla. Stat. § 1004.06(2), and restricts the viewpoints that can be taught in general education courses, Fla. Stat. § 1007.25(3).  Instead of defining the relevant terms, the Florida Legislature delegated that authority to the Board of Governors of the State University System of Florida ("Board of Governors" or "BOG"), which in 2024 promulgated regulations implementing S.B. 266.  *See* Florida BOG Regulation 9.016 ("Regulation 9.016"); Florida BOG Regulation 8.005 ("Regulation 8.005") (collectively, "the Regulations").

5.      Regulation 9.016 implements S.B. 266's ban on funding for programs or campus activities that advocate for "diversity, equity, or inclusion," or that engage in "political or social activism."  The Regulation's definitions are ambiguous, inconsistent, and far too broad to provide any real guidance other than indicating the Legislature's and the BOG's intent to disfavor certain speech. Regulation 8.005 enumerates the categories and courses that qualify for statewide general education designation.  All students, regardless of their major, are required to take a specified number of courses with the general education designation to graduate.  In January 2024, the BOG amended Regulation 8.005 to remove "Principles of Sociology" from the list of state-recognized Social Sciences courses that would satisfy the general education requirement at Florida public universities

4

because of viewpoints discussed in the course.

6.    Through the Regulations implementing S.B. 266, the BOG has stripped hundreds of university courses of their general education status, including courses that historically have been designated as general education. Florida's public universities also have denied scholarship and research funding to faculty and students that had been approved in the past.

7.    Plaintiffs bring this lawsuit to challenge S.B. 266 and these Regulations, which together have disrupted their careers and restricted the speech of faculty and students throughout the State University System.

8.    The University of Florida ("UF"), for example, cited this law when denying a professor's request for funding to present her research at a conference that she had attended the year before without issue. UF has also been unwilling to fund some doctoral students' attendance at conferences or to host guest speakers—requests that the university had previously approved—when the activities appear tied to disfavored speech.

9.    Like S.B. 266's funding ban, the bill's general education restrictions also seek to suppress viewpoints the State disfavors. For example, under section 1007.25(3), general education courses "may not distort significant historical events or include a curriculum that teaches identity politics . . . or is based on theories that systemic racism, sexism, oppression, and privilege are inherent in the

institutions of the United States and were created to maintain social, political, and economic inequities." Section 1007.25(3) does not, however, define "distort" or "identity politics." Instead, professors are left to guess whether and how their courses could run afoul of Florida law. This chills protected in-class speech, as professors seek to comply with S.B. 266 to avoid consequences to their future tenure or their ability to maintain general education status for their courses.

10.    In an attempt to comply with these vague provisions, public universities have implemented S.B. 266's restrictions to strip longstanding classes of their general education status. Florida State University ("FSU") denied general education status to fourteen out of seventeen English courses that applied for general education status, despite those courses having previously held such status. Florida International University ("FIU") likewise removed several sociology and anthropology courses from the general education catalog, and University of South Florida ("USF") has removed several humanities courses from the general education catalog. UF also removed all courses in the African American Studies program from the general education curriculum, even though those courses previously held such status.

11.    Removing these courses puts entire departments' financial viability at risk; imposes administrative and psychological burdens on professors, which detract from their other academic responsibilities; and robs students of the

6

opportunity to take these courses while also progressing toward their degrees in other fields of study. Students are less likely to take a course that does not count toward their major or general education requirements because they are concerned with (1) the cost of taking such a course, given that their tuition is based on how many credit hours they are enrolled in; and (2) whether taking that course would force them to extend their time at university in order to meet all of their graduation requirements. This is particularly true for students in science, technology, engineering, or mathematics degree programs, whose schedules are often less flexible because they are required to take specific classes each semester.

12.    To even have the possibility of keeping their courses' general education status, professors were forced to alter their course titles, course descriptions, and specific modules in an attempt to conform with the recent legislation, a task that they have taken on without clarity on how to comply with the law. For courses that have been stripped of general education status, professors remain in the dark about what additional changes would be required for their courses to reacquire general education status.

13.    The impacts of these Regulations are not limited to the classroom. Funding restrictions under section 1004.06 have stripped certain student organizations of their ability to provide meaningful services to their members. UF, for example, closed the Center for Inclusion and Multicultural Engagement

("CIME"), which provided invaluable resources to students and student organizations through their Office of Hispanic Latinx Student Engagement, Office of Black Student Engagement, Office of Asian Pacific Islander Desi Student Engagement, and Office of LGBTQ+ Student Engagement.[4]  CIME was closed despite the continued and largely state-funded operation of similar offices for disabled, veteran, and first-generation students.[5]

14.     Further, the chilling effects of section 1004.06 are felt by student organizations, despite the Legislature's carveout for student fees.  Because student organizations rely on university funding, they are limiting their events and programming for fear of violating Florida law.  For example, at UF, at least one student news organization avoided covering another student organization's event discussing the impacts of S.B. 266, for fear of losing funding.  Not only does the threat of losing funding restrict the freedom of student journalists to cover events

---

[4] CIME was abruptly shut down in August 2024, when a university spokesperson announced that the office would be undergoing changes to comply with S.B. 266.  While CIME appears to have been rebranded as the "Office of Community and Belonging," students have been left in the dark as to what this rebrand means and are concerned about whether previously available programs and resources will be maintained.  *See* Grace McClung, *State elimination of DEI initiatives shuts down UF's Center for Inclusion and Multicultural Engagement*, THE INDEPENDENT FLORIDA ALLIGATOR (Aug. 5, 2024), https://perma.cc/DNJ9-NQC3; *see also Staff*, UF STUDENT ENGAGEMENT, https://perma.cc/66NT-RGKU (last visited Jan. 14, 2025).

[5] *See Disability Resource Center*, UNIV. OF FLA., https://perma.cc/6K9B-X6AP (last visited Jan. 14, 2025); *Office of Student Veteran Services*, UNIV. OF FLA., https://perma.cc/22Y6-REJ7 (last visited Jan. 14, 2025); and *Office of First-Generation Student Success*, UNIV. OF FLA., https://perma.cc/WV8Q-A86Z (last visited Jan. 14, 2025).

taking place at their institutions, but it also robs student organizations, particularly those supporting students of color or other marginalized groups, of the opportunity to spread their message to students across campus.

15.    As described here, Plaintiffs' First Amendment rights under the United States Constitution have been violated by S.B. 266 and the Board of Governors' implementing Regulations.

16.    The United States Supreme Court has highlighted the vital role of educators' academic freedom in our democracy, emphasizing that "[t]o impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).  These protections also extend to students: "[S]tudents must always remain free to inquire, to study and to evaluate, and to gain maturity and understanding; otherwise our civilization will stagnate and die." *Id.*  As the Supreme Court explained, "The quality and creative power of student intellectual life . . . remains a vital measure of a school's influence and attainment. . . .  [T]o cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 836 (1995).

17.    S.B. 266 and Regulation 9.016 violate Floridians' academic freedom

as it relates to their First Amendment rights. *See Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967) (Academic "freedom is . . . a special concern of the First Amendment").

18.    In an attempt to close the marketplace of ideas at Florida's public universities to viewpoints that are not endorsed by the State of Florida, S.B. 266 and the Regulations impose viewpoint-based restrictions on speech in violation of the First Amendment.  This state-sponsored viewpoint discrimination, accompanied by S.B. 266's and Regulation 9.016's overbroad and vague language, inhibits academic freedom.  Together, S.B. 266 and the Regulations have left instructors and students fearful for the future of not only education, but also free thought and democracy in Florida.

19.    Part of this fear stems from the fact that S.B. 266 and Regulation 9.016 are vague and overbroad in violation of the First Amendment. Regulation 9.016, for example, purports to define key terms in S.B. 266, like "political or social activism," but its expansive definitions prohibit, for example, "any activity organized with a purpose of ***effecting or preventing change*** to a government policy, action, or function, or any activity intended to ***achieve a desired result*** related to social issues." (Emphases added).  Because the definitions are so broad, the faculty and students who are subject to the law and the administrators who must enforce it are not on notice as to what activity is

10

prohibited (or what is permitted).  As a result, professors are self-censoring out of fear of running afoul of S.B. 266, and students are concerned about speaking openly on campus out of fear that certain conversations could violate the law.

20.    By enforcing S.B. 266 and the Regulations in a way that limits students, faculty members, and staff from accessing or observing different perspectives that they may disagree with or find uncomfortable, Defendants have also violated section 1004.097(3)(f) of Florida's Campus Free Expression Act. The Florida Legislature amended the Campus Free Expression Act in 2021 to include an anti-shield provision in order "to protect the expression of diverse viewpoints at Florida College System [] institutions and state universities."[6] Section 1004.097 creates a cause of action against a public institution of higher education when that institution "shield[s] students, faculty, or staff from expressive activities."[7]  An individual is shielded from expressive activities when their "access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive," is limited.[8]  Protected under this law is an individual's "lawful oral and written communication of ideas,

---

[6] Fla. S. Educ. & Emp. Comm., *CS/CS/HB 233 — Postsecondary Education* (2021), https://perma.cc/S736-T7YR (last visited Jan. 14, 2025).

[7] Fla. H.B. 233 § 1004.097 (3)(a) (2021).

[8] Fla. H.B. 233 § 1004.097 (2)(f) (2021).

11

including . . . faculty research, lectures, writing, and commentary, whether published or unpublished."[9]  By allowing discussions of only those viewpoints that the State agrees with, Defendants are shielding faculty members, students, and staff in violation of section 1004.097(3)(f).

21.     This Court should declare the aforementioned provisions of S.B. 266 and the BOG's implementing Regulations unconstitutional and enjoin them.

## PARTIES

### A. Plaintiffs

22.     Plaintiff Sharon Austin is a researcher, educator, and tenured Professor of Political Science and the former Director of the African American Studies Program at UF.  One of the ways that Plaintiff Austin meets her professional requirements is by presenting her research at conferences.[10]  On April 8, 2024, UF, a publicly funded institution and a member of the State University System of Florida, denied Plaintiff Austin's funding request to attend an international conference hosted by Diversity Abroad (the "Global Inclusion Conference") where she was invited to present her work—a request UF had

---

[9] Fla. H.B. 233 § 1004.097 (3)(a) (2021).

[10] UF's "criteria for granting tenure, promotion, or permanent status" depends on a faculty member's" performance of the duties and responsibilities expected of a member of the university community."  UF recognizes three broad categories of academic engagement: (1) teaching; (2) research; and (3) service.  *Promoting & Tenure Guidelines for 2024–2025*, UNIV. OF FLA., https://perma.cc/L6H5-KAGD (last visited Jan. 14, 2025).

granted the year before—because her viewpoint is disfavored by the State pursuant to S.B. 266. She intends to seek funding from UF again to attend the Global Inclusion Conference in 2025. Moreover, Plaintiff Austin was recently selected as President-elect of the National Conference of Black Political Scientists. She has relied on funding from UF to attend this conference every year since she began working at UF in 2001 and has taken students to this conference to present their research. Plaintiff Austin intends to continue attending this annual conference and requesting financial support from UF to do so. However, she now fears that using university funding to attend this conference will be banned under S.B. 266 because the research she will present discusses the assault on academic freedom and DEI, and the Global Inclusion Conference was founded to increase the representation of Black scholars in the Political Science discipline. She fears that she will no longer receive funding, forcing her to either pay out-of-pocket or forgo attending.

23.    Additionally, UF's Provost's Office flagged two of Plaintiff Austin's courses ("Politics of Race" and "Black Horror and Social Justice") for non-compliance with S.B. 266, despite these courses previously satisfying UF's general education requirements. At the Provost's Office's instruction, Plaintiff Austin made changes to the course descriptions and altered a module on microaggressions to address the Assistant Provost's concern that the courses

violated S.B. 266's "text about identity politics and systemic racism."  Despite

these revisions, Plaintiff Austin was notified on December 6, 2024, that neither of

her courses were approved by the BOG for general education designation for the

2025-2026 school year.  While she intends to request approval for these courses to

be included in the general education catalog in the future (including her course

"Women of Color and the Law"), she fears that the BOG's and UF BOT's unclear

processes and lack of transparency will remain insurmountable obstacles.

24.    Plaintiff Robin Goodman is a tenured English Professor and

researcher at FSU.  Since 2015, Plaintiff Goodman has taught, as relevant here,

"Third World Cinema," a former general education course about the relationship

between political intervention and cinematographic techniques.  As part of the

course, students watch and discuss a range of films, including Academy of Motion

Picture Arts and Sciences-recognized films like "The Battle of Algiers."  In

August 2024, Plaintiff Goodman learned that FSU's general education courses,

including her own, were being reviewed by FSU and would be submitted to the

BOG to determine whether they would continue to receive general education

status.  Unlike the rigorous review process that FSU faculty is required to undergo

when adding or removing a course—a process that can take anywhere from six to

eight months—by the beginning of the Fall 2024 semester, the BOG reached its

decision without faculty input, ignoring its obligations to form a faculty

committee before deciding whether a course qualified for general education designation. In the beginning of that semester, FSU informed Plaintiff Goodman that her course had been removed from the general education list. FSU also determined that although "Third World Cinema" would continue to meet students' Ethics requirement, it would be removed from all other general education requirements, including "Humanities and Cultural Practice." Because the English Department is obligated to offer enough general education courses to allow students to fulfill their general education requirements, the Department is unlikely to offer courses that do not have a general education designation. Thus, "Third World Cinema" is unlikely to be offered, even as an elective course.

25.    Plaintiff Goodman also developed a general education course previously titled "Perspectives on the Short Story," which has historically been offered as a 3000-level course. In developing the course, Plaintiff Goodman helped publish a textbook from which her department receives monetary royalties. Her department uses these royalties to sponsor graduate students to attend conferences and for other events and programming. In 2024, the BOG denied "Perspectives on the Short Story" general education status for the Fall 2025 semester. The course was later reinstated as a general education course, however, after: (1) the course was changed from 3000-level to a 2000-level course; (2) the title was changed to "Introduction to the Short Story"; and (3) language was added

to the course syllabus to explicitly include selections from "the Western Canon." Asking how an instructor can be sure whether they are teaching sources from "the Western Canon," Plaintiff Goodman was told that the university had not received, and would not provide, guidance on how to teach selections from the "Western Canon" in a manner that conforms with S.B. 266.

26.    Plaintiff Matthew Marr is a researcher and tenured Associate Professor of Sociology in the Department of Global and Sociocultural Studies and the Asian Studies Program at FIU. Plaintiff Marr teaches both undergraduate and graduate courses at FIU, including "Introduction to Sociology," a course he is teaching in Fall 2025. "Introduction to Sociology" is a foundational sociological course, providing students the basics of the scientific study of human action and interaction. In the course, students examine how individual and group action and experiences are shaped by the social context in which they occur and, in turn, how that social context is itself shaped by individual and group action and experiences. As is the case in all sociology courses, "Introduction to Sociology" exposes students to various concepts, including that everything is socially constructed and, thus, nothing in society is inherent but is constantly evolving. In January 2024, the BOG amended Regulation 8.005, removing all introductory sociology courses across the state from the list of courses that automatically satisfy the general education requirement for a social sciences course, despite the fact that, as the

16

original social science, Sociology is the foundation for all other social sciences. As a result of the BOG's amendment of Regulation 8.005, Plaintiff Marr can no longer teach "Introduction to Sociology" as one of the general education courses required under Regulation 8.005. He continues to teach "Introduction to Sociology" as a university-specific general education course, which also is subject to S.B. 266's prohibitions. Plaintiff Marr fears that his teaching could run afoul of S.B. 266. This fear is particularly pressing because he was recently selected for post-tenure review as part of the 2025–2026 cycle.

27.    Plaintiff Marr also fears that his funding requests and use of state funds could run afoul of S.B. 266. Plaintiff Marr intends to apply for additional state or federal funding from FIU to attend future conferences and to assist with his research. For example, Plaintiff Marr plans to attend the annual meetings of the American Sociological Association from August 8 to 12, 2025, in Chicago. He has submitted a paper presentation titled "How Do Race and Ethnicity Shape Housing Outcomes After Homelessness in a Hispanic Majority County? Miami-Dade County's Continuum of Care as a Racialized Organization." Plaintiff Marr intends to seek university funding to attend this conference, but he fears FIU will deny his request for reimbursement due to S.B. 266. Plaintiff Marr's fear that his requests will be denied is reasonable, given that FIU initially denied a request that his department made for expenses incurred to host a

departmental event. Plaintiff Marr's department relies on university funding to host departmental events, including a graduate student conference and a monthly speaker colloquium. Many speakers present on topics related to race and gender. FIU initially denied expenses incurred for the colloquium because it focused on "Blackness." The expenses were eventually reimbursed, but Plaintiff Marr and his department remain unsure about whether future department expenses will be denied for reimbursement due to S.B. 266.

28.     Plaintiff Jean Rahier is a researcher and tenured Professor of Anthropology and African and African Diaspora Studies at FIU. He served as the Director of the African and African Diaspora Studies Program from 2008 to 2016. Like Plaintiff Marr, Plaintiff Rahier and his Department rely on university funding for departmental lectures and events that the university has threatened to deny as a result of S.B. 266's viewpoint discriminatory funding ban.

29.     Furthermore, in Summer 2024, Plaintiff Rahier learned that two of his courses ("Black Popular Cultures: Global Dimensions" and "Myth, Ritual, and Mysticism"), had been removed by FIU's provost from the general education curriculum at the recommendation of the BOG. Plaintiff Rahier understood that his courses were removed from the general education curriculum after the BOG ran keyword searches and concluded, based on their titles, the courses violated S.B. 266. As to "Myth, Ritual, and Mysticism," this course has historically been

so popular at FIU that the school offered multiple sections of the course, taught by several professors, every semester to accommodate student demand. After the Chair of Plaintiff Rahier's Department learned that the course was to be removed from the general education curriculum because of concerns it violated S.B. 266, he contacted the professors for "Myth, Ritual, and Mysticism," including Plaintiff Rahier. The Chair informed the professors that, based on a spreadsheet that the Chair had received from the Provost, there was the possibility of keeping the course as part of the general education curriculum if certain changes were made. At the Chair's suggestion, Plaintiff Rahier and the other professors agreed to remove the word "Myth" from the course title, as well as remove the word "supernatural" from the course description. Despite making these changes, however, Plaintiff Rahier was informed in September 2024 that his courses still would not be reinstated. Both "Black Popular Cultures: Global Dimensions" and "Myth, Ritual, and Mysticism" were popular courses among students at FIU and, due to their high numbers of enrollment, provided important funding to the African and African Diaspora Studies Program and the Global and Sociocultural Studies Department, respectively. Because of their removal from the general education curriculum, students are less likely to enroll in Plaintiff Rahier's courses and, thus, the African and African Diaspora Studies Program and the Global and Sociocultural Studies Department are in jeopardy of losing key funding.

Furthermore, in April 2025, Plaintiff Rahier learned he and five others in his department had been selected for post-tenure review, heightening his concerns about running afoul of S.B. 266.

30.    Plaintiff Andrea Jean Queeley is an Associate Professor of Anthropology and African and African Diaspora Studies at FIU.  Following the enactment of S.B. 266, two of Plaintiff Queeley's undergraduate courses ("The Anthropology of Race and Ethnicity" and "Black Popular Cultures: Global Dimensions") were stripped of their general education designation, despite the fact that both courses had been offered for general education credit for over a decade.  Plaintiff Queeley understood that her courses were removed by the BOG after it ran a keyword search that indicated her courses somehow did not comply with S.B. 266.

31.    Plaintiff Queeley is also concerned that her scholarship will be affected if her funding requests are denied for purported non-compliance with S.B. 266.  Plaintiff Queeley relies on state funding to attend conferences where she presents her scholarship and receives key feedback from other experts in her field.  In February 2025, Plaintiff Queeley's research paper, "Monumental Musings: 'Germs of Rot' and the Regeneration of Public Space," was accepted by the Caribbean Philosophical Association for its "Fanon at One Hundred" conference, scheduled for July 15-20, 2025, in Martinique.  Plaintiff Queeley

intends to apply for funding from FIU to offset her travel costs.  She is concerned, however, that her funding request will be denied because of S.B. 266 and the subject matter of the conference and/or her paper.  If her funding request is denied, Plaintiff Queeley will not be able to attend the conference and will miss out on this opportunity to present her scholarship and receive feedback on her paper.  Plaintiff Queeley also fears that denials based on S.B. 266 could be relevant to her post-tenure review, which she will undergo as part of the 2025–2026 cycle.

32.     Plaintiff Katie Rainwater is a Visiting Assistant Teaching Professor in the Department of Global and Sociocultural Studies at FIU, where she regularly teaches "Introduction to Sociology" and "Sociology of Gender."  As explained above, "Introduction to Sociology" was removed from the state-level general education courses in January 2024 but remains a university-specific general education course.  In Summer 2024, Defendant FIU's Board of Trustees members approved the removal of "Sociology of Gender" from FIU's general education curriculum.  In January 2025, the BOG approved the revised general education curriculum list, finalizing the removal of "Sociology of Gender" as a general education course.  As contingent faculty, Plaintiff Rainwater's continued employment at FIU is dependent on whether she is able to teach her courses, which are only offered when a sufficient number of students have enrolled.

Because S.B. 266 is likely to impact the funding available to departments, such as Global and Sociocultural Studies, and those departments will experience lower enrollment overall, Plaintiff Rainwater's employment is at risk, as are the classes she teaches.

33.    Plaintiff Daniel Belgrad is a Professor in the Department of Humanities and Cultural Studies at the University of South Florida ("USF") College of Arts and Sciences.  He has, since his early years at USF, taught "Twentieth Century American Culture" as a general education course.  In Summer 2024, Defendant members of USF's BOT members preliminarily approved the removal of "Twentieth Century American Culture" from USF's general education list.  Despite Plaintiff Belgrad later updating the course description, "Twentieth Century American Culture" was not ultimately on the list of approved general education courses that Defendant members of the BOG submitted to the State Board of Education.  Upon investigation, Plaintiff Belgrad discovered that staff from the BOG had indicated to USF's administration that they had found the course out of compliance with S.B. 266 because the syllabus required students to purchase Ann Moody's Civil Rights memoir, *Coming of Age in Mississippi*.  Staff from the BOG indicated that this book constituted "curriculum based on unproven, speculative, or exploratory content."  Removing "Twentieth Century American Culture" from the USF General Education list deprives Plaintiff

Belgrad of opportunities that would otherwise be available to him to contribute to the mission of his department and likely dooms his program, American Studies (a sub-program within the Department of Humanities and Cultural Studies), to imminent closure for lack of enrollment. The removal of "Twentieth Century American Culture" from the USF General Education list has had a chilling effect on Plaintiff Belgrad and other faculty, who must now avoid assigning respected, award-winning, and academically relevant works that they fear may cause them to be similarly penalized for equally unpredictable reasons. Plaintiff Belgrad is scheduled to teach "Introduction to Humanities" in Spring 2026, a statewide general education course; because of how vague S.B. 266 is, Plaintiff Belgrad is unsure how to comply with, and risks running afoul of, the law as part of that instruction.

## B. **Defendants**

34.    Defendants Brian Lamb, Ashley Bell Barnett, John Brinkman, Timothy M. Cerio, Manny Diaz, Jr., Aubrey Edge, Patricia Frost, Carson Good, Edward Haddock, Ken Jones, Alan Levine, Charles H. Lydecker, Craig Mateer, Jose Oliva, Amanda J. Phalin, and Eric Silagy are sued in their official capacities as members of the BOG.

35.    Defendants Morteza Hosseini, David L. Brandon, John Brinkman, Richard P. Cole, Christopher T. Corr, James W. Heavener, Sarah Lynne, Daniel T.

23

O'Keefe, Rahul Patel, Marsha D. Powers, Fred S. Ridley, Patrick O. Zalupski, and Anita G. Zucker are sued in their official capacities as members of the UF Board of Trustees.

36.    Defendants Peter Collins, Bob Sasser, John Thiel, Vivian de las Cuevas-Diaz, Jorge Gonzalez, Justin Roth, Kathryn Ballard, Bridgett Birmingham, Jackson Boisvert, Jim Henderson, Deborah Sargeant, Drew Weatherford, and Maximo Alvarez are sued in their official capacities as members of the FSU Board of Trustees.

37.    Defendants Rogelio Tovar, Carlos A. Duart, Noël C. Barengo, Francesca Casanova, Dean C. Colson, Alan Gonzalez, George Heisel, Jesus Lebeña, Alexander M. Peraza, Yaffa Popack, Chanel T. Rowe, Marc D. Sarnoff, and Alberto R. Taño are sued in their official capacities as members of the FIU Board of Trustees.

38.    Defendants William Weatherford, Michael E. Griffin, Charbel J. Barakat, Sandra Callahan, Michael Carrere, N. Rogan Donelly, Suryakanth Gottipati, Oscar Horton, Lauran Monbarren, Shilen Patel, Fredrick Piccolo, Melissa Seixas, and David Simmons are sued in their official capacities as members of the USF Board of Trustees.

## JURISDICTION AND VENUE

39.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983.

40.    Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b) and 1391(e).

41.    Defendants are sued in their official capacities.  Each defendant resides and/or works within the State of Florida.

## FACTUAL ALLEGATIONS

### I.    <u>Florida Statute Section 1004.06</u>

#### A. Statutory Text & Requirements

42.    Understanding how Florida's universities are governed helps expose how S.B. 266 and the BOG's regulations have negatively impacted Florida public universities' faculty and students.  Florida's twelve public universities are part of Florida's State University System, which is governed by the BOG.  The BOG exists to operate, regulate, and control the management of the university system.[11]

43.    The BOG includes seventeen members: the Chair of the Florida Student Association; the President of the Advisory Council of the Faculty Senate;

---

[11] *Higher Education*, FLA. DEP'T OF EDUC., https://perma.cc/QQP6-CEUD (last visited Jan. 14, 2025).

25

the Commissioner of Education; and fourteen members appointed by the Florida Governor and confirmed by the state Senate.[12]  The BOG is not only responsible for the management of the university system, it is also responsible for enacting regulations, such as the one at issue here, to implement legislation passed by the Florida Legislature at the state university level.

44.    While the BOG oversees the State University System, each university within the system has its own thirteen-member Board of Trustees ("BOT"), which serves as the governing body of its respective institution.  Each university's BOT consists of eleven appointed members as well as the Chair of the Faculty Senate and the President of the Student Body.  Of the eleven appointed members, six are appointed by Florida's Governor and five are appointed by the BOG.[13]  The BOT oversees operations at its designated university, including establishing and implementing policies and regulations consistent with the BOG's regulations or guidelines and maintaining high-quality education consistent with its respective university's mission.

---

[12] As of the date of this filing, only sixteen individuals were listed as members of the Board of Governors.  Members, State Univ. Sys. of Fla., https://perma.cc/ZR35-TUUN (last accessed Apr. 7, 2025).

[13] *See* Fla. Bd. of Govs. Reg. 1.001(2)(a); *Board of Trustees*, UNIV. OF FLA., https://perma.cc/QFC6-K9YY (last visited Jan. 14, 2025); *Board of Trustees*, FLA. STATE UNIV., https://perma.cc/G2KF-T9SB (last visited Jan. 14, 2025); *Board of Trustees*, FLA. INT'L UNIV., https://perma.cc/WZ66-TKZU (last visited Jan. 14, 2025); *About the Board*, FLA. AGRIC. & MECH. UNIV., https://perma.cc/KXB5-A5FA (last visited Jan. 14, 2025).

**B. Statutory Text & Requirements**

45.    S.B. 266 mandates:

> (2) A Florida College System institution, state university, Florida College System institution direct-support organization, or state university direct-support organization may not expend any state or federal funds to promote, support, or maintain any programs or campus activities that:
>
> (a)    Violate s. 1000.05;[14] or
>
> (b)    Advocate for diversity, equity, and inclusion, or promote or engage in political or social activism, as defined by rules of the State Board of Education and regulations of the Board of Governors.

Fla. Stat. § 1004.06(2).

46.    The vague and subjective language in the statute fails to provide further explanation or clarification.  It contains no description of the advocacy for "diversity, equity, and inclusion" or "political or social activism" engagement that it prohibits.  Rather, the statute references the State Board of Education's rules and the BOG's regulations as guides for interpreting the Legislature's vague language, providing no affirmative guidance on which programs or campus activities might land in the bill's crosshairs.

47.    S.B. 266 also "[r]equires the Board of Governors to provide a directive for universities to review programs [sic] violations of state law regarding

---

[14] Section 1000.05 includes the Stop W.O.K.E. Act.  *See* Fla. Stat. § 1000.05(4) (2022).

discrimination and those based on specified theories" in the law.[15]  The law

further mandates a "periodic review of general education core courses" and

requires a public university BOT and the BOG to approve general education

courses at the institution.[16]  This provision applies to both the state-wide general

education courses set forth in Regulation 8.0005 and university-specific general

education courses.  Under section 1007.25(3), general education courses "may not

distort significant historical events or include a curriculum that teaches identity

politics" and cannot be "based on theories that systemic racism, sexism,

oppression, and privilege are inherent in the institutions of the United States and

were created to maintain social, political, and economic inequities."[17]  The statute

does not, however, define "distort" or "identity politics."  The statute also

mandates the inclusion of "selections from the Western canon" in Humanities

courses,[18] without defining what the "Western canon" means.  Under section

1007.55(1), general education courses may not include "[c]ourses with a

---

[15] Pro. Staff of the S. Appropriations Comm. on Educ., *Bill Analysis and Fiscal Impact Statement* at 1, https://perma.cc/M2T4-G4QS (last accessed Dec. 3, 2024) (discussing section 1001.706(5)(a) (2023)).

[16] *Id.* at 2.

[17] Fla. Stat. § 1007.25(3)(c) (2023).

[18] Fla. Stat. § 1007.25(3)(d)(2) (2023).

curriculum based on unproven, speculative, or exploratory content."[19]

### C. Enactment History

48.    In April 2019, just three years before the Florida Legislature began its assault on academic freedom, Florida's BOG issued a Statement of Free Expression ("Statement") that was adopted by all twelve of the state's public universities.  In its Statement, the BOG recognized that the rights to freedom of speech and expression as enshrined in the United States and Florida Constitutions "are an integral part" of the BOG's "university mission" to "deliver a high quality academic experience," to "engage in meaningful and productive research," and to "provide valuable public service for the benefit of" local communities and the state.[20]  The BOG observed, "A fundamental purpose of an institution of higher education is to provide a learning environment where divergent ideas, opinions, and philosophies, new and old, can be rigorously debated and critically evaluated."[21]

49.    To develop skills that are "an essential component" of Florida's "academic and research missions,"[22] the BOG maintained that individuals must be

---

[19] Fla. Stat. § 1007.55(1) (2023).

[20] *State University System Free Expression Statement*, STATE UNIV. SYS. OF FLA. (Apr. 15, 2019). https://perma.cc/W4KN-2CE8 (last accessed on Dec. 2, 2024).

[21] *Id.*

[22] *Id.*

free to "express any ideas and opinions they wish, even if others may disagree with them or find those ideas and opinions to be offensive or otherwise antithetical to their own worldview."[23]  The BOG stressed that individuals should be "empower[ed] and enable[d]" to express ideas with which others disagree "without fear of being bullied, threatened, or silenced." [24]

50.    Florida's public universities continue to promote the principles underscoring this Statement on their websites despite the opposite principles being promoted and fostered in practice by S.B. 266 and the Regulations, and despite the punishment that accompanies embracing the Statement's principles.[25]

51.    More remarkable still: as recently as October 22, 2020, the BOG released a memorandum "making a clear and steadfast commitment to prioritize and support diversity, racial and gender equity, and inclusion in the State University System and to hold each university accountable for policies, programs, and actions that will codify and operationalize the System's commitment."[26]  The

---

[23] *Id.*

[24] *Id.*

[25] *See About FAMU*, FLA. AGRIC. & MECH. UNIV., https://perma.cc/8W29-A4MY  (last visited Dec. 3, 2024); *Freedom of Expression and Assembly Rights and Responsibilities*, FLA. AGRIC. & MECH. UNIV., https://perma.cc/FCK6-QLEU (last visited Dec. 3, 2024); *BOG Statement of Free Expression*, UNIV. OF S. FLA., https://perma.cc/7KSG-L7PZ (last visited Dec. 3, 2024).

[26] *Diversity, Equity, and Inclusion: Strategic Priorities* at 1, FLA. BD. OF GOVERNORS (Oct. 22, 2020), https://perma.cc/35S4-HCV5.

BOG recommended that "universities should consider the integration of D.E.I. best practices into their academic curriculum, knowing that a university's curriculum is under the purview of the faculty and the established academic curricular review and approval structure of the institution."[27]  The BOG also asserted that "processes and strategies that ensure that all is being done to attract, employ, and retain a fully diverse population of students, faculty, and staff are essential."[28]

52.    Even more recently, in 2021, the Florida Legislature amended section 1004.097, also known as the Campus Free Expressions Act, to include an anti-shield provision aimed at encouraging intellectual freedom and viewpoint diversity.  The Campus Free Expressions Act sets forth requirements "designed to protect the expression of diverse viewpoints at Florida College System [] institutions and state universities."[29]  Those requirements include, as relevant here, (1) a prohibition against Florida College system institutions or state universities "shield[ing] students, faculty, or staff from expressive activities"[30;] and (2) protections against "material and substantial" disruptions of "another person's

---

[27] *Id.* at 2.

[28] *Id.* at 3.

[29] Fla. S. Educ. & Emp. Comm., *CS/CS/HB 233 —Postsecondary Education* (2021), https://perma.cc/587W-52UY.

[30] Fla. H.B. 233 § 1004.097(3)(f) (2021).

or group's expressive rights."[31]

53.    Section 1004.097(2)(f) defines "shield" as "limit[ing] students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive."

54.    Section 1004.097(3)(a) further provides that expressive activities are those protected under the First Amendment to the United States Constitution and Article I of Florida's Constitution.  Those activities include, "but are not limited to, any lawful oral and written communication of ideas," including "faculty research, lectures, writings, and commentary, whether published or unpublished."  *Id.*

55.    And when, as here, an individual's expressive rights have been violated, section 1004.097(4)(a) provides a cause of action "against a public institution of higher education" to obtain "declaratory and injunctive relief" in addition to court costs and reasonable attorney fees.

56.    Now, the BOG and Florida's Legislature have made an abrupt about-face, directly undermining these still-applicable laws and guidelines, leaving educational institutions reeling and violating students' and faculty's First

---

[31] Fla. H.B. 233 § 1004.097(2)(c) (2021).

Amendment rights.

57.    The Florida Legislature took its first big step in its new crusade against academic freedom and diversity of thought in April 2022 with the Stop W.O.K.E. Act, seeking to suppress speech about diversity, equity, inclusion, systemic racism, white privilege, and critical race theory.  The Stop W.O.K.E. Act prohibited schools and businesses from any teaching or training that "espouses, promotes, advances, inculcates, or compels such individuals to believe" certain concepts regarding race, gender, racism, and privilege.[32]  The Stop W.O.K.E. Act has been challenged by students and professors and was enjoined by the United States District Court for the Northern District of Florida because, among other things, "the First Amendment does not permit the State of Florida to muzzle its university professors, impose its own orthodoxy of viewpoints, and cast us all into the dark."[33]  The Eleventh Circuit maintained the preliminary injunction of provisions of the law that apply to public education and is currently reviewing the law's constitutionality.[34]

---

[32] Fla. Stat. § 760.10 (8)(a) (2022).

[33] *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1230, 1277–78, 1289–91 (N.D. Fla. 2022), *stay denied* by *Pernell v. Lamb*, No. 22-13992-J (11th Cir. 2023).

[34] *See Pernell v. Lamb*, No. 22-13992 (11th Cir. 2023); *see also Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1230, 1277–78, 1289–91 (N.D. Fla. 2022) (finding the law unconstitutionally vague and a violation of the constitutional academic freedom doctrine under the First and Fourteenth Amendments to the United States Constitution).

58.     Despite this law's enjoinment in higher education, Florida Representative Alex Andrade and Senator Erin Grall introduced H.B. 999 and S.B. 266 in early 2023 to their respective chambers to further restrict what ideas could be discussed on college campuses.  Rep. Andrade called the bills "a progression based on the work we have been doing."[35]  In line with the aims of the Stop W.O.K.E. Act, these bills sought to prevent public colleges and universities from spending federal or state dollars on programs that promote disfavored speech, including speech related to diversity, equity, and inclusion.

59.     Numerous members of the Florida Legislature, in both the Florida State Senate and House of Representatives, warned of the potential negative impacts and constitutional violations of S.B. 266 before and after its enactment. While voting on H.B. 999, one Representative referred to the bill as an "attack on academic freedom," while another opposed the bill "because it is unconstitutional."[36]  Similarly, some Senators expressed concern that "[b]y restricting what students can learn, the state is actively suppressing students' academic and intellectual freedom."[37]

---

[35] HBCU Pulse, *Florida House Subcommittee Hearing on House Bill 999, Ron DeSantis & Possible Impacts (Full)*, YOUTUBE, at 00:00:20 (Mar. 15, 2023), https://perma.cc/JBR9-F3M3.

[36] *Id.* at 02:33:15.

[37] Anthony Izaguirre, *DeSantis curtails diversity, equity and inclusion programs in Florida state colleges*, SENTINEL (May 16, 2023), https://perma.cc/Z3WS-5APV; *See also* Diane Rado, *A*

60.     A number of members of the public also warned legislators of the impact of both H.B. 999 and S.B. 266, including fears that: (1) the bill will "destroy academic freedom";[38] (2) Florida students "will not be prepared for the workforce";[39] (3) Florida students were being condemned "to a second rate education";[40] (4) the bill will have "a chilling effect on students . . . and professors";[41] (5) universities "will not be able to hire and obtain top scholars any longer" because "people don't want to work for a university who is not recognizing how higher education works";[42] and (6) educators would leave the state if the bill were enacted.[43]

61.     Over the warnings and protestations from legislators and the public, on May 3, 2023, the Florida Legislature passed S.B. 266.  On May 15, 2023, Governor DeSantis signed S.B. 266 into law, announcing the bill's purpose of eliminating diversity, equity, and inclusion in Florida and instructing the public to

---

*contentious overhaul for higher education: DeSantis pushes far right in bill signings*, FLORIDA PHOENIX (May 15, 2023, 6:03 PM), https://perma.cc/FKU6-64FX.

[38] HBCU Pulse, *supra* note 35, at 57:40.

[39] *Id.* at 00:59:32.

[40] *Id.* at 1:09:55.

[41] *Id.* at 1:38:00.

[42] *Id.* at 1:38:00.

[43] *Id.*

"go to Berkeley" or similar places to study things like "gender ideology."[44]

62.     These fears raised and ignored during the legislative process are already being realized.  Professors, including Plaintiff Austin and Plaintiff Goodman, have begun self-censoring when teaching their courses because they are afraid that they might run afoul of S.B. 266.  As students may record university lectures in connection with a university complaint following the 2021 enactment of House Bill 233/section 1004.097, Plaintiffs fear that students with differing interpretations of S.B. 266's extraordinarily vague and broad prohibitions may submit complaints about the content of their classroom instruction, subjecting them to potential sanctions.  Plaintiff Austin has already received a university complaint for allegedly teaching concepts related to historical racial "guilt."

63.     Professors are not only censoring what they say in the classroom; they are also removing sources and reading materials from their syllabi for fear of violating S.B. 266.  Students are also self-censoring in the classroom because they are afraid of starting conversations that might expose faculty to risk of being in violation of the law.  And professors are leaving Florida public universities en masse because they do not wish to contend with S.B. 266.  A recent survey

---

[44] Danielle Brown, *Senators revise contentious higher ed bill after uproar over the state of FL's public universities*, FLORIDA PHEONIX (Apr. 12, 2023, 6:57 PM), https://perma.cc/C6TU-D3PW.

administered by the state chapters of the American Association of University

Professors and the United Faculty of Florida union found that 39% of responding

Florida faculty had already applied for jobs in other states, and another 5% plan to

do so in the next academic year.[45]  A so-called "brain drain" of professors from

Florida affects not only the viability and reputation of those schools, but also

current students' quality of education and ability to graduate.  This is especially

true for doctoral candidates who lose members of their dissertation committees,

rendering the students unable to present their dissertations and graduate.

## II.    Regulation 9.016

64.    Abandoning the State University System's stated mission to "serv[e]

the needs of a diverse state and global society,"[46] on January 24, 2024, Defendant

BOG members passed Regulation 9.016 to implement S.B. 266's restrictions on

funding for "diversity, equity, or inclusion," and "political and social activism."

In doing so, Defendant BOG members violated their statutory duties under section

1001.706(13)(c) by shielding students, faculty, and staff at state universities from

speech protected under the First Amendment and contravened the BOG's own

2019 Statement of Free Expression.

---

[45] Ian Hodgson & Divya Kumar, *More Florida faculty still looking to leave the state, survey shows*, TAMPA BAY TIMES (Sep. 18, 2024), https://perma.cc/ZND6-EY9K.

[46] Fla. Bd. of Govs., *2025 System Strategic Plan* (last visited Apr. 7, 2025), https://perma.cc/6ASR-GWX4.

65.    In accordance with S.B. 266, Regulation 9.016 prohibits any "state university or state university direct-support organization . . . [from] expend[ing] any state or federal funds to promote, support, or maintain any programs or campus activities that" violate the Stop W.O.K.E. Act;[47] advocate for diversity equity, or inclusion, as defined in Regulation 9.016; or promote or engage in political or social activism, as defined in that regulation.  Fla. BOG Reg. 9.016(2) (Jan. 24, 2024).

66.    Although S.B. 266 and Regulation 9.016 purport to prohibit certain conduct, neither the statute nor the Regulation provides fair notice as to what behavior is prohibited or allowed.  This is due, in large part, to the use of vague definitions of key terms in Regulation 9.016, such as "Diversity, Equity, or Inclusion," "Political or Social Activism," and "Any program or campus activities."

67.    "Diversity, Equity, or Inclusion" is defined as:

> [A]ny program, campus activity, or policy that classifies individuals on the basis of race, color, sex, national origin, gender identity, or sexual orientation and promotes differential or preferential treatment of individuals on the basis of such classification.

Fla. BOG Reg. 9.016(1)(a)1.

---

[47] Section 1000.05 also includes anti-discrimination provisions that remain untouched by decisions involving the Stop W.O.K.E. Act.

68.    "Political or Social Activism" is defined as:

> [A]ny activity organized with a purpose of effecting or preventing change to a government policy, action, or function, or any activity intended to achieve a desired result related to social issues, where the university endorses or promotes a position in communications, advertisements, programs, or campus activities.

Fla. BOG Reg. 9.016(1)(a)2.

69.    "'Social Issues' are topics that polarize or divide society among political, ideological, moral or religious beliefs."  Fla. BOG Reg. 9.016(1)(a)3.

70.    "Any program or campus activities" are defined as:

> [A]ctivities authorized or administered by the university or a university's direct-support organization(s) that involve:
>    a.  Academic programs subject to review as outlined in sections 1001.706(5)(a) and 1007.25, Florida Statutes, other than classroom instruction;
>    b.  Student participation, other than classroom instruction;
>    c.  Hiring, recruiting, evaluating, promoting, disciplining, or terminating university employees or contractors.

Fla. BOG Reg. 9.016(1)(a)4.

71.    As written, Defendants UF BOT members, FSU BOT members, FIU BOT members, USF BOT members, as well as all other public university trustees in Florida, are left to their own devices to interpret the unconstitutionally broad and vague language of S.B. 266 and Regulation 9.016—inspiring arbitrary and discriminatory enforcement for what constitutes "diversity, equity, or inclusion" and "political or social activism."  Given the context in which these laws were

passed, Defendants UF BOT members, FSU BOT members, FIU BOT members, USF BOT members, and other public university trustees in Florida have interpreted S.B. 266 and Regulation 9.016 to align with Governor DeSantis's viewpoints and stated goals.  In doing so, Defendants UF BOT members, FSU BOT members, FIU BOT members, USF BOT members, and other public university trustees have pushed Governor DeSantis's viewpoints on faculty and students; chilled expression of viewpoints disfavored by the State; and constrained the freedom of faculty, students, and employees of State universities to engage in expressive conduct.

### III.    Viewpoint-Based Discrimination on University Campuses

72.    As the Eleventh Circuit has recognized, "Nowhere is free speech more important than in our leading institutions of higher learning."  *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022).  Stifling the "marketplace of ideas" for Florida university students and professors is detrimental to the state, as well as the entire nation.  *See Healy v. James*, 408 U.S. 169, 180 (1972).

73.    The Florida Legislature and Defendant BOG members have used S.B. 266 and the Regulations to eradicate expression of views in State institutions of higher learning with which they disagree, committing the "greatest First Amendment sin."  *Honeyfund.com, Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024) (warning against viewpoint-based discrimination).

74.    Viewpoint-based discrimination is particularly harmful in higher education environments because it interferes with fundamental principles of academic freedom.  *See Rosenberg*, 515 U.S. at 835–36.

75.    The First Amendment protects all university educators and researchers from viewpoint-based restrictions.

76.    In addition to general viewpoint discrimination, the Florida Legislature and Defendant BOG members have also targeted speech intended to influence government policy or action, *see* Fla. BOG Reg. 9.016(1)(a)2, a direct infringement on the most core protected speech—political speech.

### A. The Role of a Professor

77.    As forewarned by the United States Supreme Court, "[n]o one should underestimate the vital role in a democracy that is played by those who guide and train our youth."  *Sweezy*, 354 U.S. at 250.

78.    According to UF's internal regulations, "the professor encourages the free pursuit of learning in students.  The professor maintains and represents the best scholarly standards of his or her discipline.  The professor demonstrates respect for the student as an individual and adheres to the proper role of intellectual guide and counselor."[48]

---

[48] *Faculty Evaluation*, UNIV. OF FLA., https://perma.cc/QK2K-54DT (last visited Dec. 3, 2024).

79.    Plaintiffs like Dr. Austin, as tenured faculty members, are held to high standards.  At UF, the broad criteria for granting tenured positions include: (1) instruction, including classroom teaching, theses, dissertations, academic advisement, extension programs, and "all preparation for this work including study to keep abreast of one's field"; (2) research or other creative activity; and (3) professional and public service.[49]  Tenured faculty members are further required to, among other things, produce "[e]vidence of a high level of professional impact, including regular participation in invited presentations or conferences."[50]  Accordingly, research, publications, and participation in academic gatherings and conferences are critical to the hiring, retention, and advancement of faculty.

80.    Given S.B. 266's vague and overbroad prohibitions, professors at Florida's colleges and universities fear how their ordinary conduct, potentially violative of S.B. 266, may impact their ability to retain their jobs at all.  Tenured professors must now undergo "a comprehensive post-tenure review every 5

---

[49] *See* UNIV. OF FLA. Reg. 6C1-7.019 § 4.

[50] *University Criteria for Post-Tenure Review*, UNIV. OF FLA., https://perma.cc/4HZ8-FK7W (last visited Jan. 13, 2025).  Similarly, at FSU, when evaluating a candidate's folder, the Office of the Provost "expects[s] every successful candidate to demonstrate a substantial commitment to both quality and quantity in teaching and research/creative activities as well as in public service." *Promotion and Tenure*, FLA. STATE UNIV., https://perma.cc/SYA3-BEHN (last visited Dec. 3, 2024).

years."[51]  As part of this review, professors are assessed for their "non-compliance with state law, Board of Governors' regulations, and university regulations and policies."[52]  Without any clear guidance as to how to comport their conduct to S.B. 266's broad-sweeping provisions, professors work in fear that anything they say or do may eventually lead them to lose their tenure or jobs.

### B. Denial of Plaintiff Austin's Request for UF's Support

81.    Plaintiff Austin is a tenured Professor of Political Science at UF.  She teaches courses and conducts research on African American politics, minority politics, American government, public law, and public policy.  As a Professor, Plaintiff Austin is expected to present her research at conferences to share her findings with other experts, to receive feedback on her work, and to contribute to the advancement of her field.  Because of this expectation, UF provides funds that professors, like Dr. Austin, use to cover expenses associated with attending or presenting at a conference.

82.    Each year, members of UF, including faculty, staff, and students, attend the Diversity Abroad Conference, an annual conference for education professionals, students, and stakeholders "dedicated to advancing student success

---

[51] Fla. Stat. § 1001.706(6)(b) (2023).

[52] BOG Reg. 10.003(3)(a)3.

through access to the benefits of global education."[53]

83.    In 2023, Plaintiff Austin, in her capacity as a professor and fully funded by UF, attended the Diversity Abroad Conference where she presented her scholarship on academic freedom as well as on international courses and study abroad experiences.  The next year, Diversity Abroad asked Plaintiff Austin to return and to present her scholarship at the 2024 conference.  She planned to present, and receive feedback on, a book that she is writing, focused on academic freedom and restrictions on diversity, equity, and inclusion across the United States.  As she had done the year before, Plaintiff Austin requested funding to attend the Diversity Abroad Conference from UF's International Center.

84.    In March 2024, UF's International Center denied Plaintiff's request because UF believes that Diversity Abroad's focus on minority representation and diversity of thought runs afoul of S.B. 266 and Regulation 9.016.  On March 30, 2024, Plaintiff asked her Department Chair if funds from the Political Science Department could be utilized instead of funds from the International Center.  In an email on April 8, 2024, UF again rejected Plaintiff's request, reiterating that "state dollars may not be used" to pay for the Diversity Abroad Conference due to S.B. 266's expenditure restrictions.

---

[53] *Global Inclusion Conference*, DIVERSITY ABROAD, https://perma.cc/B7MS-XUCA (last visited Dec. 26, 2024).

85.    Conferences like Diversity Abroad are not just important opportunities for educators to engage with other experts in their fields to enrich their own perspectives, but they are also invaluable chances for educators to present their own research and promote their work to new audiences.  Plaintiff Austin hoped to rely on these types of events to showcase her forthcoming book and other research.  However, as a result of S.B. 266, Plaintiff Austin lost this important educational and professional opportunity.  Despite the university's denial of Plaintiff Austin's request for funding in 2024, Plaintiff Austin intends to seek funding from UF to attend the Diversity Abroad Conference in October 2025 and in the future.

86.    Plaintiff Austin also intends to request funding to attend the National Conference of Black Political Scientists ("NCOBPS") in 2025.  Established in 1969, NCOBPS is a prestigious academic program organized to "study, enhance, and promote the political aspirations of people of African descent in the United States, and throughout the world."[54]  This year, NCOBPS selected Plaintiff Austin to serve as its President.  In previous years, Plaintiff Austin has always used funding from the UF Department of Political Science to attend this annual conference.  Because NCOBPS explicitly aims to advance diverse perspectives in

---

[54] *National Conference of Black Political Scientists*, AMERICAN POLITICAL SCIENCE ASSOCIATION (last visited Apr. 7, 2025), https://perma.cc/756U-8LFD.

Political Science and to "promote[] research in and critical analysis of topics usually overlooked and/or marginalized in political science scholarship," Plaintiff Austin fears that UF will deny her request for funding at this important career juncture, just as it has done with the Diversity Abroad conference.

87.    Plaintiff Austin also plans to seek funding from UF for additional conferences with events focused on diversity, equity, and inclusion to present her research on that topic.  In September 2025, she plans to attend the American Political Science Association ("APSA") conference in Vancouver and the Southern Political Science Association conference in New Orleans in January 2026.  At both conferences, she will participate in roundtable discussions about the assault on diversity, equity, and inclusion programs and discuss her diversity-related research.  Because she plans to speak at a diversity-related talk and present her research on diversity, equity, and inclusion—the very research UF hired her to do as part of her role as a professor—Plaintiff Austin fears she will again be denied funding by the UF Department of Political Science just as she was last semester.  In addition, Plaintiff Austin plans to apply for a grant from the UF Center for the Humanities to hold a speaker's workshop about her 2023 co-edited book, *Beyond Racial Capitalism: Cooperatives in the African Diaspora*.  Despite having previously received four such grants to discuss her research, Plaintiff Austin is concerned that she will be denied funding this year because of S.B.

46

266's prohibition on funding for programs related to "political or social activism," as her book addresses the concept of racial capitalism and critiques a system of exploitation which targets poor people of color. Finally, Plaintiff Austin plans to apply again for this year's Global Inclusion Conference (formerly the Diversity Abroad Conference), using funds from the UF International Center or UF's Department of Political Science, as she did last year.

88.    Dr. Austin fears that UF will continue to enforce S.B. 266's viewpoint-discriminatory funding ban to deprive her of financial support for her ongoing research activities. Furthermore, Dr. Austin also plans to seek promotion to serve as a Distinguished Professor at UF, a role which would depend on her continued engagement and recognition in the academic community. Attending prestigious conferences like APSA and NCOBPS are all the more important because they would allow her to receive the rigorous feedback and recommendations she needs to continue publishing high-quality research.

89.    UF has also refused to fund diversity-, equity-, and inclusion-related research and travel to conferences for graduate students. In doing so, UF has deprived these students of opportunities for academic enrichment and professional development.

90.    In addition to denying requests to use university funding to attend academic conferences based on viewpoint, UF has also prevented Plaintiff Austin

from accessing university funding to host lectures and colloquiums espousing

disfavored speech.  After Plaintiff Austin and several colleagues obtained a grant

from the UF Center for the Humanities and Public Sphere to host an on-campus

symposium, "War in Israel and Palestine," UF reversed its decision and told

organizers that they could not use university funding or on-campus spaces to host

the event, insisting that "nobody should show up."[55]  Faculty and students were

forced to find alternative funding sources to support the symposium and

eventually had to move the event to the Westminster Presbyterian Church in

Gainesville.

### C. Threatened Enforcement of S.B. 266's Funding Ban Against Plaintiffs Marr, Queeley, and Rahier

91.    Plaintiffs Marr and Queeley rely on university funding to attend

conferences and present their research.  For example, Plaintiff Marr intends to

attend the annual meetings of the American Sociological Association from August

8 to 12, 2025 in Chicago.  He has submitted a paper presentation titled "How Do

Race and Ethnicity Shape Housing Outcomes After Homelessness in a Hispanic

Majority County?  Miami-Dade County's Continuum of Care as a Racialized

Organization."  In the past, Plaintiff Marr has been reimbursed by FIU for his

travel and conference expenses.  Because of S.B. 266, Plaintiff Marr fears that his

---

[55] Avery Parker, *UF Canceled Symposium on Gaza Conflict*, THE FLORIDA INDEPENDENT ALLIGATOR (Nov. 4, 2024), https://perma.cc/S782-XA25.

travel and conference expenses will not be reimbursed due to the subject matter of his paper.

92.    Plaintiff Queeley also intends to apply for funding from FIU to attend and present her paper "Monumental Musings: 'Germs of Rot' and the Regeneration of Public Space" at the Caribbean Philosophical Association's "Fanon at One Hundred" conference, scheduled for July 15-20, 2025, in Martinique.  The "Fanon at One Hundred" conference will celebrate the life and work of Frantz Fanon, a Martinican philosopher whose work is influential in the fields of post-colonial studies and critical theory.  Although Plaintiff Queeley has applied for funding from FIU to attend conferences in the past without issue, she is concerned that this funding request will be denied due to the possibility that the subject matter of the conference and her paper could be viewed as violating S.B. 266.  If her funding request is denied, Plaintiff Queeley will not be able to attend the conference and will miss out on this opportunity to present her scholarship and to receive feedback on her paper.

93.    Plaintiffs Marr and Rahier are tenured professors at FIU who specialize in (1) Sociology and (2) Anthropology and African and African Diaspora Studies, respectively.  At FIU, Plaintiffs Marr and Rahier rely on university and state funding to support events hosted by their Department, such as guest lectures from visiting scholars, as well as their own individual research and

scholarship activities.  Last year, Plaintiff Marr's Department, the Global and

Sociocultural Studies Department, requested and was initially denied funding to

host a guest lecturer for their departmental graduate colloquium—a core

community building series for the department and a cornerstone for graduate

student academic enrichment and professional development.  FIU initially denied

the request because the lecturer's talk was about "Blackness;" FIU later reversed

the denial and agreed to fund the lecturer.  But FIU's about-face has only caused

greater confusion.  Plaintiffs Marr and Rahier are concerned that funds for future

talks about racial inequities and other issues may be denied due to S.B. 266.  In

addition, Plaintiffs Marr and Rahier worry that Defendants' threatened

enforcement of the funding ban will impact their individual research efforts, as

both plaintiffs have previously relied on and expect to continue to apply for state

and federal funding to support their scholarship focusing in part on racial equity.

94.    Enforcement of S.B. 266's funding ban not only harms Plaintiffs'

ability to attend conferences, host guest lecturers, and conduct research, it exposes

them to risk during the post-tenure review process.  Because FIU considers a

professor's compliance with state law and the BOG's regulations when

conducting its post-tenure review, *see* BOG Reg. 10.003(3)(a)3, if Plaintiffs Marr,

Queeley, or Rahier were to use state funds in violation of S.B. 266, they could risk

serious repercussions, up to and including termination.  Plaintiffs are thus forced

to make an impossible choice as to whether to use state funds to further their academic pursuits and risk a negative post-tenure review or to refrain from requesting state funds at all.

### D. Defendants' Viewpoint-Based Discrimination Violates Plaintiffs' First Amendment Rights

95.    Academic freedom encompasses "speech related to scholarship or teaching." *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006).

96.    Conferences like Diversity Abroad and departmental colloquiums are an integral part of scholars' efforts to workshop, develop, and communicate their scholarship.  Further, UF's university-wide criteria for post-tenure review requires faculty members to produce "evidence of a high level of professional impact" by participating in "invited presentations [and] conferences . . . within one's field."[56]

97.    Plaintiff Austin was invited to the Diversity Abroad Conference to communicate her scholarship and to teach an audience about an array of issues related to her work and research.  Likewise, Plaintiffs Rahier and Marr routinely present at academic conferences and invite guest lecturers in turn to speak at FIU through their department as an essential part of developing their research and scholarship—which supports their "accomplishments and productivity . . . in research" as assessed under FIU's university-wide criteria for post-tenure

---

[56] *University Criteria for Post-Tenure Review*, *supra* note 50.

review.[57]

98.    Attending and presenting at conferences like Diversity Abroad
Conference, APSA, NCOBPS, the American Sociological Association annual
meetings, and Caribbean Philosophical Association's "Fanon at One Hundred"
conference; inviting guest lecturers to speak at graduate colloquiums; and
exchanging ideas with other scholars are protected by Plaintiffs' First Amendment
rights and fall plainly under UF's and FIU's criteria for tenured faculty.

99.    Although Defendants are authorized to make decisions regarding
allocation of resources, they cannot apply viewpoint discriminatory conditions to
generally available funds. *See Rosenberger*, 515 U.S. at 837. Denying Plaintiffs
access to generally available funds because of the content of their speech is a
distinct First Amendment injury because when the government offers a non-
competitive benefit, it cannot condition receipt of that benefit on giving up
constitutional rights. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (the
government "may not deny a benefit to a person on a basis that infringes his
constitutionally protected interest, especially his interest in freedom of speech").

100.    UF's International Center and its Department of Political Science
denied Plaintiff Austin's request for funding because S.B. 266 and

---

[57] *Post-Tenure Faculty Review Procedures*, FLA. INT'L UNIV. (last accessed Apr. 7, 2025),
https://perma.cc/8BPX-F52T.

Regulation 9.016 prohibit the use of state funding for conferences where she expresses her particular viewpoint—as an expert and contributor to education and scholarship promoting minority representation and diversity of thought.

101.   Because Plaintiffs Marr, Rahier, Queeley, and Austin intend to speak on matters of public concern, and the challenged regulations constitute a "wholesale deterrent to a broad category of expression by a massive number of potential speakers" rather than a "single supervisory decision," the government cannot satisfy its burden to demonstrate that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *United States v. Nat'l Treasury Emps. Union* ("NTEU"), 513 U.S. 454, 467–68 (1995).  Here, "unlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens." *Id.*  The research that Plaintiff Austin planned to present at Diversity Abroad and plans to present at future conferences evaluates and criticizes anti-DEI legislation, while Plaintiffs Marr, Queeley, and Rahier intend to speak on topics including racial equity, anti-colonialism, and homelessness. Their speech at academic conferences constitutes the core of First Amendment-protected speech.  *See Meyer v. Grant*, 486 U.S. 414, 421 (1988) ("The First Amendment was fashioned to assure unfettered interchange of ideas for the

bringing about of political and social changes desired by the people." (citation

omitted)).  The State cannot show that its interest in suppressing advocacy for DEI

and political or social activism outweighs the interests of Plaintiffs' potential

audiences.

102.   Defendants unconstitutionally infringed on Plaintiffs' academic

freedom and free speech rights because of S.B. 266 and Regulation 9.016.

### E. The State's Continued Support of Favored Speech

103.   While discriminating against disfavored speech, Defendants continue

to provide support for speech they favor.

104.   The Hamilton Center, an independent university academic center at

UF "devoted to research and teaching on Western civilization,"[58] has received $30

million dollars in state funding in 2023.[59]  By contrast, the university's only other

independent academic center, the Center for Latin American Studies, received

only $3.5 million in the same period.[60]

105.   The Hamilton Center hosts events like "Philosophy of Religion in an

---

[58] *Promoting Scholarship and Shaping Leaders for a Free Society*, UNIV. OF FLA.: HAMILTON CTR., https://perma.cc/GX43-EF6R (last accessed Jan. 9, 2025).

[59] *See* Sophia Bailly and Alissa Gary, *Hamilton Center: Emphasizing apolitical position following controversial foundation*, THE INDEPENDENT FLORIDA ALLIGATOR (Dec. 4, 2023), https://perma.cc/F48H-EH6K.

[60] *See id.*

Age of Growing Non-religion"[61] and "The Political Thought of David Hume: The Origins of Liberalism and the Modern Political Imagination."[62]  Because these topics fall within the State's favored speech and preferred view of the Western Canon, they have not been targeted, despite the fact that they arguably fall within S.B. 266's prohibition of "political or social activism."

## IV.    The Sweeping Effects of Unconstitutional Restrictions

### A. Overbreadth and Vagueness

106.    S.B. 266 and Regulation 9.016 are substantially overbroad because their scope expands beyond government speech to private expression and results in a chilling effect on both faculty and students.  Furthermore, the targeting of any activity intended to promote change in government policy or action is likewise unconstitutionally overbroad, as it could cover any form of political expression. Here, although S.B. 266 and Regulation 9.016 were plainly drafted to target certain disfavored viewpoints and have been enforced to limit only those viewpoints, their language sweeps so broadly as to ostensibly prohibit funding for all speech related to "political and social activism."  Because political speech lies at the core of the First Amendment, the State cannot restrict speech merely

---

[61] *Philosophy of Religion in an Age of Growing Non-religion*, UNIV. OF FLA.: HAMILTON CTR. (Nov. 19, 2024), https://perma.cc/D5PS-UDKG.

[62] *The Political Thought of David Hume: The Origins of Liberalism and the Modern Political Imagination*, UNIV. OF FLA.: HAMILTON CTR. (March 25, 2024), https://perma.cc/6GJN-B38N.

because it is political, nor can it avoid the First Amendment's restriction on viewpoint discrimination by broadly restricting all political expression and enforcing the law only as to disfavored viewpoints. *Cf. Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("[P]olitical belief and association constitute the core of those activities protected by the First Amendment."); *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 548 (2001) ("It is fundamental that the First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people") (internal quotations omitted). Because S.B. 266 and Regulation 9.016 burden a substantial amount of protected speech, they are violative of the First Amendment.

107.    S.B. 266 and Regulation 9.016 are also void for vagueness under the First and Fourteenth Amendments as they (1) fail to provide notice that would allow "ordinary people to understand what conduct [they] prohibit" and (2) "authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

## B. The Impact on General Education Curricula

108.    Since S.B. 266 became effective, faculty and students at state-funded, higher education institutions—such as UF, FSU, USF, and FIU—have suffered from the law's devastating impact on their institutions' general education curricula. Under S.B. 266, the general education curricula at Florida's state

colleges and universities are subject to periodic review and approval by the BOG and such colleges' or universities' BOT for compliance with its restrictions.  S.B. 266 does not provide clear guidance as to what may qualify or disqualify a course from receiving general education status.  Rather, section 1007.25(3)'s vague language broadly restricts any course from receiving general education status if it "distort[s] significant historical events," "teaches identity politics," or is "based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities."[63]  Similarly, section 1007.55(1)'s prohibitions on "[c]ourses with a curriculum based on unproven, speculative, or exploratory content" fail to provide workable boundaries or guidelines.[64]

109.    S.B. 266 is unconstitutionally vague.  For several reasons, it is impossible for institutions or faculty members, looking at the plain language of sections 1007.25(3) or 1007.55(1), to know whether a course will be disqualified from receiving general education status.

110.    *First*, a university or professor asking whether a course "distort[s]" a "significant historical event" would have to determine whether the event covered by the course is "significant."  But this would fall to the independent judgment of

---

[63] Fla. Stat. 1007.25(3).

[64] Fla. Stat. 1007.55(1).

the university or professor, as section 1007.25(3) does not provide a list of "significant historical events," nor does it present any criteria to determine whether a historical event was significant. If the event is deemed significant, then the university or professor would have to identify the "State-accepted" or "true" account of the historical event because one can only "distort" (i.e., present a misleading or false account of) a historical event if there is an "accepted" or "true" recounting of the event. This necessarily assumes that there is a singular perspective of the historical event that the Legislature expects professors to teach. If the university or the professor were able to identify the "correct" perspective of the event in question, they would then be tasked with determining whether the course "distorts" that event. It could be that presenting different accounts about an event counts as distortion, or this could be seen as teaching critical thinking. Section 1007.25(3) does not provide meaningful guidance as to what may qualify as "distort[ing] a significant historical event."

111.   *Second*, section 1007.25(3) does not define "identity politics." Nor is that term defined in S.B. 266 or Regulation 9.016. Left to their own devices, universities and faculty members are forced to determine whether a course impermissibly discusses any political movements or issues pertaining to a particular social group. Without more, any course touching on the abolition of slavery, the Civil War, the civil rights movement, women's suffrage, or even

Anglo-Christian American history could teach "identity politics" in violation of S.B. 266.

112.    *Third*, there is no way for universities or faculty members to understand with certainty whether a course's contents are "unproven, speculative, or exploratory" under section 1007.55(1).  Without any further guidance, courses on world history, literature, and the basic sciences, for example, could all run afoul of S.B. 266 as "unproven" by some unclear standard, "speculative" as to an undefined arbiter, or "exploratory" in the eyes of one BOT, but not another.  Such undefined standards are impossible for Plaintiffs and other similarly situated individuals to follow.

113.    Plaintiff Belgrad, for example, plans to reapply for general education status for two of his courses, "Twentieth Century American Culture" and "Introduction to American Studies" (both of which were struck from the list of proposed USF general education courses because of S.B. 266), and plans to teach one course still approved for general education status, "Introduction to Humanities."  Despite reading the law carefully, Plaintiff Belgrad does not know how to avoid violating S.B. 266 because of how vague it is.  In "Introduction to Humanities," for example, Plaintiff Belgrad instructs students through three main units: Students learn about painting and architecture by studying the painting and architecture of modernism; they learn about literature and film by studying stories

and films based on veterans' accounts of the Vietnam War; and they learn about music and dance by studying the music and dance of the African diaspora. Because the definitions in the general education provision of S.B. 266 and its enabling Regulations are so vague, any of these units could reasonably violate S.B. 266's prohibition on teaching identity politics or "exploratory" content, leading to negative consequences for Plaintiff Belgrad in the form of losing his ability to teach the course or facing a negative post-tenure review.

114.    The possibility that a course could be seen as teaching "identity politics" is a real concern that universities face when determining whether a course can qualify for general education status.  For example, at a November 21, 2024, FSU BOT Meeting, FSU's Dean of Academic Affairs addressed concerns that S.B. 266 would impact classes such as "A History of the United States Since 1877," a survey course that teaches about "the United States from the end of the Civil War to the present with a special emphasis on the social, economic, and political problems of the twentieth century."[65]  The Dean replied that although such classes may continue to be offered at the university, those classes would not qualify for general education status if they did not meet the "definitions" of

---

[65] FSU Board of Trustees | General Meeting | November 21, 2024, at 2:21:13, YOUTUBE (streamed live on Nov. 21, 2024), https://perma.cc/7RQY-NRBE (last accessed Jan. 14, 2025); *see also* Course Description, *A History of the United States Since 1877*, FLA. STATE UNIV. https://perma.cc/CD39-3MA9 (last visited Dec. 3, 2024).

communications, mathematics, social sciences, humanities, or natural sciences.[66]

Appearing to build on the Dean's remarks, the Chair of Trustees, Peter Collins,

replied, "The BOG and the Legislature isn't trying to restrict people from learning

where they decide to seek knowledge,"[67] before implying that, when determining

whether to approve a course for general education status, the BOG would consider

whether the course involved perspectives on race, for example, with which the

BOG disagreed.  Specifically, Collins remarked that a mathematics course could

qualify as a general education course because, "Math is math.  Math isn't racist.

Math is math."[68]

115.    When it comes to the prohibition on "teach[ing] identity politics," the

BOG has applied this prohibition in an arbitrary and discriminatory manner.  For

example, despite the fact that "A History of the United States Since 1877"

demands that students "[c]ritically examine, interpret, and explain how personal,

political, economic, and social experiences and/or structures shape the history of

the United States," which arguably involves teaching "identity politics," the BOG

approved the course for general education status.  At the same time, however, the

BOG denied general education status to "Introduction to the African American

---

[66] *Id.* at 2:21:38.

[67] *Id.* at 2:22:34.

[68] *Id.* at 2:22:54.

Experience," a 2000-level course that examines "the ways that Black people have historically and presently shaped politics, economies, cultures, and intellectual spheres of thought within the Americas."[69]  Although both of these courses discuss the evolution of the United States, only "Introduction to the African American Experience" was removed from the general education catalog.  These inconsistent results demonstrate the arbitrary and discriminatory implementation of a vague statute that fails to provide universities and faculty members with needed clarity as to whether a course may qualify for general education status.

116.   Moreover, S.B. 266's prohibition against courses "based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities" has disproportionately affected faculty members teaching Social Science courses (e.g., sociology and anthropology) and Humanities courses because such courses are more likely to cover topics disfavored by the State (i.e., systemic racism, critical race theory, gender, white privilege, etc.) that may violate the statute.[70]

---

[69] Shantel Gabrieal Buggs, *AFA 2000: Intro to the African American Experience*, https://perma.cc/MW82-BLET (last visited Jan. 14, 2025).

[70] The language of the prohibition also fails to provide faculty members with guidance on what has been banned from their curriculum.  For example, faculty members have wondered whether these theories can be taught as "inherent in the institutions of the United States" if they are not taught as being "created to maintain social, political, and economic inequities," or vice versa.

117.    Sociology, Anthropology, English, and African American Studies professors, for example, have experienced significant scrutiny from the leaders of their institutions, who wield S.B. 266's sword at the direction of Florida's BOG and their institutions' boards of trustees.[71]  When their courses were flagged by their university's provost—acting under the direction of the BOG—for potentially violating the statute, these professors were asked to either edit the title and/or the description of the course or risk the course's removal from the general education course catalog.

118.    At UF, two of Plaintiff Austin's courses were flagged by the Provost's Office for non-compliance with S.B. 266: "Politics of Race" and "Black Horror and Social Justice."  These courses previously satisfied UF's general education requirements, but, according to the Assistant Provost, the courses now violate S.B. 266's "text about identity politics and systemic racism."  At the Provost Office's instruction, Plaintiff Austin made changes to the course descriptions and altered a module on microaggressions.  On December 6, 2024, Plaintiff Austin was notified that both of her courses had not been approved for general education credit.

---

[71] This scrutiny has come from all levels of the Florida University system.  For example, on December 8, 2023, Florida Commissioner of Education Manny Diaz posted on X, formerly Twitter, "Sociology has been hijacked by left-wing activists and no longer serves its intended purpose as a general knowledge course for students.  Under @GovRonDeSantis, Florida's higher education system will focus on preparing students for high-demand, high-wage jobs, not woke ideology."  Manny Diaz Jr. (@CommMannyDiazJr), X (Dec. 8, 2023, 11:32 AM), https://perma.cc/P2YY-UKLX.

Plaintiff Austin was also informed by the Associate Dean of the College of Liberal Arts and Sciences that while the BOG did not provide an explanation for the course rejections, it appeared likely that any courses dealing with identity, culture, race, or gender did not make it on the final approval list, regardless of the approach or the value of the course.  Plaintiff Austin is scheduled to teach "Politics of Race" at UF during the Summer B 2025 and Fall 2025 semesters; "Black Horror and Social Justice" during the Fall 2025 semester; and another course that she has taught previously, "Women of Color and the Law," during the Spring 2026 semester.  She intends to submit all three courses for general education approval.

119.    Meanwhile, other courses at UF that cover traditional, conservative viewpoints on identity politics have not been affected by S.B. 266's enactment. These courses include: (1) "What is the Common Good?," a general education course that features a module on the "structure of traditional marriage and family"[72]; (2) "God and Science," a general education course that "considers the relationship of thinking about God and thinking about nature from classical antiquity until the early twentieth century"[73]; and (3) "The Search for Meaning in

---

[72] Syllabus for "IDS 2935: What is the Common Good?" https://perma.cc/46KH-BXMS (last accessed Jan. 14, 2025).

[73] Syllabus for "IDS 2935: God and Science," https://perma.cc/MNY4-PTJ2 (last accessed Jan. 14, 2025).

a Secular Age," a general education course which features a module on "'identity

politics' (also called 'wokeism')."[74]

120.   At FIU, courses such as "Sociology of Gender"; "Black Popular

Cultures: Global Dimensions"; "Anthropology of Race and Ethnicity"; and

"Myth, Ritual, and Mysticism" were among those targeted and ultimately

removed after the BOG ran keyword searches on course syllabi to confirm

compliance with or violation of S.B. 266 and Regulation 9.016.  In some cases

where professors complied with the provost's later request to revise the courses,

such courses still were not approved and were removed from the general

education course catalog—as was the case for FIU's "Myth, Ritual, and

Mysticism," an introductory course to the anthropological study of religion.  Even

where FIU's Faculty Senate reviewed and voted against the general education

course list curated by FIU's provost, FIU's BOT disagreed with the Faculty

Senate and ultimately approved the general education course list that excluded

certain social science courses (including "Sociology of Gender," "Black Popular

Cultures: Global Dimensions," "Anthropology of Race and Ethnicity," and "Myth,

Ritual, and Mysticism").

121.   At FSU, courses like "Women in Literature" and "Third World

---

[74] Syllabus for "IDS 2935: The Search for Meaning in a Secular Age,"
https://tinyurl.com/545kk6p3 (last accessed Apr. 4, 2025).

Cinema" also lost their general education designation.  Although FSU reviewed

and submitted these courses to be approved for general education designation, the

BOG determined that the courses violated S.B. 266, even though it is not clear by

their names or descriptions that these courses actually violate the law.  In one

case, a class designed by Plaintiff Goodman, "Perspectives on the Short Story," a

3000-level class, was denied general education status; it was, however, later

allowed to remain a general education course after FSU changed it to a 2000-level

class; removed the term "Perspective" from the title, changing the name of the

course to "Introduction to the Short Story"; and updated its course description to

provide that the course included selections from the "Western Canon."  These

changes were deemed sufficient, even though the content of the course did not

change—demonstrating that compliance with S.B. 266 is merely form over

substance in some cases and not in furtherance of any legitimate state interest.  To

the extent that these changes are meant to substantively alter the course content,

professors are given little to no guidance on how to comply with the Laws such

that the course can retain its general education status.  For example, when Plaintiff

Goodman asked her Department Chair how she or another instructor could

determine what constitutes the "Western Canon," she was told that the university

had not been given, and would not provide, guidance on how to comply with this

requirement.  Moreover, because of S.B. 266, introductory courses at FSU that

would otherwise fall squarely within the categories enumerated by the Legislature as general education are being removed, such as "Introduction to Shakespeare" and "Criminology."

122.   Not only is S.B. 266 unconstitutionally vague, S.B. 266 and its implementing Regulations are overbroad in violation of the First Amendment. They are particularly harmful in that they coerce educators to err on the side of avoiding discussion of viewpoints disfavored by the State for fear of losing general education status for their courses or risking a negative post-tenure review.

123.   By prohibiting the teaching of curriculum that "distort[s] significant historical events" or is "based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities," Plaintiffs are unable to discern whether S.B. 266 penalizes speech espousing their personal viewpoints.  For instance, while professors at public universities are apparently free to speak *about* racial and gender inequities in their general education courses, Plaintiffs fear that S.B. 266 might prohibit them from discussing or endorsing the viewpoint that such inequities are "inherent" in the institutions of the United States.  This reasonable reading of the statute supports an understanding that S.B. 266 targets speech based not on content but *viewpoint*, which the Eleventh Circuit has recently described this as "the greatest First

Amendment sin" and "likely [] invalid per se." *Honeyfund.com Inc. v. Governor,*

94 F.4th 1272, 1277–78 (11th Cir. 2024). If this reading is inaccurate,

Defendants have not helped Plaintiffs understand how to comply. For example,

professors are plainly allowed to generally discuss the subject of racial

discrimination and are free to opine that racism is inherent in the institutions of a

foreign country like South Africa but are apparently forbidden to espouse this

view with respect to the United States. Likewise, a professor may teach about the

adoption of the Three-Fifths Compromise without worry but must decide for

themselves whether they may suggest that the inclusion of this text in Article I of

the U.S. Constitution constitutes racism inherent in a U.S. institution. In addition,

S.B. 266's prohibition on curriculum that "distort[s] significant historical events"

in general education classes itself appears to presuppose that there is single

correct interpretation of the meaning of a historical event. Plaintiffs, particularly

considering the subjects they have been hired to teach, must chill or suppress their

speech to avoid running into S.B. 266's vague and overbroad direction.

124.   Furthering these fears, Regulation 8.005 removed introductory

sociology courses from the list of state-level general education core courses

wholesale due to the belief that concepts in the courses purportedly teach "woke

ideology."[75]  Plaintiff Marr is teaching "Introduction to Sociology" in Fall 2025.

Because "Introduction to Sociology" was removed from the state-wide general

education curriculum mandated by Regulation 8.005 but not removed from the

university-specific general education curriculum at FIU, he is unsure how to teach

his class in a way that conforms with S.B. 266.  He intends to teach his course in a

balanced manner as he always has but fears that his teaching may violate S.B. 266

because of its vague and far-reaching language.  In particular, he fears he will be

reported for teaching concepts in violation of S.B. 266, that these reports will go

to his dean and his chair, and that these reports will reflect poorly on him as he

goes through the post-tenure review and promotion processes in the 2025-2026

cycle.  He fears that S.B. 266's arbitrary implementation in the general education

curriculum makes arbitrary application of it going forward likely.  Plaintiff Marr

also intends to resubmit Introduction to Sociology for consideration for state-wide

general education curriculum mandated by Regulation 8.005 if possible.  He is a

member of the FIU Faculty Senate, and the Provost's Office has mentioned that

there will be opportunities to reapply for general education course credit in the

future.

125.   It is not just introductory courses that have been removed.  The BOG

---

[75] Manny Diaz, Jr., *supra* note 71.

has removed hundreds of courses from the general education catalog. Some university departments have had all of their courses stripped of general education status; notably, at UF, both the Women's Studies and African American Studies programs have lost general education designation for all their courses.[76] At FSU, for example, 571 courses were submitted to the BOG to receive general education status.[77] As of November 2024, the BOG removed 425 of those courses, approving only 129 courses for general education.

126. Changes to a course's general education status carry potential long-term effects on entire departments and students. When a course no longer qualifies for general education, students are less likely to enroll in that course even if interested in the subject, especially when the course is outside of their major of study. Such a drop in enrollment could prove fatal to a course's viability, the university's ability to employ Assistant Professors, the amount of funding provided to a certain department or program, and professors' overall compensation as teaching fewer general education courses would lower their

---

[76] The removal of entire departments that teach ideas disfavored by the state appears to be one of the end goals for S.B. 266. Governor DeSantis explained that "What this bill is saying is, you know, some of these niche subjects like critical race theory, other types of DEI-infused courses and majors. . . . Florida's getting out of that game. You want to do things like gender ideology? Go to Berkeley. Go to some of those other places." *DeSantis signs bills to return Florida colleges to 'classical mission'*, ABC7 NEWS (May. 15, 2023), https://perma.cc/2MM7-8BNN.

[77] As of November 2024, seventeen courses were updated and are still pending before the BOG for approval.

merit-based compensation. This is so because the Florida Department of Education uses student enrollment to calculate "Full-Time Equivalent" ("FTE").[78] FTE is used by Florida's universities to determine funding and space needs, among other things. If FTE drops, (1) departments could rapidly lose funding due to this artificial lack of demand for such courses; (2) instructors, like Plaintiffs, will lose teaching opportunities and/or compensation; (3) faculty will lose opportunities to mentor graduate students in their fields; and (4) students will lose their ability to explore other disciplines while still progressing through their major and toward a timely graduation. At FIU, for example, course cancellation is determined on a case-by-case basis, but the general policy is that undergraduate courses with less than 15 students and graduate courses with less than 10 students should be cancelled. Similarly, at USF, when Plaintiff Belgrad was Chair of his department, he had to cancel various courses for low enrollment.

127. Additionally, courses, like "Third World Cinema" at FSU (which the BOG has not reinstated as a general education course), are likely to have fewer students enrolled. As a result, professors like Plaintiff Austin, Plaintiff Goodman, Plaintiff Rahier, Plaintiff Queeley, Plaintiff Rainwater, and Plaintiff Belgrad may have their classes cancelled. Cancelling classes would not only impact professors

---

[78] FLA. DEP'T OF EDUC., *Florida College System Full Time Equivalent (FTE) Procedures*, at 4 (Jul. 1, 2020), https://perma.cc/N8RE-C8BK.

teaching the course, but it could affect students who rely on certain courses for their majors as well as a department's viability if multiple courses within that department are cancelled.  Plaintiffs Rahier and Queeley fear this fate for the African and African Diaspora Studies Program at FIU, which is especially vulnerable because of the small size of the program and the fact that the BOG removed several of the program's courses from the general education curriculum.

128.   As the former Director, and now affiliate faculty, of the UF African American Studies Program, Plaintiff Austin fears the program's vulnerability as a result of these changes to the general education curriculum.  During Plaintiff Austin's eight years of service as Director, the College of Liberal Arts and Sciences frequently discussed the importance of course enrollments.  UF's Regulations state, "Reasons for terminating an academic program may include, but are not limited to, the following: Enrollments are no longer sufficient to justify the cost of instruction, facilities, and equipment."[79]  Due to the heavy focus on enrollments, Plaintiff Austin worked with faculty members to ensure that their courses could be offered for general education credit, resulting in a significant increase in course enrollments.[80]  S.B. 266's enforcement risks elimination of a

---

[79] UF Reg. 7-100, https://perma.cc/ZF3Z-83BF.

[80] For example, in Fall 2007, 10 students enrolled in "Theories of Black America" before the course gained general education status but attracted 61 students in the Spring 2018 semester after gaining such status.  In Spring 2010, 22 students enrolled in "Introduction to African American

program that has served a vital role in educating students and assisting them as they pursue graduate study and professional careers.  Indeed, all of the courses required for the UF African American Studies major no longer have their general education status.

129.   Course cancellation may impact a professor's post-tenure review.  For example, at FIU, tenured faculty are typically assigned two classes in both the Fall and Spring terms.  If classes are cancelled, professors typically make them up by teaching an additional class in a subsequent term or professors receive additional assignments.  But if their courses are repeatedly cancelled and they are unable to meet their assignment, Plaintiffs expect that concern to be raised in post-tenure review.

130.   Determinations that professors have violated S.B. 266 can also negatively affect their post-tenure review.  The BOG specifically requires the consideration of "[t]he faculty member's non-compliance with state law, Board of Governors' regulations, and university regulations and policies" in post-tenure review.  *See* BOG Reg. 10.003(3)(a)3.  This language is also reflected in

---

Studies" before the course gained general education status but attracted 70 students in Fall 2018 after gaining general education status.  The program offered several sections of the introductory course and other general education courses and saw its overall enrollment numbers increase from over 100 students in the Spring 2011 semester to almost 600 students during Fall 2018.  The general education courses were vital to the program's enrollment numbers and its ability to avoid elimination due to low enrollments.

university guidance on post-tenure review. For instance, FSU Regulation 4.073, which was recently subject to extensive negotiations with faculty, requires review of "any findings of an inquiry or investigation of non-compliance with applicable laws or regulations within the scope of [the Eligible Faculty Member's] University employment." *See* FSU Reg. 4.073(4)(b)(i). During negotiations between the BOT and faculty in the summer of 2024, faculty strongly objected to this provision, contending that consideration of these inquiries or investigations constituted a form of "double jeopardy," where faculty professors could be punished twice for a singular accusation. Despite these objections, the BOT insisted that the BOG required the university to keep this language in the regulation, evincing the BOG's intent to enforce the provision in accordance with Regulation 10.003(3)(a)3. This is all the more troublesome in the wake of Florida House Bill 233, which allows students to record professors in class, without their knowledge, if such recording is made "in connection with a complaint to the public institution of higher education where the recording was made." Fla. Stat. § 1004.097. Adding to the ever-growing fear of disciplinary action, S.B. 266 also deprives professors of the long-held opportunity to resolve issues related to "evaluations, promotions, tenure, discipline, or termination" through third-party

arbitration.  *See* Fla. Stat. § 1001.741(2).[81]  The inclusion of this arbitration ban

has caused Plaintiffs to further fear that disciplinary processes will be used to

enforce S.B. 266, including in the post-tenure review.  This risk is particularly

acute and imminent for Plaintiffs Rahier, Queeley, and Marr, who have all been

selected for post-tenure review in the 2025-2026 cycle.

131.   S.B. 266's impact on undergraduate student enrollment has a ripple

effect on graduate programs and a university's ability to fund their graduate

programs.  As the former director of FIU's African and African Diaspora Studies

master's program, Plaintiff Queeley is concerned that declining enrollment in

undergraduate courses will cause FIU to limit the number of Teaching Assistant

("TA") positions that the department allots for those courses.  Fewer TA positions

means that the university cannot recruit and fund the same number of graduate

students, jeopardizing the viability of the master's program.

132.   Course reductions also affect universities and colleges' ability to hire

and retain high-caliber professors.  Many professors at Florida universities,

including Plaintiff Rainwater, are employed on a contingent basis, with their

employment status for the following year or semester largely dependent on

student enrollment in their respective departments or courses.  Any reduction in

---

[81] This provision of S.B. 266 has been challenged in a separate litigation brought in this Court. *United Fac. of Fla. v. Lamb*, No. 1:24-cv-00136-MW-MAF (N.D. Fla. filed Aug. 7, 2024).

demand for these professors' courses, or even courses within the department due to the correlation between enrollment and funding, threatens their livelihood and ability to serve as instructors and mentors to students.

### C. The Impact on Student Expression

133.    Connection outside of the classroom is particularly important for free expression in the university context.  Fostering connection often requires creating or allowing spaces for student and faculty bonding and discussion, and for smaller communities among the larger campus population.  It is within these spaces that students and faculty are often most comfortable expressing their views on campus.[82]  After S.B. 266's enactment, however, students and faculty alike are unsure whether or how they are allowed to express their views and are self-censoring out of a justified fear of legal repercussions.

134.    This self-censorship arises, in part, because Regulation 9.016's vague

---

[82] Univ. of Fla. Student Senate Bill 2024-1234: "A Resolution Condemning the University of Florida's Decision to Terminate Diversity, Equity and Inclusion Offices and Employees," https://perma.cc/D6YE-LNXZ (Mar. 21, 2024) (providing that DEI initiatives help students "feel valued, supported, and included," by creating "inclusive and equitable educational environments for University of Florida students").  The termination of DEI policies, among other things, has caused students of color and other marginalized groups to feel unsafe in classrooms and has exposed them to "physical aggression and verbal attacks."  *Under Siege: Attacks on DEI and its Implications for Students*, DIVERSEEDUCATION.COM, https://perma.cc/252G-C4JT (last visited Jan. 14, 2025) (summarizing a University of Southern California's survey of undergraduate students of color, in which high percentages of Black, mixed-race, Latino, and Asian American students (1) described their respective college campuses as racist; (2) reported experiencing physical aggression and verbal attacks; (3) noted racist experiences from white-faculty; and (4) reported that their emotional-wellbeing had reduced from such incidents).

definitions fail to provide clarity as to what conduct is allowed or prohibited and only add to the confusion of students and faculty trying to determine how they can express their views on campus. This self-censorship is coupled with the fear that their conduct may jeopardize funding for research or affinity group-based student organizations if the university determines that their conduct violates S.B. 266 or Regulation 9.016.

135.    Students in particular are forced to self-censor because any "student participation" falls within the ambit of S.B. 266 and Regulation 9.016. Because "student participation" is defined by Regulation 9.016 as including anything "other than classroom instruction," and students often live, work, or research on campus, the Regulation covers much of their lives. A myriad of activities, ranging from planning a social event, to attending an academic meeting or participating in academic research, to merely partaking in a conversation with a fellow student or faculty member, may be deemed to violate Florida law.

136.    Similarly, Regulation 9.016's vague definition of "social issues" could affect hundreds of student organizations in Florida's public universities—those deemed by Defendants as drivers of political or social activism, advocating for change to government policies or actions, or promoting topics that are "polarizing" or "divide society." This list of nominally affected organizations would be unconstitutionally incomplete without the University of Florida's

College Republicans and Federalist Society.  The UF College Republicans is an

organization that "push[es] an America First platform in alignment with a truly

conservative Republican Party."[83]  This involves hosting events like "You Can't

Say That!," a discussion with Professor Mark Bailey on "censorship and who

benefits from it,"[84] and a talk with Derek Paul, an "Occupational Therapist who

personally overcame same-sex attraction through Christian faith."[85]  The UF

Federalist Society has recently hosted events including "A Post-*Dobbs* World."[86]

These events all fall under Regulation 9.016's language wide sweep, yet, as

examples of State-favored speech, they have not been targeted in practice.

137.   Supporting over 1,000 student organizations, UF is no stranger to

community engagement in its student body.[87]  However, S.B. 266 and Regulation

9.016 cast a frigid chill on Florida's colleges' and universities' student

organizations, which is likely to cause many of them to limit their programming

---

[83] *College Republicans: Purpose*, GATORCONNECT, https://perma.cc/9V34-VTK5 (last visited Jan. 9, 2025).

[84] UF College Republicans (@ufcollegerepublicans), INSTAGRAM (Mar. 19, 2024), https://perma.cc/P774-LG8X (last visited Jan. 15, 2025).

[85] UF College Republicans (@ufcollegerepublicans), INSTAGRAM (Aug. 2, 2023), https://perma.cc/Z927-HZ2X (last visited Jan. 15, 2025).

[86] *A Post-Dobbs World*, FEDERALIST SOCIETY (Oct. 12, 2022), https://fedsoc.org/events/a-post-dobbs-world, also available at https://perma.cc/W2PH-999P (last visited Jan. 15, 2025).

[87] *Student Activities & Involvement: Get Involved*, UNIV OF FLA., https://perma.cc/MWY3-EBXQ (last visited Aug. 3, 2024).

and activities on campus for fear of risking their access to funding by violating a law that they do not understand. Although S.B. 266 provides a carve out for student fees for student-led organizations, student organizations nevertheless experience a chill in their ability to program and hold events because, among other reasons, they may not know the source of their funding and whether their organization is using university funds to hold an event that could arguably advocate for diversity, equity, and inclusion. And universities have already been cutting back on their support for certain groups. At UF, for example, the Center for Inclusion and Multicultural Engagement ("CIME") had long been a pivotal resource for student organizations, hosting culture-enriching programs, creating listservs for student groups, participating in university sponsored mentorship programs, and so much more. Because of S.B. 266 and Regulation 9.016, CIME has now shuttered, while equivalent offices continue to operate for First Generation students and others.

138. The overbreadth and vagueness of the law and its implementing Regulations leave too much room for individual interpretation—permitting Defendant UF BOT members to classify some groups as violative of S.B. 266 whose viewpoints they may disagree with, like programs or activities focused on supporting abortion rights, the rights of the lesbian, gay, bisexual, and transgender community, or those focused on exposing racial injustices in the United States.

139.    Florida is a large state with a varied population.  Without clarification, the number of actions that may be considered "political or social activism" and topics deemed "social issues" among a university's student population are virtually infinite.  Indeed, a course on the American Revolution that discusses the value and effectiveness of American colonists' protest in the face of British tyranny may be interpreted as promoting political and social activism.

### D. Unsupportive and Unwelcoming for Minority Populations

140.    S.B. 266 and Regulation 9.016 prohibit the use of university funds to advocate for diversity, equity, and inclusion.

141.    Regulation 9.016's definition of diversity, equity, and inclusion is vague, contributing to misguided implementation and overbroad enforcement.  As an example, it is unclear whether, under the regulation's vague and overbroad definition of "diversity, equity, and inclusion," gendered sports groups would be deemed impermissible.  This raises the question of whether exempting gendered athletic clubs from the statute's sweeping definition of diversity, equity, and inclusion would be arbitrary.

142.    S.B. 266's prohibitions against advocating for diversity, equity, and inclusion threaten fundamental First Amendment rights.  Under the legislation's vague language, one could argue that providing news coverage of an event run by a student affinity group might be considered "advocat[ing] for diversity, equity,

and inclusion" under its vague and overbroad definition. In fact, this concern has already been raised at UF. In Fall 2024, a student-run media outlet avoided covering an affinity group event aimed at discussing how the recent legislation had impacted their community for fear of losing their school funding.

143.   Relatedly, if a Black professor at UF, like Plaintiff Austin, encourages a fellow Black professor at UF to apply for a leadership role to expand diversity in faculty, Defendants may interpret this as unlawful hiring or recruiting under S.B. 266. Such bans on advocating for diversity, equity, and inclusion and providing opportunities for political and social activism jeopardize the ability of Florida universities to support a diverse faculty and to prepare their students to enter society with the knowledge, understanding, and well-rounded mindset they need to contribute to our democracy.

144.   S.B. 266 and the Regulations leave faculty and students with too many fundamental, unanswered questions about what conduct is permitted or prohibited; how they can teach; what they can teach; and what words they can or cannot use, all resulting in self-censorship and a chilling effect across campuses.

## CAUSES OF ACTION

### Count I

**Violation of the First Amendment to the United States Constitution, 42 U.S.C. § 1983: Viewpoint Discrimination**

145.    Paragraphs 1–144 are incorporated here by reference.

146.    The First Amendment binds the State of Florida pursuant to the incorporation doctrine of the Fourteenth Amendment.  References below to the First Amendment include the First Amendment as applied to states through the Fourteenth Amendment.

147.    Viewpoint-based discrimination is presumptively unconstitutional and especially dangerous in higher education.  And when, as here, that viewpoint-based discrimination prohibits advocacy to change government policy or action, it infringes on core political speech and the right to petition the government.

148.    Defendants violated Plaintiff Austin's First Amendment rights by denying her funding to attend and present her scholarship at the Diversity Abroad Conference because of her disfavored viewpoint.  Dr. Austin plans to continue to seek funding for conferences on topics related to diversity, equity, and inclusion to present her research and fears this funding will similarly be denied, including for conferences she hopes to attend in the coming months.

149.    Similarly, Plaintiffs Marr, Queeley, and Rahier intend to seek

reimbursement from FIU to attend conferences in the coming months.  Plaintiffs fear that their requests will be denied because of the content of their speech at these conferences.  If their requests are denied, they will either have to pay out-of-pocket or forgo attendance.

150.   Plaintiffs fear that by requesting and using funds to attend conferences, host guest speakers, and conduct their research, among other things, they will run afoul of S.B. 266 and the BOG's Regulations, risking a negative post-tenure review.

151.   S.B. 266 and the Regulations impose unconstitutional viewpoint-based restrictions on faculty and students that contradict the principles of academic freedom.  Specifically, they prohibit otherwise generally available funding for viewpoints disfavored by the State, while permitting financial assistance for programs and activities that condemn those same viewpoints.

## Count II

### Violation of the First Amendment to the United States Constitution, 42 U.S.C. § 1983: Overbreadth

152.   Paragraphs 1–144 and 146 are incorporated here by reference.

153.   S.B. 266 and Regulation 9.016 violate the First Amendment because they are overinclusive and otherwise overbroad.  S.B. 266 and Regulation 9.016 are not narrowly tailored to accomplish a legitimate government purpose.  The

law expands beyond the legitimate sweep of government speech to a substantial amount of constitutionally protected private expression, chilling faculty and student speech.

154.   Due to its lack of specifications or helpful guidelines, S.B. 266 and Regulation 9.016 create an expansive curtailment of any expression favoring diversity, equity, and inclusion, as well as political and social activism.  As such, they are substantially overbroad, expanding beyond government speech to private expression and resulting in a chilling effect on both faculty and students.

## Count III

## Violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983: Void for Vagueness

155.   Paragraphs 1–144 are incorporated here by reference.

156.   The void for vagueness doctrine arises when a law: (1) "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits"; or (2) "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *Morales*, 527 U.S. at 56.

157.   Additionally, under the unconstitutional conditions doctrine, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interest, especially his interest in freedom of speech." *Perry*, 408 U.S. at 597.

158.   S.B. 266 and Regulation 9.016 violate the Fourteenth Amendment because their terms are impermissibly vague, making it impossible to determine what conduct is prohibited, and they encourage arbitrary and discriminatory enforcement.  S.B. 266's and Regulation 9.016's vague terms infringe Plaintiffs' constitutionally protected right to free speech because the terms require Plaintiffs to seek to conform their speech with vague provisions or risk losing access to generally available funds or general education designations.

159.   Regulation 9.016's ambiguous definitions provide no insight into understanding S.B. 266's scope or determining how faculty and students can express their views.

160.   S.B. 266's and Regulation 9.016's vague language prohibiting general education courses from "distort[ing] significant historical events"; teaching "identity politics"; being "based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities"; or containing "a curriculum based on unproven, speculative, or exploratory content" fails to provide sufficient notice as to (1) which courses may receive general education designation and (2) what professors are permitted to teach.

161.   The vagueness of S.B. 266 and Regulation 9.016 leaves too much room for individual interpretation—permitting Defendants to classify some groups

as violative of the law whose viewpoints they may disagree with, while supporting others' whose viewpoints they favor.

162.    S.B. 266 and Regulation 9.016 leave faculty and students with too many fundamental, unanswered questions about what conduct is prohibited, resulting in self-censorship and a chilling effect across campuses.

## Count IV

### Violation of Florida's Campus Free Expression Act

163.    Paragraphs 1–144 are incorporated here by reference.

164.    Section 1004.097(3)(f) provides, "A Florida College System institution or a state university may not shield students, faculty, or staff from expressive activities."

165.    Section 1004.097(2)(f) defines "shield" as conduct that "limit[s] students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive."

166.    Section 1004.097(3)(a) further provides that expressive activities are protected under the First Amendment to the United States Constitution and Article I of the Florida Constitution.  These activities include, as pertinent here, faculty research, lectures, writings, and commentary, whether published or unpublished.

167.    The Florida legislature has demonstrated its intent that the Campus

Free Expression Act (Section 1004.097) should have enforcement teeth and not just exist as a statement of policy by including Section 1004.097(4)(a), which provides a private right of action for persons injured by a violation of the Act.

168.    Through selective enforcement of S.B. 266 and the Regulations, Defendant BOT members have prohibited faculty from teaching, and students and faculty from engaging in discussions, about ideas and opinions that some may find unwelcome or disagreeable.

169.    Defendants have, therefore, shielded students and faculty at Florida's public universities in violation of section 1004.097(3)(f).

## REQUEST FOR RELIEF

**WHEREFORE**, considering the foregoing facts and arguments, Plaintiff respectfully requests that this Court enter judgement in their favor and:

A.    Issue permanent injunctive relief restraining Defendants and their successors from enforcing Fla. Stat. §§ 1004.06(2)(b),1007.25(3), and 1007.55(1) and Regulation 9.016;

B.    Declare Fla. Stat. §§ 1004.06(2)(b), 1007.25(3), 1007.55(1) and Regulation 9.016 unconstitutional in violation of the First and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983;

C.     Pronounce Defendants' enforcement of Fla. Stat. §§ 1004.06(2)(b), 1007.25(3), and 1007.55(1) and Regulation 9.016 in violation of Fla. Stat.

§ 1004.097.

D.    Award to Plaintiffs costs incurred in pursuing this action, including

reasonable attorneys' fees and other necessary expenses, pursuant to 42 U.S.C.

§ 1988, Fla. Stat. § 1004.097(4)(a), and other applicable authority; and

E.    Grant such additional relief as the interests of justice may require.

Dated: April 8, 2025                Respectfully submitted,

By: /s/ Michelle Morton

Jerry C. Edwards (FBN 1003437)
Samantha J. Past (FBN 1054519)
Amien Kacou (FBN 44302)
Michelle Morton (FBN 81975)
Daniel B. Tilley (FBN 102882)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF FLORIDA
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel.: (786) 363-2714
jedwards@aclufl.org
spast@aclufl.org
akacou@aclufl.org
mmorton@aclufl.org
dtilley@aclufl.org

-and-

Lee R. Crain (appearing *pro hac vice*)
Martie Kutscher Clark (appearing *pro hac vice*)
Laura M. Sturges (appearing *pro hac vice*)
Janiel Myers (appearing *pro hac vice*)
Caelin Moriarity Miltko (appearing *pro hac vice*)
A. Nell Tooley (appearing *pro hac vice*)

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212-351-4000
lcrain@gibsondunn.com
mkutscherclark@gibsondunn.com
lsturges@gibsondunn.com
jjmyers@gibsondunn.com
cmoriaritymiltko@gibsondunn.com
ntooley@gibsondunn.com

*Co-Counsel for Plaintiffs*